IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,


v.                                                    Criminal Action No.
                                                      1:11-CR-533 (TJM)


JEREMY ZIELINSKI,

                    Defendant.

_____

APPEARANCES:                          OF COUNSEL:

FOR THE UNITED STATES:

HON. RICHARD S. HARTUNIAN          ROBERT A. SHARPE, ESQ.
United States Attorney for the NDNY   Assistant U.S. Attorney
445 Broadway, Room 218
Albany, NY 12207-2924

FOR THE DEFENDANT:

JEREMY ZIELINSKI, *Pro Se*
P.O. Box 231
Hagaman, NY 12086

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

The defendant in this action, Jeremy Zielinski, was convicted of

conspiracy to commit access fraud in the District Court of New Jersey,

and sentenced to a term of incarceration. Upon release from prison,

defendant began a period of supervised release, and the matter was ultimately transferred to this district. At the center of the pending controversy is one of defendants' release conditions requiring him to participate in a mental health treatment program for sexual disorders.

Currently before the court are two separate motions related to that condition. In the first, defendant challenges the court's decision to impose the requirement that he participate in a sexual disorder treatment program, and requests a release from the condition. The government, in turn, has petitioned the court for revocation of defendant's supervised release status, based upon his discharge from the sex offender treatment program to which he was assigned by probation personnel.

The matter has been referred to me for the purpose of conducting an evidentiary hearing and providing a recommendation to Senior District Judge Thomas J. McAvoy concerning disposition of these two applications. Based on my factual findings, which are incorporated below, I recommend that defendant's motion for release from the condition be denied, and the court find that defendant has violated the terms of his supervised release.

## I.    BACKGROUND

On June 28, 2006, defendant was convicted in the District of New Jersey of conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1028(a)(7), and was sentenced to a period of incarceration of twenty-one months, to be followed by two years of post-release supervision.  Dkt. Nos. 2, 3, 9, 22.  Upon completion of the confinement portion of his federal sentence, Zielinski appeared in Warren County, New York, to face state criminal charges lodged against him in a fifty-six count indictment.[1]  Dkt. No. 2.  On August 30, 2006, defendant pleaded guilty to three of those fifty-six counts.  *U.S. v. Zielinski*, No. 12-CR-0595, 2013 WL 536095, at *1 (2d Cir. Feb. 14, 2013).  As a result of those convictions, defendant has been classified by New York State authorities as a level two sex offender.  Dkt. No. 2.

Upon his release from state prison on January 28, 2011, defendant commenced his two-year period of federal post-release supervision.[2]  Dkt.

_____

[1]    Zielinski was initially arrested and charged in Warren County in 2002, but he subsequently absconded to Florida to avoid prosecution on those charges. Dkt. No. 2.

[2]    While at the time judicial oversight of the case remained with the District of New Jersey, defendant was supervised by probation officials in this district, as a courtesy to the sentencing court.  Jurisdiction was later formally transferred to this court on November 14, 2011.  Dkt. No. 1.

Nos. 3, 22.  On November 15, 2011, the United States Probation Office for the Northern District of New York petitioned the court for modification of the terms of defendant's supervised release.  Dkt. Nos. 2, 3.  That request was prompted by defendant's Warren County convictions, and sought the imposition of conditions typically imposed in connection with sex offenses including, *inter alia*, the requirement that he participate in a mental health program that includes treatment for sexual disorders.  *Id.* Defendant opposed the request for modification.  Dkt. No. 11.

On January 31, 2012, while the modification request remained pending, the United States Probation Office again petitioned the court, alleging that the defendant had violated his existing supervised release conditions by leaving the Northern District of New York without permission, and neglecting to respond to an inquiry from the New York State Division of Criminal Justice Services concerning his employment status, a failure that constitutes a felony under New York law.  Dkt. No. 22.

On February 2, 2012, Judge McAvoy held a hearing to address both the request for modification of defendant's supervised release conditions and the petition alleging a violation of his existing conditions.  Dkt. No. 23.

During that hearing, Zielinski admitted the first allegation that accused him of traveling outside of the district without permission.  Dkt. Nos. 23, 26, 37.  As a result of that admission, and in light of the nature of his Warren County convictions, Judge McAvoy imposed a two-year period of supervised release, required the defendant to serve six months of home detention, and imposed a series of additional conditions, including the following requirement:

> Defendant shall participate in a mental health program, which will include, but will not be limited to, participation in a treatment program for sexual disorders.  The program shall be approved by the United States Probation Office.

Dkt. No. 26 at 4.  When imposing that condition, Judge McAvoy offered the following admonition to defendant:

> I think, basically ya have to understand, Mr. Zielinski, that you're not runnin' your supervised release program.  The Probation Department, in conjunction with the Court, is running it, and it can't be done the way you want it to be done, it's gonna be done the way we want it to be done.  And there's a reason for that.  And you might not be able to see it clearly now because of the experiences you've been through, and the Court appreciates that, but one of the first things that the Court would like to have come out of this whole session is an attitude adjustment on your behalf.

Dkt. No. 37 at 156.  A judgment with respect to the supervised release

violation was subsequently entered on February 8, 2012. Dkt. No. 26.

Defendant appealed Judge McAvoy's ruling to the United States Court of Appeals for the Second Circuit. Dkt. No. 27. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") reveals that, on appeal, defendant argued, *inter alia*, that (1) his state-court convictions, upon which Judge McAvoy relied in imposing additional conditions of supervised release, were too remote in time to justify the additional conditions, and (2) the imposition of a mental health program violates his right to freedom of thought. *U.S. v. Zielinski*, No. 12-CR-0595, Def.'s Brief (Dkt. No. 17) (avail. on PACER). By summary order issued on February 14, 2013, the Second Circuit affirmed the court's modification of defendant's supervised release conditions, including the imposition of sex offender conditions. *U.S. v. Zielinski*, No. 12-CR-0595, 2013 WL 536095 (2d Cir., Feb. 14, 2013).[3] In its decision, the Second Circuit concluded, *inter alia*, that Judge McAvoy properly imposed the special condition requiring him to participate in a mental health treatment program, finding that it was "reasonably related to Zielinski's history and characteristics, his need for treatment, and the public's need for protection from him."

---

[3] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* defendant.

*Zielinski*, 2013 WL 536095, at *3 (internal quotation marks and alterations omitted).

In accordance with the revised supervised release conditions, defendant was referred by the United States Probation Office to Forensic Mental Health Associates ("FMHA") for the required mental health program. Dkt. No. 74 at 9, 143-44. FMHA is the only agency under contract with the United States Probation Office to provide sex offender treatment services in the eastern portion of this district. *Id.* Following the referral, Dr. Richard M. Hamill, Ph.D., FMHA's former executive director, conducted an initial evaluation of defendant between March 20 and 22, 2012. *Id.* at 11-14, 145; Gov't Exhs. 1A, 2. In conjunction with that evaluation, background documentation was secured and reviewed, Zielinski was interviewed, and eight different psychological tests were administered. Gov't Exh. 2 at 1, 11-17. Among those eight tests was the Minnesota Multiphasic Personality Inventory - Second Edition ("MMPI-2"). Gov't Exh. 2 at 12-13. The MMPI-2 was administered by Dr. Hamill, who both scored it and formed his own conclusions, and additionally "use[d] computer software to generate an Interpretative Report, in order to corroborate his interpretation." *Id.* at 12. The computer generated MMPI-

2 interpretative report noted the following with respect to defendant's personality functioning:

> Mr. Zielinski is a self-centered individual who tends to engage in impulsive acting out behavior without planning. He disregards rules and behaves in an irresponsible, hedonistic[,] self-indulgent manner. Mr. Zielinski has difficulty learning from his experiences, both good and bad.
>
> He tends to be [m]oody and irritable, especially if he does not get his way. This anger may be used to manipulate others. Mr. Zielinski experiences little anxiety or remorse.
>
> Poor social adjustment is probable with Mr. Zielinski having tendencies to act out criminally.
>
> Mr. Zielinski []is self-centered and may have an overly positive concept of himself[,] as well as elevated self-esteem. His profectionistic are an excellent rationalization for disregarding convention, as he feels above social rules which he views as [im]perfect if not irrational.

*Id.* at 13. Based upon his complete evaluation of defendant, Dr. Hamill offered the following conclusions and recommendations:

> First, it is noteworthy that Mr. Zielinski has never completed a specialized sex offender treatment program. Second, his personality dynamics suggest that he is highly aggressive and manipulative, and generally unwilling to be open and honest in providing information about himself. Third, Mr. Zielinski suffers from chronic, deviant sexual interest, which appear to include Pedophilia and Sexual

Sadism. Fourth, Mr. Z[i]elinski appears to be at moderate-high risk for committing another sex offense. Fifth, he is found to have a significantly above-average degree of homicidal ideation, suggestive of a propensity for violent behavior. As a result of these findings, this evaluator suggests that Jeremy Zielinski be mandated to participate in a course of sex offender specific treatment.

*Id.* at 21.

On June 27, 2012, United States Probation Office Michael Patnaude ("P.O. Patnaude") e-mailed Zielinski to apprise him of the FMHA recommendation that he undergo sex offender therapy, and stated that the evaluation and treatment recommendation would be discussed in a meeting with the defendant, P.O. Patnaude, and Dr. Jose Rossy-Millan, a clinician with FMHA.[4] Dkt. No. 73 at 145-150; Gov't Exh. 18. Defendant responded on that same day, by e-mail, stating his objection to undergoing treatment with FMHA, asserting his right to "maintain absolute dominion over [his] mind," and expressing concern with the alleged "religious components of the FMHA/Good Lives-based program."[5] Dkt.

---

[4]     Dr. Rossy-Millan assumed responsibility for defendant's case after Dr. Hamill's death in May 2012. Dkt. No. 73 at 8-9. Dr. Rossy-Millan possesses a bachelor's degree, two masters degrees and a doctorate, all in the area of psychology, and trained under Dr. Hamill, prior to his death. *Id.* at 7.

[5]     There is no record evidence that FMHA utilizes the Good Lives Model in its group therapy program, other than to make passing reference to small portions of that sex offender treatment protocol. Dkt. No. 73 at 69-70.

No. 73 at 151-53; Gov't Exh. 18.

On July 12, 2012, defendant met with P.O. Patnaude and Dr. Rossy-Millan to review the FMHA evaluation and findings. Dkt. No. 73 at 14-15, 146. At that time, Zielinski was informed of the recommendation that he participate in one of between fifteen and sixteen different group therapy programs offered by FMHA. *Id.* at 15-17, 146. Those programs typically involve small groups led by two clinicians, one male and one female. *Id.* at 16. The purpose of those group sessions is to allow participants to develop strategies to control their sexual urges. *Id.* The primary model used by FHMA sex offender treatment programs is derived from a publication entitled *The Road to Freedom* authored by John W. Morrin, Ph.D., and Jill S. Levenson, Ph.D. *Id.* at 17; *see also* Gov't Exh. 15. According to Dr. Rossy-Millan, *The Road to Freedom* is a widely used workbook in sex offender treatment programs. Dkt. No. 73 at 17. Although there are portions of the publication with which Dr. Rossy-Millan disagrees, and thus does not incorporate into his programming, he uses the text as a general guide. *Id.* at 17. *The Road to Freedom* is not a Hazelden Foundation publication, is not based upon the twelve-step modality utilized, for example, in various drug and alcohol rehabilitation

programs, and is not based upon any religious principles.[6]  *Id.* at 70-74.

In addition, FMHA does not use the "Good Lives Model" for its

programming because Dr. Rossy-Millan believes that it has less empirical

support than other programs, including *The Road to Freedom*.  *Id.* at 69-

70.

Literally from the outset, Zielinski persistently objected to both the

general requirement that he undergo mental health treatment, as well as

to the content he assumed would be incorporated into the treatment

program.  Even before meeting with P.O. Patnaude and Dr. Rossy-Millan

in July 2012, for example, defendant explained his objections in a series

of e-mails to P.O. Patnaude.  Dkt. No. 73 at 147-62; Gov't Exhs. 17-24.  In

one e-mail, defendant characterized the FHMA treatment requirement a

"mental death sentence," suggesting that "it would be better for the

preservation of liberty itself if [his] execution were ordered."  Gov't Exhs.

17, 18.  In another communication, defendant explained that, based on his

---

[6]      Hazelden Foundation is a non-profit organization that operates alcohol and drug addiction treatment centers.  *McChesney v. Hogan*, No. 08-CV-1186, 2012 WL 3686083, at *2 (N.D.N.Y. July 30, 2012) (Peebles, M.J.), *report and recommendation adopted by* 2012 WL 3655467 (N.D.N.Y. Aug. 24, 2012) (Mordue, J.).  Although the court is aware of only one case where Hazelden's programming has been accused of incorporating religious teachings, the court has yet to find any evidence supporting such allegations.  *See*, *e.g.*, *McChesney*, 2012 WL 3686083 at *8 (examining four of Hazeldeon's programs and finding that none of them support a finding that Hazelden is based in Christianity).

study of the Good Lives Model, he believed that the treatment program he would undergo is "not only incompatible, with, but hostile to, many of [his] most important and deeply-held fundamental beliefs[.]" Gov't Exh. 21. Despite his reservations, however, defendant agreed that he would attend at least a couple of group sessions before deciding whether to continue. Dkt. No. 73 at 162.

Defendant attended FHMA group sessions on September 6, 13, 20, and 27, 2012, as well as October 4, 11, 18, and 25, 2012. Dkt. No. 73 at 22-23, 51-52; Gov't Exhs. 3-13. He was placed in a group with four other individuals, and both Dr. Rossy-Millan and another FMHA clinician, Jamie-Lynn Maaz, led the group during each session.[7] Dkt. No. 73 at 18-19. Treatment notes from those sessions reveal that defendant voiced his objections to the treatment program during each meeting, denouncing it as evil and criticizing religion. *Id.* at 22-66.

The first group session attended by the defendant, held on September 6, 2012, was relatively uneventful. *Id.* at 26-31; Gov't Exhs. 3, 8. During that session, Zielinski was familiarized with the rules and

---

[7] Ms. Maaz possesses a bachelor's degree in psychology and a masters in counseling and community psychology. In 2009, she became a licensed clinical psychologist in New York. Dkt. No. 73 at 133.

expectations for the group, including those relating to confidentiality, and was asked to describe his sex offenses.  *Id.*

In his second group session, conducted on September 13, 2012, defendant became more vocal in his objections to treatment, stating his belief that it could harm him, and describing it as "evil."  Dkt. No. 73 at 33-37; Gov't Exh. 4.  In his notes of that session, Dr. Rossy-Millan wrote that, while he did not completely understand defendant's protestations, he believed that defendant's objections amounted only to a desire not to participate in the program, and that they bore little relationship to defendant's principles and beliefs.  Gov't Exh. 4.  During that second session, defendant indicated that he disagreed with the suggestion, found in *The Road to Freedom*, that ammonia inhalation be used as a technique for averting sexual impulses.  Dkt. No. 73 at 34-35.  In response, Dr. Rossy-Millan explained that FMHA does not advocate for or recommend the use of the use of ammonia as an aversion strategy.  *Id.*

During the third group session, held on September 20, 2012, defendant explained that one of his goals was to "bring down [and] expose religion."  Gov't Exh. 5; *see also* Dkt. No. 73 at 37-45.  Zielinski also insisted that his constitutional rights were being violated, and that he was

prepared to sue FMHA and its employees.  Dkt. No. 73 at 44.

At the next weekly session, held on September 27, 2012, defendant became argumentative when asked about his homework, raising his voice and interrupting clinicians.  Gov't Exh. 6.  Defendant also explained that his sexual behaviors are not compulsive or against his values.  Dkt. No. 74 at 46.

A monthly treatment report was prepared on September 27, 2012, reflecting defendant's participation in the group up until that date.  Gov't Exh. 8.  The report notes that defendant "refused to identify treatment goals[, and] insist[ed] on talking about how religion has ruined the world." *Id.*  The monthly report also recounts defendant's statement that the required treatment violates his constitutional rights and notes that defendant "[i]s resistant to treatment bordering on disruptive." *Id.*  In addition, on September 30, 2012, Dr. Rossy-Millan and Ms. Maaz prepared a third quarter report rating defendant's general progress in the program as poor.  Dkt. No. 73 at 49; Gov't Exh. 7.

Defendant next attended an FMHA group session held on October 4, 2012, although he arrived late.  Dkt. No. 73 at 51, 57-60; Gov't Exh. 9. During that session, Zielinski refused to participate in a writing exercise

that asked him to describe how the people in his life have been affected by his offenses.  Dkt. No. 73 at 57-58; Gov't Exh. 9.  In addition, at the end of the session, Zielinski asked the clinicians for their daily schedules, and advised them that he was asking so he could make plans to serve them with a habeas corpus petition.  Dkt. No. 73 at 59; Gov't Exh. 9.

On October 11, 2012, defendant was again late for the group session, and again refused to participate in an in-class exercise.  Dkt. No. 73 at 51, 60-62; Gov't Exh. 10.  During that meeting, Zielinski asked Dr. Rossy-Millan to explain an assignment, and insisted that it did not make sense to him.  Dkt. No. 73 at 61; Gov't Exh. 10.  The assignment focused on anger, and defendant debated with the clinicians over the definition of the word anger.  *Id.*  When asked to identify the first person he recalls that demonstrated anger, he replied, facetiously, that it was the Incredible Hulk.  *Id.*

The controversy surrounding the anger exercise continued into the next group meeting, conducted on October 18, 2012.  Dkt. No. 73 at 62-64; Gov't Exh. 11.  On that occasion, Zielinski continued to press the clinicians for a definition of the word anger, a request they found disruptive.  Dkt. No. 73 at 62-63. Ultimately, defendant opted to not

participate in the group activity assigned for that session.  *Id.* at 63.

During that meeting, defendant offered an apology for his answer

regarding the Incredible Hulk from the previous session on October 11,

2012.  *Id.* at 62; Gov't Exh. 11.

The final group session attended by defendant was held on October

25, 2012.  Dkt. No. 73 at 66.  During that session, defendant explained

that he intended to file a lawsuit the next day challenging the *Road to

Freedom*'s programming.  *Id.* at 64; Gov't Exh. 12.  Defendant also

expressed disagreement with his diagnoses of "narcissistic personality

disorder," stating instead that he meets the legal definition of "genius."

Dkt. No. 73 at 65; Gov't Exh. 12.  He also informed Ms. Maaz that he was

also going to "take [FMHA] down," and that she should begin looking for

another job.  Dkt. No. 73 at 136-37.

In a monthly report summarizing the group sessions held in October

2012, Dr. Rossy-Millan concluded that, by his tardiness, refusal to

complete assigned exercises, and argumentative behavior, defendant had

disrupted the group sessions, and interfered with the opportunity for other

participants to benefit from treatment.  Dkt. No. 73 at 51-54; Gov't Exh.

13.  Based upon this assessment, Dr. Rossy-Millan noted his intention to

meet with the FMHA clinical supervisor, Kathleen Gibbons, to consider discharging defendant from the program.  Dkt. No. 73 at 54, 66; Gov't Exh. 13.  Dr. Rossy-Millan met with Ms. Gibbons on October 26, 2012, and together they agreed that defendant should be discharged from FMHA because his behavior was disruptive to other group members and their participation in the program.  Dkt. No. 73 at 54-55.  On November 14, 2012, Dr. Rossy-Millan notified P.O. Patnaude of FMHA's decision to discharge defendant.  *Id.* at 74-76; Gov't Exh. 14.  As a result of that discharge, P.O. Patnaude filed the supervised release revocation petition now before the court.

II.    PROCEDURAL HISTORY

On October 26, 2012, defendant filed a habeas petition asserting claims under 28 U.S.C. §§ 2241 and 2255 or, in the alternative, requesting modification of his supervised release conditions, pursuant to 18 U.S.C. § 3583(e).  *Zielinski v. U.S.*, No. 12-CV-1609; *see also* Dkt. No. 42.  By order dated November 7, 2012, Judge McAvoy dismissed Zielinski's section 2255 claim without prejudice, as well as all claims asserted against Dr. Rossy-Millan and Ms. Maaz from the action.  Dkt. No. 41.  In his order, Judge McAvoy further concluded that the petition should be

treated as a motion to modify the conditions of defendant's supervised release, pursuant to 28 U.S.C. § 2241 and 18 U.S.C. § 3583(e), and directed that all further filings in connection with the matter be made in this criminal case. *Id.*

On November 30, 2012, P.O. Patnaude filed a petition alleging that defendant violated the terms of his supervised released, as modified, by failing to successfully complete the required mental health treatment program. Dkt. No. 44. A summons was subsequently issued to the defendant, requiring him to appear in connection with the alleged violation. Dkt. No. 45.

On January 8, 2013, Judge McAvoy issued an order directing that an evidentiary hearing be held to address both defendant's habeas corpus petition and the government's request to revoke defendant's supervised release status. Dkt. No. 52. Judge McAvoy has since referred the matter to me for the purposes of conducting that hearing and issuing a report and recommendation concerning the pending applications. Text Order Dated February 5, 2013.

The court-ordered evidentiary hearing was held on March 18 and 20, 2013. Text Minute Entries Dated Mar. 18 and 20, 2013. At the outset of

the hearing, defendant moved to restore the portion of his habeas petition brought under 28 U.S.C. § 2255, in light of the Second Circuit's disposition of his appeal.  A decision regarding that motion was reserved. During the hearing, the government presented three witnesses, including Dr. Rossy-Millan, Ms. Maaz, and P.O. Patnaude; defendant testified in his own defense.

At the conclusion of the evidentiary hearing, the court granted the parties permission to file post-hearing briefs, and ordered that any memoranda be submitted fourteen days following the receipt of the transcript of the hearing.  Dkt. No. 74 at 91-92.  By way of further clarification, because the parties had received the hearing transcript by April 2, 2013, the court issued a text order notifying the parties that post-hearing briefing was due by April 18, 2013.  Text Order Dated April 2, 2013.  Subsequently, on April 18, 2013, the government submitted a request for an extension of that deadline; that request was granted.  Text Order Dated April 19, 2013.  On April 22, 2013, defendant requested a further extension until April 26, 2013; that request was also granted.  Text Order Dated April 23, 2013.  On April 29, 2013, the court received defendant's post-hearing brief that was accompanied by a cover letter

explaining that his brief was late because he missed the last mail pickup on April 26, 2013.[8]  Dkt. No. 69-1.  The court later received the government's post-hearing submission on April 30, 2013, with no explanation for its tardiness.  Dkt. No. 68.  Because both parties' submissions were filed after the court's final deadline of April 26, 2013, and neither party offered sufficient justification for its tardiness, both submissions were stricken from the record.  Text Order Dated May 3, 2013.

The following are my factual findings and recommendations based on my independent review of the record without consideration of either party's post-hearing submission.

III.  DISCUSSION

A.  Defendant's Petition

On October 26, 2012, defendant filed his habeas corpus petition pursuant to 28 U.S.C. §§ 2241 and 2255 and 18 U.S.C. § 3583.  Dkt. No. 42.  In general, defendant's petition argues that the court should modify his conditions of supervised release because imposition of the mental

---

[8]  As a result of defendant's failure to mail his submission on April 26, 2013, defendant chose to hand-deliver it to the Albany Clerk's Office on the next business day, April 29, 2013.  Dkt. No. 69-1.

health program violates his rights to freedom of thought and religion under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1. *Id*.

### 1. Motion to Reinstate Defendant's Habeas Petition Under 28 U.S.C. § 2255

On November 7, 2012, Judge McAvoy issued an order dismissing, without prejudice, defendant's section 2255 habeas petition, determining it premature because defendant's appeal to the Second Circuit challenging the imposition of additional conditions remained pending, and reserving decision on defendant's sections 2241 and 3583 applications pending an evidentiary hearing. Dkt. No. 41. On February 14, 2013, the Second Circuit dismissed defendant's appeal rejecting, *inter alia*, defendant's argument that the imposition of a mental health program violated his rights to freedom of thought. *See Zielinski*, 2013 WL 536095, at *3 (finding that the four special conditions of defendant's supervised release, including the requirement that he participate in a mental health program, were "reasonably related to Zielinski's history and characteristics, and his need for treatment, and the public's need for protection from him" (alterations omitted)).

At the evidentiary hearing held before me on March 18 and 20,

2013, defendant made a motion to reinstate his section 2255 petition to challenge the imposition of the same conditions he challenged on appeal. Dkt. No. 73 at 4-5. Although I am inclined to find that whether Judge McAvoy improperly imposed the mental health program as a condition to defendant's supervised release has been foreclosed with the issuance of the Second Circuit's dismissal of defendant's appeal, I note that defendant has not yet had an opportunity to make his arguments pursuant to section 2255. For that reason, I recommend that Judge McAvoy reinstate defendant's 2255 motion. In the interest of completeness, I will first address the merits of that motion.

Pursuant to section 2255, a person "in custody under sentence of a court" may move a sentencing court to vacate, set aside, or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to attack."[9] 28

---

[9] Although defendant is not currently imprisoned, because he is serving a term of supervised release, he remains in custody for purposes of section 2255. *See Abimobola v. U.S.,* 369 F. Supp. 2d 249, 254 (E.D.N.Y. 2005) ("[A] petitioner who is on parole or serving a term of supervised release is 'in custody' for purposes of the federal habeas corpus statutes."); *see also Forrestal v. U.S.*, 187 F. Supp. 2d 37 (N.D.N.Y. 2002) (Munson, J.) ("[A]ctual physical imprisonment is not required [to meet the 'in custody' requirement of section 2255], so long as petitioner suffers from

U.S.C. § 2255; *see also U.S. v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (holding that collateral relief under section 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice" (internal quotation marks omitted)); *Brama v. U.S.* , No. 08-CV-1931, 2010 WL 1253644, at *2 (S.D.N.Y. Mar. 16, 2010); *U.S. v. Wright*, No. 08-CV-1271, 2009 WL 1911038, at *1 (N.D.N.Y. June 30, 2009) (McAvoy, J.); *Guidice v. U.S.*, No. 03-CV-4983, 2007 WL 1987746, at *1 (E.D.N.Y. July 3, 2007).  These limited grounds for relief demonstrate a "respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place[.]"  *Bokun*, 73 F.3d at 12; *see also U.S. v. Addonizio*, 442 U.S. 178, 184 n.11 (1979).

In a section 2255 motion, the "petitioner bears the burden of establishing by a preponderance of the evidence that he is entitled to relief."  *U.S. v. Gallo-Lopez*, 931 F. Supp. 146, 148 (N.D.N.Y. 1996) (McAvoy, J.); *accord Parsons v. U.S.*, 919 F. Supp. 86, 88-89 (N.D.N.Y.

---

substantial restraints not shared by the public generally."); *Mandarino v. Ashcroft,* 290 F. Supp. 2d 253 (D. Conn. 2002) ("Petitioner is presently serving his term of supervised release. As such, he is deemed 'in custody' for purposes of [section] 2255")).

1996) (Munson, J.). "The court may summarily dismiss the motion based upon a review of the record, moving papers and any attached exhibits and affidavits if it plainly appears that the movant is not entitled to relief." *Parsons*, 919 F. Supp. at 89 (internal quotation marks and alterations omitted).

In this case, defendant argues that the condition of his supervised release requiring him to participate in a mental health program violates his right to freedom of thought, and his religious rights under the RFRA. Dkt. No. 42 at ¶ 106. Because these are constitutional challenges, they are properly considered in a motion to vacate pursuant to section 2255.

As previously discussed, the Second Circuit has already decided whether defendant's right to freedom of thought was violated by imposing the condition of supervised release requiring him to participate in mental health treatment when it dismissed defendant's appeal. *See Zielinski*, 2013 WL 536095, at *3 ("Zielinski also takes issue with four of the special conditions of his supervised release: . . . (2) the requirement that he participate in a mental health program . . . (Special Condition 5) . . . . His arguments are without merit."). For this reason, I find that this argument under is without merit.

As it relates to defendant's argument that the condition violates his religious rights under the RFRA, for the reasons set forth below, I also conclude that this argument lacks merit.[10]  Accordingly, I recommend that defendant's section 2255 motion be reinstated, and summarily denied.

## 2.    The Court's Authority Under 18 U.S.C. § 3583

The next issue to be addressed is defendant's motion under 18 U.S.C. § 3583 for modification of the conditions of his supervised release. Based upon a careful review of the Second Circuit's decision in *U.S. v. Lussier*, 104 F.3d 32 (2d Cir.1997), I conclude that the court lacks jurisdiction to modify defendant's conditions of supervised release in this case under that provision.

In *Lussier*, the Second Circuit examined whether a district court had authority to modify a condition of supervised release pursuant to section 3583 based on the defendant's argument that it was illegally imposed. *Lussier*, 104 F.3d at 33.  The court explained that section 3583 "sets out four ways that a district court . . . can subsequently alter the term or conditions of supervised release after a defendant has been initially sentenced to a term of supervised release."  *Id.* at 35.  Those grounds

_____

[10]      *See* Part III.A.4.b., *post*.

have been summarized in the following manner:

> First, where a defendant has served at least one year of his supervised release and his conduct and the interests of justice so requires, the court may terminate the remainder of the defendant's supervision;

> Second, pursuant to the procedures of [Fed. R. Crim. P.] 32 and 32.1, the court may modify the conditions of a defendant's supervised release and may extend a defendant's term of supervised release to the maximum that originally could have been imposed;

> Third, where a defendant's violation of a condition of his supervised release has been shown by a preponderance of the evidence, the court may revoke the defendant's supervised release and may order the defendant incarcerated for all, or any portion, of the term which was originally ordered to be served under supervised release; [and]

> Fourth, where incarceration is permitted, the court may order a defendant placed under 'house arrest' and this restriction may be monitored by telephone or electronic signaling devices.

*U.S. v. Truss*, 4 F.3d 437, 438-39 (6th Cir. 1993) *abrogated on other grounds by Johnson v. U.S.*, 529 U.S. 694 (2000); *accord Lussier*, 104 F.3d at 36.  None of these circumstances includes consideration of whether a condition of supervised release was illegally imposed.

Under any of these four circumstances a district court "retain[s] authority to revoke, discharge, or modify terms of conditions of supervised

release following its initial imposition of a supervised release term *in order to account for new or unforeseen circumstances*." *Lussier*, 104 F.3d at 36 (emphasis added). The Second Circuit provided some examples of "new or unforseen circumstances," including "exceptionally good behavior by the defendant[,] . . . a downward turn in the defendant's ability to pay a fine or restitution imposed as conditions[,] . . . the defendant's violation of conditions of release[,] or the discovery of information indicating that the defendant has secreted important financial assets." *Id.* The court concluded that challenging the legality of a condition of supervised release "does not involve changed circumstances or affect in any way general punishment aims such as deterrence, rehabilitation, and proportionality." *Id.*

Here, defendant challenges the condition of his supervised release that requires him to participate in a mental health program on the ground that it violates his right to freedom of thought and his religious rights under the RFRA. Like the defendant in *Lussier*, Zielinski contends that the imposition of a mental health program is illegal, and does not argue the existence of new or unforeseen circumstances that would justify modification of the supervised release condition. Whether defendant

knew of the content of the mental health program at the time it was imposed is irrelevant; under *Lussier*, the circumstances warranting modification under section 3583 must have been unforeseen to the court imposing the condition. *See Lussier*, 104. F.3d at 36 (explaining, for example, that the defendant's good or bad behavior is sufficient to warrant new or unforeseen circumstances). Although defendant has advanced a variety of arguments since the inception of this and his related habeas action, he has never argued that Judge McAvoy was unaware of the contents of the mental health programs offered by the United States Probation Office. Accordingly, inasmuch as defendant only challenges the legality of the imposition of the condition, which is not a proper ground for modifying or vacating conditions of supervised release under section 3583, his motion under that section should be denied. *Lussier*, 104 F.3d at 36.

### 3. 28 U.S.C. § 2241

Because defendant's challenge to the sexual disorder treatment program fails under 28 U.S.C. § 2255 and 18 U.S.C. § 3583, the only remaining vehicle through which his petition may succeed is 28 U.S.C. § 2241.

Section 2241 allows district courts to grant a writ of habeas corpus "within their respective jurisdictions."  28 U.S.C. § 2241.  Motions pursuant to section 2241 "generally challenge the execution of a federal prisoner's sentence, including such matters as the administration of parole [and] computation of a prisoner's sentence by prison officials."  *Jackson v. Killian*, No. 08-CV-4386, 2009 WL 1835004, at *2 (S.D.N.Y. June 23, 2009) (emphasis omitted).  Accordingly, section 2241 is a proper means for challenging the execution of a condition requiring a defendant to undergo mental health treatment.

### 3.    Defendant's RFRA Argument

#### a.    Governing Legal Standard

The RFRA prohibits the federal government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the government demonstrates that the the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1.  The RFRA further provides that

> [a] person whose religious exercise has been
> burdened in violation of this section may assert that

> violation as a claim or defense in a judicial
> proceeding and obtain appropriate relief against a
> government.

42 U.S.C. § 2000bb-1(c).

In 1997, the Supreme Court held the RFRA unconstitutional as applied to the states. *City of Boerne v. Flores*, 521 U.S. 507 (1997). In 2006, however, the Second Circuit joined "the other circuits in holding that the RFRA is constitutional as applied to federal law under the Necessary and Proper Clause of the Constitution." *Hankins v. Lyght*, 441 F.3d 96, 106 (2d Cir. 2006) (citing *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003); *Madison v. Riter*, 355 F.3d 310, 315 (4th Cir. 2003); *Guam v. Guerrero*, 290 F.3d 1210, 1221 (9th Cir. 2002); *Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C. Cir. 2001); *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001); *Christians v. Crystal Evangelical Free Church (In re Young)*, 141 F.3d 854, 856 (8th Cir. 1998)). Therefore, the RFRA is applicable in this case.

To establish a *prima facie* violation under the RFRA, a party must show that the government's conduct "'(1) substantially burden[s] (2) a sincere (3) religious exercise.'" *Hankins v. The NY Annual Conf. of United Methodist Church*, 516 F. Supp. 2d 225, 235 (E.D.N.Y. 2007) (quoting

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S.

418 (2006)).  In the event this initial burden is met, the government must

demonstrate that its conduct "is in furtherance of a compelling

governmental interest[,] and . . . is the least restrictive means of furthering

that compelling governmental interest."  42 U.S.C. § 2000bb-1(b); *see*

*also Hankins*, 516 F. Supp. 2d at 235.  The RFRA "requires the

Government to demonstrate that the compelling interest test is satisfied

through application of the challenged law to the person – the particular

claimant whose sincere exercise of religion is being substantially

burdened."  *Gonzales*, 546 U.S. at 430-31.  Accordingly, when addressing

an RFRA claim, a court must be guided by the facts and circumstances

presented by the case before it.  *Redhead v. Conf. of Seventh-Day*

*Adventists*, 440 F. Supp. 2d 211, 219 (E.D.N.Y. 2006).

Under the RFRA, the term "exercise of religion" is defined by cross-

reference to the Religious Land Use and Institutionalized Persons Act of

2000 ("RLUIPA"), 42 U.S.C. § 2000cc, as "any exercise of religion,

whether or not compelled by, or central to, a system of religious belief."

42 U.S.C. § 2000-cc-5(7)(A).  In the context of the First Amendment, the

Supreme Court has held that "only beliefs rooted in religion are protected

by the Free Exercise Clause," and that "[p]urely secular views do not suffice." *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 833 (1972). However, because "a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question," *Wisc. v. Yoder*, 406 U.S. 205, 215 (1972), the Second Circuit has explained that courts are "singularly ill-equipped to sit in judgement of the verity of an adherent's religious beliefs," *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984). Courts are limited to determining whether a claimant's beliefs are "'sincerely held and whether they are, in his own scheme of things, religious.'" *Patrick*, 745 F.2d at 157 (quoting *U.S. v. Seeger*, 380 U.S. 163, 185 (1965)).

To find sincerity, a court examines whether a claimant has a "good faith in the expression of his religious belief." *Patrick*, 745 F.2d at 157. "This test provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deceit and fraud." *Id.* A court should examine the claimant's "inward attitudes towards a particular belief system," and afford "great weight" to his claim that his "belief[s] [are] an essential part of a religious faith." *Id.* at 158.

To find that a set of beliefs amount to a religion, rather than a philosophy or way of life, courts have considered a number of factors including (1) ultimate ideas, (2) metaphysical beliefs, (3) moral or ethical system, (4) comprehensiveness of beliefs, and (5) accoutrements of religion that include consideration of the founder, important writings, gathering places, ceremonies or rituals, the organizational scheme, holidays, diet or fasting, appearance and clothing, and propagation. *U.S. v. Meyers*, 95 F.3d 1475, 1483-84 (10th Cir. 1996). The Second Circuit has defined the term religion as "'the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine.'" *Patrick*, 745 F.2d at 158 (quoting *U.S. v. Sun Myung Moon*, 718 F.2d 1210, 1227 (2d Cir. 1983)). The Supreme Court has warned, however, that "an asserted belief might be so bizarre, so clearly non-religious in motivation, as not to be entitled to protection[.]" *Frazee*, 489 U.S. at 834 n.2 (internal quotation marks omitted); *accord U.S. v. Manneh*, 645 F. Supp. 2d 98, 109 (E.D.N.Y. 2008).

The RFRA prohibits government conduct that substantially burdens a sincere exercise of religion. Under that provision, "a substantial burden

is a situation where the state 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Forde v. Baird*, 720 F. Supp. 2d 170, 176 (2d Cir. 2010) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)).

b.    Application

In this case, defendant does not claim to be either an atheist or a member of any established religion.  Instead, he ascribes to an array of beliefs identified as "Objectivism," and maintains that those beliefs are incompatible with the sexual disorder treatment program offered by FMHA.  Zielinski describes Objectivism as "a belief system based on observation, logic, reason, and individual autonomy first articulated by Ayn Rand."[11]  Dkt. No. 42 at ¶ 71.  According to defendant, "[i]ts ideal is complete coherence between reality, belief, and action.  Objectivism encompasses every aspect of human existence addressed by traditional 'religions' including metaphysics, epistemology, human nature, ethics, politics, and asthetics [sic]."  *Id.* (footnote omitted).  Zielinski's habeas petition also includes the following observations regarding Objectivism:

---

[11]    In support of Zielinski's habeas petition, he has submitted an article entitled "Objectivism: Philosophy of Ayn Rand," authored by Leonard Peikoff, in which Reikoff describes the beliefs associated with that philosophy.  Dkt. No. 41 Exh. B at 41-52.

72. Objectivism is a hierarchal belief system that holds foundationally that reality exists as an objective absolute, independent of man and his consciousness. It holds that man's consciousness perceives reality, and rejects any belief in the supernatural and any claim that reality flows from human consciousness, whether individual or group.

73. Objectivism further holds (a) that man's consciousness is fully competent to perceive reality correctly; (b) that reason is man's only means of knowledge; (c) that a single fundamental decision – the choice between existence (life) and nonexistence (death) – underlies all other decisions; and (d) that 'values' are those objects, actions and beliefs that man judges preservative of his individual consciousness, with such judgment arrived at through the application of reason to perceptual data in a specific context.

74. Objectivism's most fundamental tenet is that one maintain absolute, unfailing loyalty to one's own sovereign independent judgment in all matters. It demands that one relentlessly root out incoherencies and contradictions in any assertion or claim and objectively evaluate it in the context of the entirety of one's knowledge before accepting it; and that any assertion which cannot survive this process of evaluation be rejected. In Objectivism, to suspend independent judgment and accept an assertion–any assertion, no matter its proponent and no matter its alleged importance or triviality–on faith or blind trust is equivalent to mental suicide.

75. Objectivism further holds that that [sic] no person can think for another, that subordination of one's mind to the conclusions of another is the worst form of self-abasement possible, and that suspending one's own judgment or acting contrary to it abandons reason and judgment at their roots and leaves a man without principles to guide his life by and without any means to recover them.

76. Objectivism further holds that since reason is the means of human knowledge and knowledge is necessary for survival and the achievement of values, the preservation and protection of reason is necessary to man's survival.

77. Objectivism holds that the use or threat of force to obtain a value from another against his or her will neutralizes the practical effect of his or her reason and judgment. Therefore, Objectivism holds as a fundamental tenet that the initiation of force in any form, whether directly by physical force, or indirectly through threats or fraud,[] is contrary to reason and thus, evil. (The use of force in self-defense against others who have initiated it, however, is not evil provided it is limited to that necessary to remove the threat.)

78. As the initiation of force is contrary to reason, Objectivism holds that the only type of human behavior consistent with reason and man's nature is individual liberty and voluntary cooperation and trade. It requires that every man hold his own rational self-interest as his highest end and morally live by his own effort and achievements, whether individual or in cooperation with others for mutual benefit;

respecting the rights of all others to do the same, neither sacrificing himself to others nor sacrificing others to him. It rejects any social system that attempts to subjugate or sacrifice the individual to the group, and rejects any attempt to define people by their race, sex, tribe, sexual orientation, nation, class, or any other quality or characteristic.

*Id.* at ¶¶ 72-78 (footnote omitted).

Despite a thorough search, I have been unable to identify any case in which a court has recognized Objectivism as a religion for any purpose, and defendant failed to cite any cases so holding either prior to or during the evidentiary hearing.[12] Although the court does not question the sincerity with which Zielinski believes in Objectivism, there is nothing in the record to suggest that defendant's beliefs are related to anything remotely divine. *See Patrick*, 745 F.2d at 158 (defining religion as "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine" (internal quotation marks omitted)). Indeed, defendant has described Objectivism in a way that suggests Objectivists

---

[12] To the extent that defendant may have cited case law in his post-hearing memorandum of law, the court has not considered it because defendant's post-hearing submission was struck from the record due to untimeliness. Text Order Dated May 3, 2013; Dkt. No. 75.

would reject the Second Circuit's definition of religion.  Specifically,
defendant explains that "Objectivism's most fundamental tenet is that one
maintain absolute, unfailing loyalty to one's own sovereign independent
judgment in all matters."  Dkt. No. 42 at ¶ 74.  The definition of religion
that guides the court suggests that religion requires a relationship with
some divinity, *Patrick*, 745 F.2d at 158, while Objectivism demands
complete independence, emphasizes reason, and rejects anything
supernatural, Dkt. No. 42 at ¶¶ 72, 74, 75.  In addition, Leonard Peikoff's
published work related to Objectivism, submitted by defendant as
evidence, describes it as a "philosophical system" and analogizes it to "a
computer operating system."  Dkt. No. 42 Exh. B at 41.

Based on my review of defendant's evidence concerning
Objectivism, I conclude that it is a manner of processing information that
is more appropriately considered a philosophy, rather than a religion.
Again, although I do not challenge the sincerity of defendant's beliefs in
Objectivism, I cannot find that its characteristics reflect a religion that is
protected by the RFRA.  *See Yoder*, 406 U.S. at 216 ("Thoreau's choice
[to reject the social values of his time and isolate[] himself at Walden
Pond] was philosophical and personal rather than religious, and such

belief does not rise to the demands of the Religion Clauses."); *see also Meyers*, 95 F.3d at 1484 (explaining that the defendant "is, of course, absolutely free to think or believe what he wants. If he thinks that his beliefs are a religion, then so be it. No one can restrict his beliefs, and no one can begrudge him those beliefs.  None of this, however, changes the fact that his beliefs do not constitute a 'religion' as that term is uneasily defined by law").

In any event, however, even assuming, without agreeing, that defendant's beliefs related to Objectivism amount to a religion, I nonetheless conclude that defendant has failed to establish, by a preponderance of the evidence, that the FMHA program substantially burdens his beliefs.  All of defendant's complaints about the FMHA program are vague and generalized, complaining that the program requires participants to consider thinking differently, and to view their behavior from a certain perspective.  For example, defendant accuses the *Road to Freedom* of teaching Judeo-Christian ideology by asking participants to love others unconditionally and accept others without judgment.  Dkt. No. 42 at ¶ 86.  Aside from this allegation, there is no evidence in the record that the *Road to Freedom* is based on any religion

or religious ideologies.  Indeed, Dr. Rossy-Millan expressly denied this allegation during his testimony at the evidentiary hearing.  Dkt. No. 73 at 68-69.  In addition, defendant has failed to prove how loving others unconditionally, for example, violates his Objectivism beliefs.  Defendant also accuses the FMHA program of requiring him to suspend independent judgment and replace it with approval of society.  Dkt. No. 42 at ¶ 85.  Even after carefully reviewing all of the evidence in this case, however, I am unclear how the FHMA program attempts to do this, or, even assuming that it does, which of defendant's Objectivism beliefs are challenged by such a teaching.  Finally, although defendant complained that a practice described in the *Road to Freedom* encourages participants to sniff ammonia to deter sexual impulses, Dr. Rossy-Millan testified that FMHA does not promote or teach that practice in its programs.  Dkt. No. 73 at 34-35.

In summary, defendant's allegations regarding the contents of the FHMA program have not been substantiated by any evidence, other than defendant's own testimony, and defendant has failed to prove by a preponderance of the evidence that the FMHA program substantially burdens any of his Objectivism beliefs.  Accordingly, I recommend that

defendant's petition to modify his conditions of supervised release pursuant to 28 U.S.C. § 2241 be denied.

> B. The Government's Motion to Revoke Defendant's Supervised Release Status

Supervised release revocation proceedings are governed in the first instance by Rule 32.1 of the Federal Rules of Criminal Procedure. Fed. R. Crim. P. 32.1; *U.S. v. Fleming*, No. 88-CR-0473, 1993 WL 105181, at *1 (E.D.N.Y. Feb. 10, 1993). They may also be governed by 18 U.S.C. § 3583. 18 U.S.C. § 3583(e)(3). In such a proceeding, the government bears the burden of proving that a violation has occurred by a preponderance of the evidence. 18 U.S.C. § 3583(e)(3); *U.S. v. Sash,* 444 F. Supp. 2d 224, 228 (S.D.N.Y. 2006); *U.S. v. Taintor,* No. 01-CR-0219, 2003 WL 144811, at *6 (N.D.N.Y. Jan. 17, 2003) (Sharpe, M.J.); *see also U.S. v. Nagelberg*, 413 F.2d 708, 709-10 (2d Cir. 1969) ("On a hearing to revoke probation, all that is required is that the court be satisfied that appellant had abused the opportunity granted him not to be incarcerated. The burden of persuasion is on the Government but it is not the same as in the original trial on the criminal offense which produced the sentence of probation." (internal quotation marks omitted)); *accord Schneider v. House Wright,* 668 F.2d 366, 368 (8th Cir. 1981).

In this instance, I recommend a finding that the government has proven by a preponderance of the evidence that defendant violated the terms of his supervised release, and specifically the condition that he "participate in a mental health program, which will include, but will not be limited to, participation in a treatment program for sexual disorders[.]"  In order to implement that condition, United States Probation Officers arranged to have defendant evaluated by clinicians at FMHA.  Based upon the results of that evaluation, defendant was placed in a small group program utilizing *The Road to Freedom* model.  Defendant, however, challenged the leaders and participants of the group at every stage of the program.  Between arriving late, refusing to participate in activities, demanding that the clinicians provide him with specific definitions, and declaring the program and all religion evil in the presence of other group participants, defendant created a disruptive atmosphere in which Dr. Rossy-Millan and Ms. Maaz could no longer operate a productive group session.  In addition, defendant surreptitiously videotaped one of the sessions, in direct violation of the confidentiality rules to which each participant agrees upon entering the program.

All of this behavior must be viewed in light of Judge McAvoy's

explicit admonition to defendant that the United States Probation Office would dictate the execution and terms of his supervised release, rather than defendant himself. Dkt. No. 37 at 156. Judge McAvoy also suggested the defendant might benefit from an adjustment in his attitude. *Id.* In the court's view, rather than heed this advice, defendant's conduct reflects his willful and manipulative efforts to undermine the authority of FHMA clinicians, the United States Probation Office, and the courts. Supervised release is a privilege, not a right; by his conduct, defendant has demonstrated that he is unwilling to fulfill the responsibilities that accompany such privilege. *See U.S. v. Markovich*, 348 F.2d 238, 241 (2d Cir. 1965) (finding it sufficient that the district court revoked the defendant's probation where it "was satisfied that appellant had abused the opportunity granted him not to be incarcerated and that his conduct had not been as good as is required on one enjoying the privilege of probation").

In summary, defendant's discharge from the FMHA program was justified, and that discharge constitutes a violation of a condition of his supervised release. Accordingly, I recommend that the government's motion to revoke defendant's supervised release status be granted.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

The Second Circuit has ruled that Senior District Judge McAvoy acted within his discretion when imposing, as a condition of defendant's supervised release, the requirement that he participate in a mental health program that includes treatment for sexual disorders.  Accordingly, to the extent that defendant seeks modification of the conditions of supervised release on that ground, including pursuant to 28 U.S.C. § 2255, I recommend it be denied.

As it relates to defendant's argument that the requirement that he participate in a mental health program that includes treatment for sexual disorders violates his rights under the RFRA, I find no basis to conclude that the treatment program administered by the FMHA violated any genuinely held religious beliefs of the defendant.  Rather, I find that his discharge from that program resulted from his disruptive behavior that was motivated by his misguided belief that he could refuse to participate in any portion of the program with which he disagreed.  I further conclude that Zielinski's discharge from the FMHA program was justified, given his disruptive behavior and the negative impact his behavior had on the other participants and the FMHA clinicians.  Finally, I find that the government

has established by a preponderance of the evidence that defendant failed to participate in and successfully complete the required mental health treatment.  Accordingly, defendant is in violation of the terms of his supervised release.

Based upon the foregoing, it is hereby respectfully RECOMMENDED that:

(1)     Defendant's motion to reinstate his claim pursuant to 28 U.S.C. § 2255 be GRANTED;

(2)     Defendant's petition for modification of his supervised release conditions pursuant to 28 U.S.C. §§ 2241 and 2255, and 18 U.S.C. § 3583 be DENIED; and

(3)     The government's motion for revocation of the defendant's supervised release be GRANTED, and that the court exercise its sound discretion in determining the appropriate sanction to be imposed for that violation.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:      May 15, 2013
            Syracuse, New York

David E. Peebles
U.S. Magistrate Judge



Slip Copy, 2013 WL 536095 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 2013 WL 536095 (C.A.2 (N.Y.)))

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,

Second Circuit.
UNITED STATES Of America, Appellee,
v.
Jeremy ZIELINSKI, Defendant–Appellant.
No. 12–595–cr.

Feb. 14, 2013.

**Background:** The United States District Court for the Northern District of New York, Thomas J. McAvoy, J., revoked defendant's supervised release and imposed a sentence of home confinement and new supervised release conditions, and defendant appealed.

**Holding:** The Court of Appeals held that defendant's relevant sex offense was not too remote to justify the imposition of sex offender conditions of supervised release.

Affirmed.

West Headnotes

**[1] Sentencing and Punishment 350H**  1977(2)

350H Sentencing and Punishment

    350HIX Probation and Related Dispositions
        350HIX(G) Conditions of Probation
            350Hk1964 Particular Terms and Conditions
                350Hk1977 Rehabilitation and Therapy
                    350Hk1977(2) k. Validity. Most Cited Cases
    The defendant's relevant sex offense was not too remote to justify the imposition of sex offender conditions

of the supervised release imposed for defendant's conspiracy to commit access device fraud; defendant's sex offenses of promoting sexual performance by a child and attempted dissemination of indecent material to a minor occurred during 2001 and 2002, a 2004 search of his home revealed movies and images that appeared to be child pornography as well as online chat records in which he discussed manufacturing and selling child pornography, his guilty plea to the access device conspiracy offense was in 2006, and during his incarceration between 2006 and 2011, he was removed from prison's Sex Offender Counseling and Treatment Program for possessing pornography and a book on rape. 18 U.S.C.A. § 3583(d).

**[2] Sentencing and Punishment 350H**  2016

350H Sentencing and Punishment

    350HIX Probation and Related Dispositions
        350HIX(I) Revocation
            350HIX(I)3 Proceedings
                350Hk2015 Evidence
                    350Hk2016 k. In general. Most Cited Cases
    The Federal Rules of Evidence do not apply with their normal force in supervised release revocation or modification hearings, and a district court need only base its findings on verified facts and accurate knowledge.

Appeal from a judgment of the United States District Court for the Northern District of New York (Thomas J. McAvoy, Judge).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court entered on February 8, 2012 is **AFFIRMED.**James Anthony Resila, Carter, Conboy, Case, Blackmore, Maloney & Laird, P.C., Albany, NY, for Defendant–Appellant.

Ross Goldman, Appellate Section, Criminal Division, United States Department of Justice (Lanny A. Breuer, Assistant Attorney General, John D. Buretta, Deputy

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 536095 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 2013 WL 536095 (C.A.2 (N.Y.)))

Assistant Attorney General, Thomas E. Booth, Richard S. Hartunian, United States Attorney for the Northern District of New York, Brenda K. Sannes, Robert A. Sharpe, Assistant United States Attorneys, on the brief), Washington, DC., for Appellee.

PRESENT: JOHN M. WALKER, JR., JOSÉ A. CABRANES, and RICHARD C. WESLEY, Circuit Judges.

### SUMMARY ORDER

**\*1** Jeremy Zielinski appeals from a final judgment of the District Court revoking his supervised release and imposing certain sex offender conditions. On appeal, Zielinski argues that (1) the District Court erred by imposing sex offender conditions of supervised release on him because his relevant sex offenses are temporally remote, (2) four of the special conditions are unconstitutional, and (3) the District Court improperly considered certain items of evidence at sentencing. We assume the parties' familiarity with the background of the case, which we reference only as necessary to explain our decision to affirm.

### BACKGROUND

In 2001–2002, Zielinski had occasional inappropriate online conversations with an undercover police officer he believed was a 13–year–old girl. He transmitted images of child pornography to the undercover officer in January 2002, which caused law enforcement officials to search his New York residence. Images of child pornography were seized from Zielinski's computer during the search, and he was arrested in April 2002. While out on bail, Zielinski fled to Florida to avoid prosecution.

Zielinski became involved with a group that promoted online fraud schemes in Florida. In February 2004, law enforcement officials intercepted a package with counterfeit credit cards sent by Zielinski to a confidential informant. Zielinski's home in Florida was searched, and the search revealed movies and images that appeared to be child pornography as well as online chat records, in which Zielinski discussed manufacturing and selling child pornography. Zielinski was arrested on October 29, 2004.

Zielinski then was transferred to New Jersey, where

he pleaded guilty to conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1028(a)(7), before the United States District Court for the District of New Jersey. On June 28, 2006, he was sentenced to 21 months' imprisonment and two years of supervised release.

After serving his federal sentence, Zielinski was transferred to New York state custody on account of his aforementioned actions during 2001–2002. On August 30, 2006, he pleaded guilty, in Warren County Court, to one count of promoting sexual performance by a child, one count of attempted dissemination of indecent material to a minor, and one count of bail jumping; he was sentenced to two-to-six years' imprisonment. While incarcerated in New York, Zielinski was enrolled in a Sex Offender Counseling and Treatment Program, but he was removed from the program for various instances of non-compliance, including possessing pornography on the first day of the program and possessing a book on rape that prison officials seized. On January 14, 2011, the Warren County Court classified Zielinski as a Level 2 Sex Offender; he was released from custody two weeks later and began his term of supervised release.

**\*2** On November 16, 2011—after Zielinski's case was transferred to the Northern District of New York,[FN1] and after the United States Probation Office ("Probation Office") learned of Zielinski's state sex offense and bail jumping convictions—the Probation Office petitioned the District Court to add certain sex offender conditions to Zielinski's term of supervised release. It also petitioned the District Court to revoke Zielinski's supervised release because he (1) failed to respond to a letter from the state sex offender registration office, and (2) traveled to New York City without proper authorization.

The District Court held a supervised release violation and modification hearing on February 2, 2012. At the hearing, Zielinski conceded the unlawful travel violation, and the District Court heard evidence regarding the Probation Office's modification petition. The District Court sentenced Zielinski to home confinement for a period of six months. It also imposed sex offender conditions of supervised release on Zielinski, noting that "prophylactic" measures were justified until it could be

Slip Copy, 2013 WL 536095 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 2013 WL 536095 (C.A.2 (N.Y.)))

demonstrated that Zielinski "no longer ha[s] a propensity" to commit sex crimes. This appeal followed.

## DISCUSSION

District courts possess "broad authority ... to impose any condition of supervised release that [they] consider[ ] to be appropriate, provided such condition ... is 'reasonably related' to certain statutory sentencing factors listed in section 3553(a)(1) and (a)(2) of [Title 18], 'involves no greater deprivation of liberty than is reasonably necessary' to implement the statutory purposes of sentencing, and is consistent with pertinent Sentencing Commission policy statements." *United States v. Dupes,* 513 F.3d 338, 343 (2d Cir.), *cert. denied,* 552 U.S. 1272, 128 S.Ct. 1686, 170 L.Ed.2d 381 (2008) (quoting 18 U.S.C. § 3583(d)). We generally review conditions of supervised release imposed by a district court for abuse of discretion, but a challenge to conditions of supervised release that presents an issue of law is generally reviewed *de novo. Id.; see United States v. Brown,* 402 F.3d 133, 136 (2d Cir.2005).

### A. The District Court Properly Imposed Sex Offender Conditions of Supervised Release

[1] We have held that sex offender conditions of supervised release may be reasonably related to a defendant's history and characteristics even though the instant offense was not a sex offense. *See Dupes,* 513 F.3d at 343–44. Although we are aware that some circuits have held that imposing sex-offender conditions can be an abuse of discretion where the past sex offense is temporally remote and minimal intervening circumstances exist, *see, e.g., United States v. Dougan,* 684 F.3d 1030, 1034–37 (10th Cir.2012) (17 year-old sex offense); *United States v. Carter,* 463 F.3d 526, 527 (6th Cir.2006) (17 year-old sex offense); *United States v. T.M.,* 330 F.3d 1235, 1237–40 (9th Cir.2003) (20 year-old sex offense); *United States v. Kent,* 209 F.3d 1073, 1077 (8th Cir.2000) (13 year-old sex offense), we conclude that the District Court did not abuse its discretion in this case for multiple reasons.

**\*3** First, the amount of time between Zielinski's relevant sex offense and the District Court's imposition of sex offender conditions of supervised release is shorter than the cases described above and shorter than several

cases in which circuits have affirmed the imposition of sex offender conditions of supervised release.[FN2] *See, e.g., United States v. Smith,* 655 F.3d 839, 847 (8th Cir.2011) (affirming the imposition of sex offender conditions of supervised release based on a 12 year-old sex offense); *United States v. Genovese,* 311 Fed.Appx. 465 (2d Cir.2009) (affirming the imposition of sex offender conditions of supervised release 12 years after defendant received his first probationary sentence); *United States v. Brogdon,* 503 F.3d 555, 563–65 (6th Cir.2007) (affirming the imposition of sex offender conditions of supervised release based on approximately a 12–year–old sex offense).

Second, Zielinski's intervening conduct counsels in favor of affirming the District Court. As noted, a 2004 search of Zielinski's home in Florida revealed movies and images that appeared to be child pornography as well as online chat records, in which Zielinski discussed manufacturing and selling child pornography. Moreover, during his incarceration between 2006 and 2011, Zielinski was removed from the prison's Sex Offender Counseling and Treatment Program for non-compliance, including possessing pornography and a book on rape.

On the facts presented in this appeal, we conclude that Zielinski's relevant sex offense is not too remote so as to justify the imposition of sex offender conditions of supervised release.

### B. The Special Conditions Imposed Were Appropriate

Zielinski also takes issue with four of the special conditions of his supervised release: (1) a ban on direct and indirect contact with minors without supervision (Special Condition 2); (2) the requirement that he participate in a mental health program approved by the Probation Office (Special Condition 5); (3) the requirement that he submit to various searches on reasonable suspicion (Special Condition 9); and (4) the requirement that he contribute to the cost of any evaluation, treatment, or monitoring to be determined by the Probation Office (Special Condition 11). His arguments are without merit.

The District Court properly imposed these four

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 536095 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 2013 WL 536095 (C.A.2 (N.Y.)))

challenged special conditions because each of them "is reasonably related to [Zielinski's] history and characteristics ..., his need for treatment, and the public's need for protection from him." *Dupes,* 513 F.3d at 344. These conditions are not overly broad or vague, and similar conditions previously have been upheld by this Court or our sister circuits pursuant to § 3583(d). In *United States v. Johnson,* 446 F.3d 272 (2d Cir.2006), we approved a ban on direct and indirect contact with minors virtually identical to Special Condition 2. *Id.* at 280–81. In *Dupes,* we held that a district court had the authority to require that a defendant undergo sex offender treatment (as ordered by Special Condition 5) based on a prior conviction for a sex offense. 513 F.3d at 344. We approved a special condition relating to searches in *United States v. Jennings,* 652 F.3d 290, 294 (2d Cir.2011), quite similar to Special Condition 9. And we have no difficulty affirming the District Court's imposition of Special Condition 11, which requires Zielinski to contribute to the cost of his treatment and monitoring as determined by the Probation Office. *See, e.g., United States v. Soltero,* 510 F.3d 858, 864 & n. 5 (9th Cir.2007); *United States v. Warden,* 291 F.3d 363, 365–66 (5th Cir.2002).

### C. The Contested Evidentiary Rulings Were Correct

**\*4** Finally, Zielinski argues that the District Court improperly admitted 11 documents, which described his sex offenses, his subsequent conviction, and his classification as a sex offender. As district courts maintain "broad discretion over the admission of evidence," *United States v. McDermott,* 245 F.3d 133, 140 (2d Cir.2001), we review their evidentiary rulings for abuse of discretion only, *United States v. Carthen,* 681 F.3d 94, 100 (2d Cir.2012).

[2] Despite Zielinski's argument that this evidence should have been precluded under Federal Rule of Evidence 403, "the Federal Rules of Evidence do not apply with their normal force in supervised release revocation [or modification] hearings," *United States v. Bari,* 599 F.3d 176, 179 (2d Cir.2010), and a district court need only base its findings on 'verified facts' and 'accurate knowledge,' " *id.* (quoting *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). In light of these principles, and after reviewing

the record, we conclude that the District Court did not abuse its discretion by considering these documents.

### CONCLUSION

We have considered all of Zielinski's arguments on appeal and find them to be without merit. For the reasons stated above, we **AFFIRM** the February 8, 2012 judgment of the District Court.

FN1. The case was transferred to the Northern District of New York because Zielinski lived in that district after being released from New York state custody.

FN2. Specifically, the District Court imposed sex offender conditions on Zielinski less than ten years after a search of Zielinski's home revealed child pornography and less than six years after he pleaded guilty to and was sentenced on account of his relevant sex offenses.

C.A.2 (N.Y.),2013.

U.S. v. Zielinski
Slip Copy, 2013 WL 536095 (C.A.2 (N.Y.))
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
David McCHESNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, New York State
Office of Mental Health, et al., Defendants.
Civil Action No. 9:08–CV–1186 (NAM/DEP).

July 30, 2012.
David McChesney, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Office of Attorney General, State of New York, Adele Taylor–Scott Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff David McChesney, a convicted sex offender who has been civilly committed to the Central New York Psychiatric Center ("CNYPC") for participation in sex offender treatment, has commenced this action pursuant to 42 U.S.C. § 1983 claiming deprivation of his civil rights. In his complaint, plaintiff alleges that his forced participation in the Sex Offender Treatment Program ("SOTP") administered at the CNYPC violates his constitutional rights.[FN1] The sole remaining claim in this action, following earlier motion practice, is McChesney's assertion that the SOTP is predicated in part upon religious tenets, and he is being forced, contrary to his beliefs as an atheist, to practice religion in violation of his First Amendment rights. The matter is now before the court on defendants' second motion for summary judgment seeking dismissal of the remaining causes of action alleged under the Establishment and Free Exercise Clauses against defendants in their official capacities for prospective injunctive relief.

FN1. Plaintiff has commenced seven separate

actions in this court related to his involuntary civil confinement. In *McChesney v. Hogan, et al.,* No. 9:08–CV–0163 (filed Feb. 11, 2008), plaintiff complained of various policies at the CNYPC ranging from those addressing receipt of food packages and telephone access to mail censorship and the use of short chain restraints, and maintained that the adoption and implementation of those policies by the various defendants named in his complaint resulted in violation of his rights under the First, Fourth, Eighth, and Fourteenth Amendments. That action resulted in the entry of summary judgment dismissing plaintiff's claims. *See id.* at Dkt. Nos. 49 and 50. In *McChesney v. Miller, et al.,* No. 9:08–CV–0195 (filed Feb. 21, 2008), plaintiff asserted a medical indifference claim under the Eighth Amendment. McChesney voluntarily dismissed that action, and judgment was entered in favor of the defendants. *See id.* at Dkt. Nos. 5 and 6. In *McChesney v. Hogan, et al.,* No. 9:08–CV–0563 (filed June 10, 2008), plaintiff alleged three instances on which he was assaulted by fellow patients on two separate days, and argued that the attacks resulted from defendants' failure to properly protect him from harm in violation of his constitutional rights. The complaint in that action was dismissed upon defendants' motion for summary judgment, and judgment was entered in favor of defendants. *See id.* at Dkt. Nos. 36 and 37. In *McChesney v. Hogan, et al.,* No. 9:08–CV–1290 (filed Nov. 28, 2008), plaintiff made claims similar to those made in this lawsuit alleging, *inter alia,* that the SOTP administered at the CNYPC is predicated in part upon religious tenets, and he is being forced, contrary to his beliefs as an atheist, to practice religion in violation of his First Amendment rights. That action was dismissed and judgment entered in favor of the defendants. *See McChesney v. Hogan, et al.,* No. 9:08–CV–1290, at Dkt. No. 9. In *McChesney v. Bastien,* No. 9:10–CV–0047 (filed Jan. 13,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

2010), plaintiff alleged a single cause of action for deprivation of liberty without due process of law based upon his alleged involuntary detention at another psychiatric facility operated by the New York State Office of Mental Health ("OMH") for a period of sixty days, from October 5, 2007 until December 4, 2007. After the defendant moved to dismiss, the action was dismissed without prejudice at plaintiff's request. *See id.* at Dkt. No. 11. In *McChesney v. Bastien,* No. 9:10–CV–1409 (filed Nov. 22, 2010), plaintiff made the same claims as in the earlier filed lawsuit against Bastien; on July 5, 2012, finding the existence of material issues of fact as to whether plaintiff was deprived of his liberty without due process of law, I issued a report recommending that defendant's motion for summary judgment in that action be denied. *See id.* at Dkt. No. 14.

Having now provided the court with the SOTP treatment materials and modalities at issue, defendants argue, once again, that the use of these programs in the SOTP does not violate plaintiff's First Amendment rights and that they are, therefore, entitled to summary judgment. Additionally, proposed intervenor Jeremy Zielinski, has sought leave to intervene for the sole purpose of moving to vacate the court's order allowing defendants to file the SOTP program materials under seal. For the reasons set forth below, I will deny the proposed intervenor's motion and recommend that defendants' motion be granted.

I. *BACKGROUND*[FN2]

> [FN2.] In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

The CNYPC is a mental health facility located in Marcy, New York and operated under the jurisdiction of the New York State Office of Mental Health ("OMH"). Complaint (Dkt. No. 1) § 2; Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 38–3) ¶ 2.[FN3] The SOTP is a "secure

treatment facility" created for the purpose of providing care and treatment to dangerous sex offenders who are civilly confined after serving their prison sentences pursuant to New York Mental Hygiene Law ("MHL") Article 10. Defendants' Rule 7.1(a) (3) Statement (Dkt. No. 38–3) ¶ 2.[FN4]

> [FN3.] Plaintiff is deemed to have admitted the allegations contained within defendants' Local Rule 7.1(a)(3) Statement, based upon his failure to oppose defendants' motion. *See* pp. 17–20, *post.*

> [FN4.] Under New York law a "dangerous sex offender requiring confinement" is a detained sex offender suffering from mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility. N.Y. Mental Hyg. Law § 10.03(e). The MHL does not allow for indefinite confinement of a detained sex offender. Instead, the Commissioner of the OMH is required to provide a civilly committed sex offender and his or her counsel with annual notice of the right to petition the court for discharge, and must assure that each civilly confined person receives an examination for evaluation of his or her mental condition at least once a year, calculated from the date on which the court last ordered or confirmed the need for civil confinement. *See* N.Y. Mental Hyg. Law § 10.09(a) and (b). The law also includes a provision for annual court review in the form of an evidentiary hearing to determine the necessity of continued retention. *See id.* at § 10.09(d).

Plaintiff's complaint, which is sparse in factual detail, asserts that the treatment programs in which he has been forced to participate at the CNYPC subject him, as an atheist, to various religious rituals and practices. [FN5] More specifically, he claims that The Good Lives Model and Boundaries programs teach that you must believe in spirituality, the Dialectic Behavior Therapy ("DBT"), Self Care Skills I & II, and Relaxation programs adopt or are

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

patterned after the rituals and practices of Zen Buddhism, and the Growing up Male, From the Inside Out, Problem Solving, and Anger Management programs are all "Hazelden" products which incorporate Christian beliefs and practices. According to plaintiff's complaint, defendants' use of these programs violates the First Amendment's prohibition of establishment of religion as well as its protection of his right to the free exercise of religion.

FN5. It appears from the record that plaintiff's religious beliefs have fluctuated over time. At various points while in the custody of the New York State Department of Correctional Services (now the Department of Corrections and Community Services, or "DOCCS"), he indicated his religious affiliation as Buddhist, and later as Methodist. *See* Taylor Scott Decl. (Dkt. No. 32–3) Exhs. A and B. Most recently, in his religious designation of May 2011, plaintiff advised personnel at the CNYPC that he is now a Buddhist. Maxmillian Decl. (Dkt. No. 38–2) ¶ 55.

*2 The sex offender treatment services provided at CNYPC through the SOTP are "evidence-based" methods; as new research emerges and best practices evolve, the SOTP adapts its services accordingly, including creation of new groups, modification of existing groups or discontinuation of groups which no longer reflect effective treatment modalities.FN6 Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 38–3) ¶ 3; Maxmillian Decl. (Dkt. No. 38–2) ¶¶ 7–8. The treatment programs at the CNYPC–SOTP are designed to address specific risks and criminogenic and responsivity needs of participants, and are targeted at reducing the person's risk of recidivism, enhancing his or her treatment engagement, developing self regulation skills, managing sexual deviancy, and assisting him or her in developing pro-social attitudes and behaviors. Defendants' Local Rule 7.1 Statement (Dkt. No. 38–3) ¶¶ 4 and 5; Maxmillian Decl. (Dkt. No. 10) ¶¶ 9–10. The programs may also provide educational and vocational training, didactic and psycho-educational training, pro-social development, and behavioral therapy, as well as process-oriented treatment. *Id.*

FN6. Defendants' first motion for summary judgment was denied based upon the court's finding that defendants had failed to carry their burden in demonstrating their entitlement to summary judgment, "primarily because they had not submitted the SOTP material so as to enable the court to determine whether or not their content supports plaintiff's First Amendment claims." *McChesney v. Hogan,* No. 9:08–CV–1186, 2011 WL 4592360, at * 3 (N.D.N.Y. Sep. 30, 2011) (Mordue, C.J.); Memorandum Decision and Order, dated Sep. 30, 2011 (Dkt. No. 35); *see also* Report and Recommendation, dated Aug. 2, 2011 (Dkt.33). When filing their second summary judgment motion defendants requested permission to file the SOTP materials by traditional means for the court's *in camera* review in association with that motion, asserting that a public filing allowing CNYPC–SOTP residents to access the materials would run counter to their therapies. Dkt. No. 36. Upon review of the defendants' request, as well as the materials submitted, and having received no objection to the request from plaintiff, the court granted defendants' request to file the SOTP materials under seal, denied the request that the court consider the materials *ex parte,* and directed that defendants provide plaintiff an opportunity to review the materials by providing a complete set of the materials to plaintiff's SOTP counselor and a reasonable opportunity for plaintiff to review them in association with his preparation of a response to defendants' motion. *See* Decision and Order, dated Dec. 6, 2011 (Dkt. No. 41). Defendants have provided the court with all of the SOTP written materials challenged by plaintiff in this action, as well as two DVDs containing additional From the Inside Out program materials. SOTP Director Maxmillian has also advised the court that she personally oversaw plaintiff's review of the program materials, which took plaintiff a period of two to three days. Maxmillian Decl. (Dkt. No. 45) ¶ 3.

The group therapy protocols at the CNYPC–SOTP

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

are developed by the group leaders at that facility and are reviewed and approved by SOTP Director Terri Maxymillian. Maxymillian Decl. (Dkt. No. 38–2) ¶ 11. The content and format for each program is drafted in such a manner that any SOTP clinical staff may lead the group. *Id.* at ¶ 12. Individuals committed to the SOTP are required to participate in the therapeutic programming, and if they choose not to do so, a court reviewing whether civil commitment remains necessary may continue to require in-patient treatment until the individual has appropriately addressed his or her risk to re-offend. *See id.* at ¶¶ 6, 50. Nonetheless, the SOTP does not rigidly require a civilly committed sex offender to attend and participate in every single session of a group in order to "pass" a class. *Id.* at ¶¶ 47–48. Instead, the expectation is that the residents will make an effort to engage and participate in the treatment modalities offered in a meaningful manner, yet allowing for participants to miss or opt out of a small portion of the therapy offered. *Id.* at ¶ 48.

Nine group therapies are at issue in this case; four of those are Hazelden products, including From the Inside Out, Growing Up Male, Problem Solving, and Anger Management. Maxymillian Decl. (Dkt. No. 38–2) ¶ 13. Plaintiff claims that the Hazelden products are Christian-based, and use of these programs violates his First Amendment freedoms. According to its website, www.hazelden.org, Hazelden which was founded in 1949, is one of the world's largest and most respected private not-for-profit alcohol and drug addiction treatment centers. Maxymillian Decl. (Dkt. No. 38–2) ¶ 18. Though originating as a care treatment center for alcoholic priests, it has since evolved into an entity assisting individuals, families, and communities struggling with abuse and addiction by providing treatment and recovery services as well as an array of resources, and its programs have grown to address a broader patient base. *See id.*

**\*3** From the Inside Out is group therapy program designed to teach participants the need for healthy relationships and to take responsibility for their lives and their relationships without blame shifting. *See* Maxymillian Decl. (Dkt. No. 38–2) Exh. A. Growing Up Male, another group therapy modality used in the SOTP, is aimed at assisting CNYPC residents in developing the ability to identify current attitudes and beliefs that

perpetuate the cycle of violence in society, to understand its costs, and to identify the different ways it is manifested. *See id.* at Exh. B. Problem Solving, yet another Hazelden product included within plaintiff's challenge, is intended to assist the participants in developing group problem solving techniques and appropriate participation and social interaction. *See id.* at Exh. C. Anger Management, the last of the Hazelden products at issue in this case, is designed to help CNYPCSOTP residents recognize anger, aggression, and assertiveness, to understand the impact personal anger has had on their lives, and to develop skills to regulate anger and interrupt the aggression cycle in the future. *See id.* at Exh. D.

DBT, another group therapy program used in the SOTP, has been found to be an effective therapeutic tool for persons with personality disorders, teaching them to learn to regulate their emotions, tolerate stress, and ultimately, to avoid offending behaviors. Maxymillian Decl. (Dkt. No. 38–2) ¶ 35; *see also id.* at Exh. E. Self Care Skills I and II are group programs designed to teach CNYPC residents to understand and identify what causes their stress and how to develop appropriate coping mechanisms. Maxymillian Decl. (Dkt. No. 38–2) ¶ 36, Exh. F. Self Care II builds on the basic concepts taught in the first segment, and asks the participants to apply those concepts to explore their family systems by analyzing each family member's role in the family unit as well as what separates healthy families from dysfunctional families. *See id.* The self care and relaxation techniques practiced at the CNYPC are part of the DBT and are taught as part of a broader menu of relaxation tools of which group participants are made aware so that they may choose the techniques and relaxation tools that work best for them and apply them when needed. Maxymillian Decl. (Dkt. No. 38–2) ¶¶ 32; *see also id.* at Exhs. E, F, and G; Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 38–3) ¶ 18. Under the DBT treatment modality a program participant may consider, but is not required to, employ these relaxation techniques to facilitate his or her treatment and progress through the various phases of the treatment program. Maxymillian Decl. (Dkt. No. 38–2) ¶ 33; Defendant's Rule 7.1(a)(3) Statement (Dkt. No. 38–3) ¶ 20.

The primary goal of the Living the Good Life (the

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

"Good Lives Model" or "GLM") group program is to assist participants in understanding their identities as they relate to the needs they have in life. *See* Maxymillian Decl. (Dkt. No. 38–2) Exh. H. This modality is intended to help the participants to develop skills to attain those needs in appropriate and socially acceptable ways. *See id.*

**\*4** Another treatment regimen at issue is the Boundaries program. *See* Maxymillian Decl. (Dkt. No. 38–2) Exh. I. That program is aimed at assisting the group participants to become aware of interpersonal boundaries, including physical, emotional, psychological, and sexual boundaries, as well as boundary violations. *See id.*

Use of all of the above referenced modalities in the SOTP is in furtherance of the overarching purposes of the entire treatment program, which are to rehabilitate sex offenders and protect the safety of communities by reducing the risk that persons civilly committed to the CNYPC for sex offender treatment will sexually re-offend upon release. Maxymillian Decl. (Dkt. No. 38–2) ¶ 58.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 6, 2008. A second related action, Civil Action No. 9:08–CV–1290 (NAM/DEP), was initiated by McChesney some three weeks later, on November 28, 2008. The two actions were subsequently consolidated by the court, *sua sponte,* but have since been severed.[FN7] Dkt. Nos. 4, 13.

> FN7. The two actions were consolidated by the court, of its own initiative, based upon a report I issued on December 23, 2008 recommending that measure and approval of that recommendation by Chief District Judge Norman A. Mordue on March 9, 2009. The court's consolidation order designated Civil Action No. 9:08–CV–1186 (NAM/DEP) as the lead action. As a result of the dismissal of plaintiff's claims in Civil Action No. 9:08–CV–1290 (NAM/DEP), on August 24, 2010, the court issued another order, *sua sponte,* severing the two actions in order to allow the plaintiff to appeal the dismissal to the United States Court of Appeals for the Second Circuit without awaiting the outcome of this action. Civil Action No.

9:08–CV–1290 (NAM/DEP) has been closed, and it appears that plaintiff did not file an appeal in that action.

Plaintiff's complaint in this action named OMH Commissioner Michael Hogan and CNYPC Executive Director Donald Sawyer as defendants, and asserted claims under the First and Fifth Amendments to the United States Constitution. On April 21, 2009, defendants moved for dismissal of plaintiff's claims in the two consolidated actions. Dkt. No. 17. The motion was granted in large part, leaving only plaintiff's First Amendment claims against the defendants in this action in their official capacities for prospective injunctive relief. Dkt. Nos. 23, 25.

On March 31, 2011, following expiration of the deadline for completion of discovery, defendants filed their first motion for summary judgment. Dkt. No. 32. That motion was referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). In a report dated August 2, 2011, finding that defendants had failed to meet their burden of demonstrating the lack of triable issues of material fact, I recommended denial of defendants' motion. Dkt. No.33. That conclusion was based primarily upon the defendants' failure to provide the court with anything more than the SOTP protocols in support of their motion. On September 30, 2011, then Chief District Judge Norman A. Mordue, accepted my report and recommendation, except as to my factual finding that From the Inside Out is a treatment modality product developed by Hazelden, which incorporates the twelve step Alcoholics Anonymous and "NA methodology" used in treatment programs, and is based upon Christian principles.[FN8] Dkt. No. 35 at p. 5. In doing so, the court declined defendants' request to permit supplementation of the record on the motion before it, but expressly stated that it would entertain a second motion for summary judgment if filed within sixty days. Dkt. No. 35 at pp. 5–6.

> FN8. In rejecting that factual finding, Judge Mordue found instead that this was defendants' characterization of plaintiff's contention, which defendants dispute, and noted that "[t]he

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

statement on page 18 [of the report and recommendation] that defendants 'acknowledge that the group treatment modalities at issue incorporate spirituality' differs somewhat from defendants' position ." Dkt. No. 35 at p. 5. Judge Mordue agreed with my ultimate conclusion, however, that defendants had not met their burden on the summary judgment motion since they had not filed SOTP materials with the court so as to enable the court to determine whether or not their content supports plaintiff's First Amendment claims. *See id* .

Plaintiff timely filed the pending renewed motion on November 29, 2011. Dkt. No. 38. Despite having been served with the requisite notification of the 'consequences of failing to respond to the motion, as required under Northern District of New York Local Rule 56.2, and having reviewed the SOTP program materials in the presence of SOTP Director Maxymillian, *see* Dkt. No. 38, plaintiff has failed to file any opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgement Standard*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See* *Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also* *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Legal Significance of Plaintiff's Failure to Properly Respond to Defendant's Local Rule 7.1(a)(3) Statement*

**\*6** Plaintiff has neither opposed defendants' motion, nor responded to Defendants' Statement of Undisputed Material facts, as required by Local Rule 7.1(a)(3). Before

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

turning to the merits of plaintiff's claims, the court will therefore address as a threshold matter the legal significance of his failure to properly respond to that statement.

The consequences of this failure are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y .L.R. 7.1(a)(3). Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); [FN9] *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[FN10]

> **FN9.** Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

> **FN10.** As to any facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I will assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v.. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with a failure to comply with the court's local rules. *See Robinson v. Delgado,* No. 96–CV–169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95–CV–1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp.106, 106–07 (N.D.N.Y.1997). Thus, "a *pro se* litigant is not relieved of

the duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 9:09–CV–308, 2011 WL 11003045, at *1 (N.D.N.Y. Mar. 23, 2011)* (Mordue, C.J.) (citing *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008) and *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has been specifically notified of the consequences of failing to respond to a movant's Local Rule 7.1(a)(3) Statement but has failed to do so, and the facts contained within that statement are supported by the evidence in the record, the court will accept such facts as true. *Id.* (citing *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008)* (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)).

With their motion, defendants served a court-authorized notice specifically warning plaintiff of the consequences of his failure to properly respond to defendants' Local Rule 7.1(a)(3) Statement.[FN11] That form advised the plaintiff as follows:

> **FN11.** Northern District of New York Local Rule 56.2 mandates that when summary judgment is sought against a *pro se* litigant the moving party must notify that *pro se* litigant of the consequences of failing to respond to the motion. *See* N.D.N.Y.L .R. 56.2. The local rule also advises that a sample notice can be obtained through the court.

Pursuant to Local Rule 7.1 of the Northern District, you are required to submit the following papers in opposition to this motion (1) a **memorandum of law** (containing relevant factual and legal argument); (ii) **one or more affidavits** in opposition to the motion and (iii) **a short and concise statement of material facts** as to which you claim there are genuine issues in dispute. **These papers must be filed and served in accordance with the time set by Local Rule 7.1.**

*7 Notification of Consequences of Failing to Respond to a Summary Judgment Motion (Dkt. No. 12–1) (emphasis in original).[FN12] The notification continued, warning the plaintiff as follows:

> **FN12.** The court notes that although the form utilized by the defendants tracks the language of

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

a previous court-approved iteration, the court has revised the form, and the form sent to the plaintiff is therefore not the current court-approved notification. The changes made, however, are not so material as to provide a basis to relieve the plaintiff from the consequences of his failure to respond to Defendant's Local Rule 7.1(a)(3) Statement.

If you do not submit a short and concise statement of material facts as to which you claim there are general issues in dispute, all material facts set forth in the statement filed and served by defendant(s) shall be deemed admitted.

*Id.*

As the foregoing reflects, the plaintiff was squarely put on notice of the consequences of his failure to respond to defendants' motion. In view of the foregoing, despite plaintiff's *pro se* status, I recommend that the court accept defendants' assertions of facts as set forth in his Local Rule 7.1(a)(3) Statement as uncontroverted when considering the pending motion.

C. *Summary of Governing First Amendment Principles*

The First Amendment, made applicable to the states through the Fourteenth Amendment, provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. CONST. AMEND . I. "It embraces two fundamental concepts: freedom to believe and freedom to act on one's beliefs." *Hatzfeld v. Eagen,* No. 9:08–CV–283, 2010 WL 5579883, at *6 (N.D.N.Y. Dec. 10, 2010) (Homer, M.J.) (citing *Decker v. Hogan,* No.9:09–cv–0239, 2009 WL 3165830, at * 2 (N.D.N.Y. Sept. 28, 2009) (McAvoy, S.J.)) (internal citations omitted), *report and recommendation adopted,* 2011 WL 124535 (Jan. 14, 2011) (Strom, S.J.).

Both of these basic freedoms are potentially implicated in this action. Plaintiff asserts that by incorporating religious tenets in a required treatment program for sex offenders, the state has violated the First Amendment's requirement regarding establishment of religion and separation of church and state. In addition, plaintiff maintains that the defendants have interfered with

his right to exercise or, conversely, to be free from, religious beliefs as his conscience dictates.

D. *Plaintiff's Establishment Clause Claim*

The touchstone for the court's analysis of an Establishment Clause claim is the deeply rooted principle that the " 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.' " *McCreary Cnty ., Kentucky v. American Civil Liberties Union,* 545 U.S. 844, 860, 125 S.Ct. 2722, 2733 (2005) (quoting *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266 (1968) (other citation omitted). "[A]t a minimum, the government may not coerce anyone to participate in religion or its exercise." *Hatzfeld,* 2010 WL 5579883, at *6 (quoting *Lee v. Weisman,* 505 U.S. 577, 587, 112 S.Ct. 2649, 2655 (1992)). In the Second Circuit, analysis of an alleged Establishment Clause violation is governed by the test enunciated by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105 (1971), as modified by *Agostini v. Felton,* 521 U.S. 203, 232, 117 S.Ct. 1997, 2015 (1997). *Skoros v. City of New York,* 437 F.3d 1, 17 (2d Cir.2006); *DeStefano v. Emergency Housing Group, Inc.,* 247 F.3d 397, 406 (2d Cir.2001). The focus of the inquiry is "whether the government acted with the purpose of advancing or inhibiting religion...." *DeStefano,* 247 F.3d at 406 (quoting *Mitchell v. Helms,* 530 U.S. 793, 845, 120 S.Ct. 2530, 2560 (2000) (O'Connor, J. concurring)) (internal quotations omitted). The "three primary criteria" employed under *Lemon–Agostini* are "whether the action or program 'result[s] in governmental indoctrination; define[s] its recipients by reference to religion; or create[s] an excessive entanglement.' " *DeStefano,* 247 F.3d at 406 (quoting *Agostini,* 521 U.S. at 234, 117 S.Ct.1997) (alterations in original). "The ultimate inquiry for the purposes of [p]laintiffs' § 1983 claim is whether the [SOTP] program requires participation in religious activity." *Miner v. Goord,* 354 Fed. App'x 489, 492 (2d Cir.2009) (citing *Warner v. Orange Cnty. Dep't of Prob.,* 115 F.3d 1068, 1074–1075 (2d Cir.1997) (cited in accordance with Fed. R.App. Proc. 32.1 not for precedential effect but to show continuing vitality of *Warner* ).[FN13]

FN13. The court notes that unlike the inquiry involved in a Free Exercise claim, the sincerity

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

of the plaintiff's belief has no bearing on the question of whether there has been an Establishment Clause violation since this provision was "drafted, as Supreme Court has repeatedly stated, to prevent government from coercing *anyone* to support or participate in a religion or its exercise, or otherwise act in a way which establishes a [state] religion or religious faith, or tends to do so." *Alexander v. Schenk,* 118 F.Supp.2d 298, 305 (N.D.N.Y.2000) (quoting *Lee,* 505 U.S. at 587, 112 S.Ct. 2649) (emphasis and alteration in original) (internal quotations omitted). Thus, insofar as plaintiff has changed his religious designation, over time, potentially raising questions as to the sincerity of his beliefs, any such questions have no bearing on the court's determination of his Establishment Clause claim.

*8 The First Amendment's Establishment Clause prohibits a government from coercing any person to participate in religion or its exercise.[FN14] *Alexander v. Schenk,* 118 F.Supp.2d at 301 (citing, *inter alia, Lee,* 505 U.S at 587, 112 S.Ct. 2649). The threshold question, then, is whether McChesney was coerced into participating in the SOTP. In this instance there is no dispute that plaintiff's commitment to the CNYPC–SOTP was involuntary.

FN14. Where coercion is not at issue, to assess whether an Establishment Clause violation has occurred the court must consider whether "the practice (1) has a secular purpose; (2) whether it advances or inhibits religion in its principal or primary effect; and (3) whether it fosters excessive entanglement with religion." *Alexander,* 118 F.Supp.2d at 301 (citing *Lemon,* 403 U.S. at 612–613, 91 S.Ct. 2105; *Allegheny Cnty. v. Am. Civil Liberties Union,* 492 U.S. 573, 592, 109 S.Ct. 3086 (1989)); *Skoros,* 437 F.3d at 17.

The next inquiry for the court is whether the treatment modalities incorporated into the SOTP are religious in nature and, if so, whether secular alternatives are available to the plaintiff. As I have previously observed in this case,

and other courts in the district have recognized, "the law is anything but clear on the question of whether compelled use by officials at the CNYPC of treatment materials peripherally based upon religious principles violates the rights of patients involuntarily committed and subjected to the program." *McChesney v. Hogan,* Nos. 9:08–CV–1186, 9:08–CV–1290, 2010 WL 1027443, at *11 (N.D.N.Y. Feb. 26, 2010) (citing *Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (Hurd, J.)), *report and recommendation adopted,* 2010 WL 1037957 (N.D.N.Y. Mar 18, 2010) (Mordue, C.J.); *Carey v. Hogan,* Nos. 9:08–CV–1251, 9:08–CV–1280, 2010 WL 2519121, at *6 (N .D.N.Y. Mar. 30, 2010) (Baxter, M.J.) *report and recommendation adopted,* 2010 WL 2519961 (N.D.N.Y. Jun 15, 2010) (Baldwin, J.). Significantly, however, those decisions were made at the pleading stage upon Federal Rule of Civil Procedure 12(b)(6) motions to dismiss, where the plaintiffs alleged, and the court was bound to accept as true, that the SOTP programs at issue incorporated religious beliefs and/or practices. The court's research has not revealed a reported decision in this circuit addressing the merits of such a claim based upon a fully developed evidentiary record.[FN15]

FN15. *But see Pratt v. Hogan,* 79 A.D.3d 1669, 914 N.Y.S.2d 540 (4th Dep't 2010), which affirmed the dismissal of the plaintiff's Article 78 petition, brought pursuant to New York Civil Practice Law and Rules ("CPLR"), seeking a judgment "vacating the SOTP" and "directing respondents to cease and desist all programming with any religious foundation, belief, ritualism, connotation or suggestion of religious affiliation" on the grounds that such programming violates his constitutional right to freedom of religion," *id.* at 1670, 914 N.Y.S.2d at 541, based upon a finding that "a government facility does not violate the constitutional right to freedom of religion merely by offering religion-based sex offender treatment but only when an individual is coerced into participating in such programming. *Id.* (citing *Mtr. of Griffin v. Coughlin,* 88 N.Y.2d 674, 677, 649 N.Y.S.2d 903, 673 N.E.2d 98, *cert. denied* 519 U.S. 1054, 117 S.Ct. 681; *Alexander,* 118 F.Supp.2d at 302; *Warner,* 115 F.3d at 1074–1075). The court found further

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

that,

> Petitioner, who is an atheist, failed to establish that he was required to participate in any religion-based treatment programs offered by CNYPC and, indeed, the documents submitted by petitioner demonstrate that most of the programs cited by petitioner as being religion-based provide nothing more than relaxation, meditation or introspection techniques. The record further establishes that petitioner was free to choose the programs in which he would participate and that there were several secular programs from which he could choose to satisfy his sex offender treatment requirement

*Id.,* 914 N.Y.S.2d at 542–42 (citing *Griffin,* 88 N.Y.2d at 677, 649 N.Y.S.2d 903, 673 N.E.2d 98; *Warner,* 115 F.3d at 1075).

### E. *The SOTP Programs At Issue*

At issue in this case are nine group therapy programs employed in the SOTP, four of which are Hazelden products, including from the Inside Out (Hazelden), Growing Up Male (Hazelden), Problem Solving (Hazelden), Anger Management (Hazelden), DBT, Self Care Skills I and II, Relaxation, Good Lives Model, [FN16] and Boundaries. Defendants have now submitted to the court a complete copy of these SOTP treatment modalities, including the protocols for each, and the formatted content of the programs, including the lesson plans, and the related worksheets.[FN17] Among the materials provided are also two DVDs that are used in association with the From the Inside Out group program. The protocols reveal the structure of each treatment modality and the topic of each weekly session. The program materials, DVDs, and worksheets show the actual content of each treatment modality.

> FN16. SOTP Director Terri Maxmillian states that Group Problem Solving is no longer offered at the CNYPC and has not been utilized for more than two years. Maxmillian Decl. (Dkt. No. 38–2) ¶ 21. A federal court has no authority to decide an issue when the relief sought can no

longer be given, or is no longer needed. *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). Since plaintiff's only remaining claims seek prospective injunctive relief and the Group Problem Solving program is no longer in use in the SOTP, it would appear that his challenge to that program is now moot.

> FN17. As was previously mentioned, the content and format for each program is drafted in such a manner that any SOTP clinical staff may lead the group, which gives the SOTP flexibility in the assignment of instructors each semester. Maxmillian Decl. (Dkt. No. 38–2) ¶ 12. It thus appears that while the material presented each semester is comparable, it may not be identical. *See id.*

### 1. *The Growing Up Male, Problem Solving, and Anger Management Group Therapy Modalities*

Plaintiff alleges that the Growing Up Male, Problem Solving, and Anger Management group therapy programs are all Hazelden products, which incorporate Christian beliefs and practices. Complaint (Dkt. No. 1) ¶ 3. Upon careful review of these program materials it is evident that they contain no reference to God, a Higher Power, or religion, nor do they appear to incorporate any religious rituals or practices.[FN18] Furthermore, there is nothing within those Hazelden group therapy programs supporting plaintiff's allegations that the programs are based in Christianity and include Christian practices. To the contrary, there is simply no evidence in the record before the court suggesting that the Growing Up Male, Problem Solving, and Anger Management group therapy modalities incorporate any religious beliefs or practices. As result, based upon the evidence before the court I have determined that no reasonable juror could find that these programs are offensive to the Establishment Clause.

> FN18. At week nine the Anger Management lesson includes a sample "Anger Control Plan" that identifies stress relief strategies. *See* Maxmillian Decl. (Dkt. No. 38–2) Exh. D. Among the potential strategies are exercise, relaxation, journal, and mediation. To the extent that plaintiff may take issue with the reference to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

meditation, the court notes that its review of the program material reveals no connection in the program materials between the suggested meditation and any religious practice or philosophy. To the extent that plaintiff alleges that meditation is a Buddhist practice, as defendants point out, there is no basis for a finding that only Buddhists meditate.

### 2. *From the Inside Out*

**\*9** Plaintiff similarly alleges that From the Inside Out, another Hazelden product, incorporates Christianity. Once again, however, the program materials associated with that group therapy modality do not support plaintiff's claim. The From the Inside Out group therapy materials reveal that the goal of that program is to teach SOTP participants that relationships are critical to living a responsible and productive life, and to take personal responsibility for the relationships in their lives. *See* Maxmillian Decl. (Dkt. No. 38–2) Exh. A. During the first week of that program the residents are taught, *inter alia,* that the course is about relationships and that relapse is most often "traced back to not knowing how to participate in healthy relationships—with ourselves, with others, and with our Higher Power." *Id.* Residents are asked to complete a worksheet intended to help the participant realize why relationships are important. The introductory paragraph to the worksheet notes, "There are many kinds of relationships. This exercise provides the names of different types of relationships you might have with different people [,]" and proceeds to list and identify six types of relationships, including the relationship with self, a significant other, children, relatives, support people, and a "Higher Power." *See id.* One's relationship with a higher power is labeled "faith." *See id.* The participant is then asked to chose one of the relationships listed, and to write the name of a person he or she would like to reestablish or continue a relationship with, and also to write in the type of relationship that is desired. *See id.* During the fifth session of the From the Inside Out group therapy, "trust" is discussed, and the resident is asked to complete a worksheet addressing that topic. Reference is once again made to "your Higher Power"; the worksheet instructs, "What you most owe yourself and your Higher Power is to change what you bring to your relationship that is not

fair." *Id.*

In my view, especially when considered in context of the goal of the From the Inside Out group therapy and the particular exercises in which they appear, it seems clear that these mere references to a higher power within that group modality do not advance or inhibit any particular religion. *See Skoros,* 437 F.3d at 13. It is equally obvious that the mention of a potential relationship with a higher power in these lessons and activities does not require or coerce the participant into believing in the existence of a higher power. Rather, these references simply supply an example of a kind of personal relationship an individual may have and may wish to pursue, one that is identified as "faith", in order to advance their healing.

At week ten of the From the Inside Out Program the lesson is focused on trust in communication. *See* Maxmillian Decl. (Dkt. No. 38–2) Exh. A. Within the context of that discussion, to emphasize the point that words have different meanings to different people, the instructor may use the word "Christmas" as an example, explaining that "[t]o one it might mean the best time of year, presents, religion, family, love, and so on. But to other people it might mean disappointment, pain and abandonment." *Id.* at ¶ 27 and Exh. A. At week 12, a Chinese parable, entitled "The Difference Between Heaven and Hell", is used in association with the lesson about making and keeping healthy relationships.[FN19] *See id.* It is intended to help make the point that in healthy relationships with others, everyone survives, but when you attempt to rely on yourself, you often fail. Maxmillian Decl. (Dkt. No. 38–2) ¶ 28. Again, there is nothing in the material before the court that suggests that these lessons foster, promote, or coerce any religious belief or practice.

FN19. That parable teaches as follows:

A very old man knew that he was going to die soon. Before he died, he wanted to know what heaven and hell were like, so he visited the wise man in his village. "Can you tell me what heaven and hell are like?" he asked the wise man. "Come with me and I will show you," the wise man replied. The two men walked down a long path until they came to a large house. The wise man took the old man inside, and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

there they found a large dining room with an enormous table covered with every kind of food imaginable. Around the table were many people, all thin and hungry, who were holding twelve-foot chopsticks. Every time they tried to feed themselves, the food fell off the chopsticks. The old man said to the wise man, "Surely this must be hell. Will you now show me heaven?" The wise man said, "Yes, come with me." The two men left the house and walked farther down the path until they reached another large house. Again they found a large dining room and in it a table filled with all kinds of food. The people there were happy and appeared well fed, but they also held twelve-foot chopsticks. "How can this be?" asked the old man. "These people have twelve-foot chopsticks and yet they are happy and well fed. The wise man replied, "In heaven the people feed each other."

Maxmillian Decl. (Dkt. No. 38–2) Exh. A.

**\*10** The DVDs used with the From the Inside Out program feature Ernie Larsen as an instructor/moderator, along with several former prison inmates who, at the beginning of the DVD set, discuss their respective backgrounds and their willingness to participate in creating the DVD due to a desire to give back and demonstrate to others that people are capable of changing their own lives. The DVDs include some instruction from Larsen, as well as discussion and role playing by the former inmates which coincides with the topics discussed each week in the program materials. The DVD was filmed at a halfway house. Maxmillian Decl. (Dkt. No. 38–2) ¶ 23. Occasionally in the DVD there are banners visible in the background that make reference to "God." [FN20] The men appearing in the DVD do not, however, discuss or promote their religion, and there are no lessons, interviews, or role playing that obviously relate to any religion or religious practices. In my view, these few fleeting and inconspicuous appearances of religious banners in the DVDs, or the mention of Christmas, or reciting of a Chinese parable, alone are insufficient to support plaintiff's claim that the From the Inside Out program is based in Christianity. *See Skoros,* 437 F.3d at

13.

FN20. The two banners that the court observed read as follows: "Live in God's Grace," and "All things Bright and Beautiful Come From God."

3. *GLM, DBT, Self Care Skills I and II, and Relaxation*

According to plaintiff's complaint, the GLM, DBT, Self–Care Skills I and II, and Relaxation group treatment modalities teach the rituals and practices of Buddhism. The purpose of the GLM modality is to assist participants in understanding a part of their identity as it relates to what they want to approach in life, which are identified as "primary needs." Maxmillian Decl. (Dkt. No. 38–2) Exh. H. There are fourteen basic human primary needs identified.[FN21] *See id.* At the start of that group therapy, participants are asked to rank in order of personal importance their primary needs, including spirituality and inner peace. *See id.* Residents are free to discount any of the primary human needs, including spirituality, if that need has no significance to the path they wish to pursue in furtherance of a socially acceptable lifestyle. Maxmillian Decl. (Dkt. No. 38–2) ¶ 44. In the following weeks, each class is devoted to discussing one or more of the primary needs. *Id.* at ¶ 42. There is no evidence of Buddhist practices or teachings contained within the GLM group therapy program materials.

FN21. Those fourteen primary needs are identified as autonomy, self-esteem, intimacy, health, sex, creativity, spirituality, financial security, excellence in work, recreation/leisure time, inner peace, intellectual stimulation, friendships and socialization, and family. Maxmillian Decl. (Dkt. No. 38–2) Exh. H.

DBT is designed to teach SOTP participants to regulate their emotions, manage stress and interpersonal relationships, and become aware of potential vulnerabilities they may have. *See* Maxmillian Decl. (Dkt. No. 38–2) Exh. E. For weeks three and four, the lesson is described in the lesson plan as "Distract–Wise Mind ACCEPTS". *See id.* The lessons utilize acronyms to assist in teaching "Crisis Survival Strategies"; in four boxes the handout for weeks three and four lists "[s]kills for tolerating painful events and emotions when you

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

cannot make things better right away." *Id.* As indicated in the first box in that handout, "ACCEPTS" denotes "Activities, Contributing, Comparisons, Emotions, Pushing away, Thoughts, Sensations." *See id.* That handout also refers to "Self–Soothe the Five Senses" as another apparent destressing strategy, as well as "IMPROVE THE MOMENT", with "IMPROVE" referencing "Imagery, Meaning, Prayer, Relaxation, One thing at a time, Vacation, Encouragement", and finally "PROS AND CONS" in the last box, referring to developing a list of pros and cons of "tolerating the distress" and another list of pros and cons resulting from "not tolerating the distress". *See id.* The materials further explain the various strategies signified by IMPROVE, describing the seven skills the word symbolizes, including imagery, meaning, prayer, relaxation, and "one thing in the moment," specifically stating with regard to prayer and relaxation,

**\*11 With *P* rayer:**

Open your heart to a supreme being, greater wisdom, God, your own wise mind. Ask for strength to bear the pain in this moment. Turn things over to God or a higher being.

**With *R* elaxation:**

Try muscle relaxing by tensing and relaxing each large muscle group, starting with your hands and arms, going to the top of your head, and then working down; listen to a relaxation tape; exercise hard; take a hot bath or sit in a hot tub; drink hot milk; massage your neck and scalp, your calves and feet. Get in a tub filled with very cold or hot water and stay in it until the water is tepid. Breathe deeply; half-smile; change facial expression.

Maximillian Decl. (Dkt. No. 38–2) Exh. E (emphasis in original).

According to SOTP Director Maximillian, DBT is an effective therapeutic tool for persons with personality orders; for some, learning to relax or pray, as referenced in the lesson formats for weeks three and four, helps them to manage or avoid stressful situations. Maximillian Decl. (Dkt. No. 38–2) ¶ 35. Other than the two generic

references to prayer and relaxation as potential skills that participants can employ as tools to aid in diffusing stressful situations, there are no references to any religion or religious practices or rituals found in the DBT program materials and, contrary to plaintiff's allegations in this action, they do not mention Buddha or incorporate Buddhism.[FN22]

> FN22. "Buddha" is an "Indian mystic and founder of Buddhism. He began preaching after achieving supreme enlightenment at the age of 35." AMERICAN HERITAGE DICTIONARY 241 (4th ed.2000). Buddhism is defined by the same source as "[t]he teaching of Buddha that life is permeated with suffering caused by desire, that suffering ceases when desire ceases, and that enlightenment obtained through right conduct, wisdom, and meditation releases one from desire, suffering, and rebirth." *Id.* Nothing in the content of the DBT, Self Care Skills I and II, and Relaxation program materials refers to or discusses these concepts.

The Self Care Skills I and II group treatment programs are intended to teach residents the causes of stress and enable them to develop appropriate coping skills. Maximillian Decl. (Dkt. No. 38–2) ¶ 36 and Exh. F. The second segment of that program builds on the concepts taught in the first and asks the participants to apply those concepts to explore their family systems by analyzing each family member's role in the family unit, as well as what separates healthy families from dysfunctional families. *See id.* In Self Care Skills II, in the lesson plan for week two, which is described as understanding family belief patterns, participants are instructed how each is shaped by his or her past and are asked to brainstorm about their own belief patterns. *See id.* Two categories are identified for the brainstorming exercise: "family" and "individual." The subcategories under family include family configuration, ethnic origin, cultural values, economics, and religion. *See id.* These concepts are introduced as part of the discussion pertaining to understanding family belief patterns and are continued into weeks three of Self Care Skills II, when the discussion is focused on the function of families. Maximillian Decl. (Dkt. No. 38–2) ¶ 37. The handout associated with that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

lesson describes how healthy families function and what needs they fulfill for their members, including maintenance, nurturance, inclusion, privacy, esteem, understanding, recreation, and spirituality. *See id.* at Exh. F. These are the only references to religion or spirituality that are found in the Self Care Skills I and II program materials. As with DBT, based upon a review of the materials before me, I find no evidence to support plaintiff's allegation that the Self Care Skills I and II group therapies are Buddhist-based.

**\*12** I next turn to the Relaxation group therapy. *See* Maxymillian Decl. (Dkt. No. 38–2) Exh. G. Defendants concede that this program includes relaxation techniques, such as self awareness and deep breathing, which may be associated with some Eastern philosophies such as Buddhism. *Id.* at ¶ 31. The court's review of the program materials associated with this modality, however, confirms that there is no reference to any of those philosophies, any other religion, or to the concepts of religion, a higher power, or even spirituality for that matter.

### 4. *Boundaries Group Therapy*

The only remaining program to be addressed is the Boundaries program, the purpose of which is to teach SOTP residents the concept of interpersonal boundaries and to understand boundary violations. In that group treatment modality, I have found a single reference to religion in the program materials. At week seven, the resident is asked to identify how much he or she is threatened by others whose religious views differ from his or hers. Maxymillian Decl. (Dkt. No. 38–2) ¶ 46 and Exh. I. Once again, this single general reference to religion is insufficient to support an Establishment Clause violation. *See Skoros,* 437 F.3d at 13.

In sum, a careful review of the record before the court, reveals that, at worst, six of the nine group treatment modalities utilized in the SOTP include some acknowledgment that religion and/or spirituality plays an important role in our society and can contribute to healing and provide a potential tool for managing difficult situations in one's life. Of the nearly 600 pages of program materials submitted to the court, I have found only twelve general references to the concept of religion or spirituality. The Establishment Clause, however, has never been interpreted to require government " 'to purge from the public sphere all that in any way partakes of the religious' ", *Skoros,* 437 F.3d at 13 (quoting *Van Orden v. Perry,* 545 U.S. 677, 699, 125 S.Ct. 2854, 2868 (2005) (Breyer, J., concurring)), nor does that clause demand that courts " 'sweep away all government recognition and acknowledgment of the role of religion in the lives of our citizens,' " *id.* at 30 (quoting *Allegheny Cnty.,* 492 U.S. at 623, 109 S.Ct. 3086). Similarly, references to spirituality alone do not draw into play the Establishment Clause. *Hatzfeld,* 2010 WL 5579883, at *7 (citing *Decker v. Hogan,* No. 9:09–CV–0239, 2009 WL 3165830, at *4 (N.D.N.Y. Sep. 28, 2009) (in turn citing *Boyd v. Coughlin,* 914 F.Supp. 828, 833 (N.D.N.Y.1996) and *Pratt v. Hogan,* No. 6:08–cv–1003, 2009 WL 87587, at *2 (N.D.N.Y. Jan. 9, 2009)).

To be sure, as the Second Circuit has recognized,

the type of coercion that violates the Establishment Clause need not involve either the forcible subjection of a person to religious exercises or the conditioning of relief from punishment on the attendance at church services. Coercion is also impermissible when it takes the form of "subtle coercive pressure" and interferes with an individual's "real choice" about whether to participate in worship or prayer.

**\*13** *DeStefano,* 247 F.3d at 412 (citations omitted). In other words, the fact that participants are not "required" to engage in prayer or participate in religion is not necessarily dispositive. The Supreme Court has cautioned "that purpose must be taken seriously under the Establishment Clause and needs to be understood in light of context[.]" *McCreary Cnty., Kentucky,* 545 U.S. at 874, 125 S.Ct. at 2733.

The unrefuted goals of the SOTP, as well as the treatment modalities contained within the record, are secular—that is, to rehabilitate dangerous sex offenders and thereby further the state's interest in protecting the safety of its communities by reducing the risk of recidivism of sex offenders who are released into society. Each of the group therapy modalities at issue has its own goal intended to further this secular purpose; none of these goals is intended to promote religion or spirituality.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

Moreover, the record is devoid of any evidence even remotely suggesting that the treatment modalities at issue employ subtle coercion to inculcate the notion that participants are required to participate in a religion or exercise spirituality. To the contrary, the references to religion and spirituality appear on limited occasions throughout the materials as examples of types of personal relationships or skills that may be used to promote mental health and achieve a socially acceptable lifestyle. Additionally, defendants have established that SOTP participants are afforded the option of not participating in activities they perceive as spiritual or offensive to their religious beliefs; an SOTP resident's decision not to participate in these relatively few exercises or discussions would in no way impede his or her progress in the program. Indeed, it seems clear that on the record before this court that the concepts of religion and spirituality are not coercively employed in the SOTP program, but instead merely introduced as an effort to provide SOTP participants with options and/or skills for improving their lives.

In view of the foregoing, based upon the evidence before the court, I have determined that no reasonable factfinder could conclude that the SOTP group therapy programs at issue in this case violate the Establishment Clause, and I therefore recommend that defendants' motion for summary judgment as to this claim be granted.

F. *Plaintiff's Free Exercise Claim*

In addition to a violation of the Establishment Clause, plaintiff also complaints of interference with his rights under the Free Exercise Clause of the First Amendment. That provision prohibits "governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion." *Mozert v. Hawkins Cnty. Bd. of Educ.,* 827 F.2d 1058, 1066 (2d Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029 (1988).[FN23] In general, in order to avoid a violation of the Free Exercise Clause of the First Amendment a government action that substantially burdens a religious practice must be justified by a compelling government interest. *See Sherbert v. Verner,* 374 U.S. 398, 406, 83 S.Ct. 1790, 1795 (1963). In a prison setting, due to the unique concerns presented, the governmental burden in this regard is substantially lessened. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003).

> FN23. Courts have consistently recognized that atheism falls within the ambit of the First Amendment's protection. *Hatzfeld,* 2010 WL 557883, at * 6 (citing cases); *see also Wallace v. Jaffree,* 472 U.S. 53, 105 S.Ct. 2479, 2487 (1985) ("[T]he Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all."). At the time of commencement of this action plaintiff asserted that he was an atheist. However, it appears that he is now claiming to be Buddhist.

**\*14** It is recognized that while inmates are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the Free Exercise Clause of that amendment does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system ."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases). The task of defining the contours of a prison inmate's free exercise rights requires careful balance of the rights of prison inmates against the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987); *Ford,* 352 F.3d at 588; *Salahuddin v. Coughlin,* 993 F.2d at 308. When considering whether an action impinges upon an inmate's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574, *cert. denied,* 498 U.S. 951, 111 S.Ct. 372 (2d Cir.1990) (quoting *Turner v. Safely,* 482 U.S. 78, 89, 107

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

S.Ct. 2254, 2261 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404).

The Second Circuit has yet to decide the appropriate standard to be applied where, as here, a plaintiff is involuntarily civilly committed in a secure treatment facility sharing many of the concerns and characteristics of prison facilities; as was recently noted by one of my colleagues, the issue appears to be one that has divided courts. *Kalwasinski v. Maxymillain,* No. 9:09–CV–0214, 2010 WL 5620908, at * 3 (N.D.N.Y. Dec. 23, 2010) (Lowe, M.J.) (citing cases), *report and recommendation adopted,* 2011 WL 195648 (N.D.N.Y.2011) (Hurd, J.); *compare Carey,* 2010 WL 2519121, at *3 (applying substantial burden/compelling interest test to CNYPC patient's free exercise claim) and *Pratt,* 631 F.Supp.2d at 198 (same), *with Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 WL 2543573, at *6 (S.D.N.Y. June 25, 2008) (applying legitimate penological purpose test to Mid–Hudson Psychiatric Center patient's free exercise claim) and *Abdul–Matiyn v. Pataki,* No. 9:06–CV–1503, 2008 WL 974409, at *12 (N.D.N.Y. Apr. 8, 2008) (applying legitimate penological purpose test to CNYPC patient's free exercise claim) (Hurd, J.). Resolution of this question of law is unnecessary in this case, however, since I have concluded that under even the more rigorous test, plaintiff's Free Exercise claim would fail.

**\*15** As an initial matter, a plaintiff challenging a prison regulation on Free Exercise grounds must show that it substantially burdens a sincerely held religious belief.[FN24] *Salahuddin v. Goord,* 467 F.3d at 274–75. Defendants have now shown that the program materials at issue would not impose a substantial burden on plaintiff's beliefs, whether they be grounded in atheism or Buddhism, since there is nothing in the SOTP that requires a participant to engage in the practice of religion, or perform any exercises that demand a belief in spirituality, and there is no evidence in the record that plaintiff is otherwise required or forbidden to perform any activity that is offensive to his own religious beliefs. To the contrary, defendants have shown that with respect to those activities that mention religion and/or spirituality, plaintiff may freely choose not to participate.

FN24. Here, defendants seem to take issue with plaintiff's ability to make this required showing with respect to those programs that he challenges as incorporating Buddhism since he is now a practicing Buddhist. According to a recent statement made by plaintiff, he meditates and performs yoga daily and also follows a regimen of "mindfulness," apparently stemming from his current Buddhist beliefs. Maxmillian Decl. (Dkt. No. 38–2) ¶ 56. As a result, at least with respect to those group therapy modalities that he claims incorporate Buddhism, it seems clear that given his current religious practices plaintiff cannot now claim that those programs impose a substantial burden on his beliefs.

Even if that were not the case, however, plaintiff's Free Exercise claim would fail as application of the *Turner* factors favors the defendants in this action. In considering whether the governmental action serves a legitimate interest, the Second Circuit has characterized "the first 'factor' [as] more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Salahuddin v. Goord,* 467 F.3d at 274 (citing and quoting *O'Lone,* 482 U.S. at 350, 107 S.Ct. 2400 ("[A] regulation must have a logical connection to legitimate governmental interests....")).

In its decision in *McKune v. Lile,* 536 U.S. 24, 35–36, 122, S.Ct. 2017, 2026 (2002), the Supreme Court recognized the serious threat presented by sex offenders released into the community and the high rate of recidivism, attributable to that segment, noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sexual assault[,]" adding that "[s]tates thus have a vital interest in rehabilitating convicted sex offenders. *McKune,* 536 U.S. at 33, 122 S.Ct. at 2024 (citations omitted); *see also Hobbs v. Westchester Cnty.,* 397 F.3d 133, 150 (2d Cir.) (finding protection of physical and social well being of minors a compelling interest when evaluating a First Amendment challenge to the ban on the issuance of permits for solicitation, performance or similar activity on county property to persons known to have been convicted of sex offenses against minors, where the presentation would

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

entice children to congregate), *cert. denied,* 546 U.S. 815, 126 S.Ct. 340 (2005); *Stevenson v. State and Local Police Agencies,* 42 F.Supp.2d 229, 223 (W.D.N.Y.1999) (finding that with respect to sex offender registration legislation that "[o]bviously the state has a strong interest in ensuring the safety and well-being of its citizens").

The evidence now before the court shows that the group therapy programs are part of a regimen designed to rehabilitate repeat sex offenders in order to reduce recidivism and protect the community upon their release; these are governmental interests that the court finds to be indisputably compelling. Defendants have likewise established a rational connection between the use of the materials at issue and the rehabilitation of the SOTP program participants. Defendants have produced uncontroverted evidence that the treatment services are designed to enhance an individual's treatment engagement and develop the skills necessary to avoid future anti-social behavior. They have shown that the materials they use are based upon methods that are consistent with best known practices in the field of sex offender treatment, and that as new research evolves the SOTP adapts its programs accordingly, incorporating new groups and eliminating others as appropriate. In addition, defendants have come forward with evidence that religion and spirituality may play a role in some people's recovery, and that relaxation and spirituality have proven to be effective therapeutic tools for persons with personality disorders, such as sex offenders, by teaching them coping skills and how to regulate their emotions, and ultimately to avoid offending behaviors. *See* Maximmilian Decl. (Dkt. No. 38–2) ¶¶ 35, 53.

**\*16** In sum, after careful review of the record before the court, I have found no evidence that anything encompassed within the SOTP group therapy modalities that plaintiff challenges in this action imposes a substantial burden upon his religious beliefs, whether that is as an atheist or a Buddhist. Moreover, the evidence presented establishes that the occasional identification of religion and/or spirituality as a potential tool for achieving a socially acceptable lifestyle is reasonably related to the compelling governmental interests of reducing recidivism and protecting society from repeat sex offenders. *See Bush v. Goord,* No. 03–CV–759S, 2009 WL 790358, at *3–4

(W.D.N.Y. Mar. 25, 2009) (finding a rational connection between the sex offender counseling program ("SOCP"), including its requirement that prisoners take responsibility for their crimes or face the loss of good time credits for non-participation, and the DOCS' interest in rehabilitating prisoners, and that the primary purpose of the SOCP, which is to reduce the likelihood that convicted sex offenders and other inmates with histories of sexual offending behavior will reoffend, by helping them to gain control of the chain of behaviors that leads to sexual offending).

For all of the foregoing reasons, I have concluded that based upon the record before the court no reasonable juror could find in favor of plaintiff on his Free Exercise claim, and therefore recommend that defendants' motion be granted as to that cause of action as well.

## G. *The Intervenor's Motion*

Jeremy Zielinski, who identifies himself as a member and supporter of the New York chapter of Reform Sex Offender Laws ("RSOL"), an organization devoted to reforming sexual offense laws and ending biases and stereotypes against those labeled as sex offenders, has moved to intervene in this action for the limited purpose of seeking access to the documents filed under seal, and to vacate the court's order granting defendants leave to file the SOTP program materials under seal, asserting his own as well as the public's First Amendment right to access judicial proceedings. *See* Dkt. Nos. 43. Defendants' have opposed that motion. Dkt. No. 45.

As was recognized by the Second Circuit in *Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110 (2d Cir.2006), the right of public access to the federal courts, including judicial records, is firmly rooted in our nation's history and gives rise to a presumption of openness in judicial proceedings. *Id.* at 119; *see also Gambale v. Deutsche Bank,* 377 F.3d 133, 140 (2d Cir.2004). This presumption of public access serves twin purposes, promoting accountability of the courts and fostering public confidence in the administration of justice. *Id.* (quoting *United States v. Amodeo,* 71 F.3d 1044, 1048 (2d Cir.1995)). In deciding whether to seal presumptively public judicial documents a court should weigh the importance of the presumption of public access,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

depending upon the type of judicial function at issue, against the interests sought to be protected by sealing. *Securities and Exchange Comm'n v. Oakford Corp.,* No. 00 Civ. 2426, 2001 WL 266996, at\* 1 (S.D.N.Y. Mar. 16, 2001) (citing, *inter alia, Amodeo,* 71 F.3d at 1047–51). Additionally,

> **\*17** [t]he motives of the party invoking the presumption of public access, and those of the party opposing such access, may be considered insofar as they bear on the veracity of the parties' asserted positions. In all events, "a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need."

> *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.,* 26 F.Supp.2d 606, 610–11 (S.D.N.Y.1998) (citing *Amodeo* and quoting *In re Orion Pictures Corp.,* 21 F.3d 24, 27 (2d Cir.1994)).[FN25] By its very nature, the sealing of some or all of the court's records in a case "impose[s] a substantial burden on the court[ ] and the judge[ ] to whom [it] is assigned." *Standard Chartered Bank Int's (Americas) Ltd. v. Calvo,* 757 F.Supp.2d 258, 260 (S.D .N.Y. Jun. 16, 2010).

> FN25. Rule 83.13 of this court's local rules of practice, which outlines the procedures to be filed when some or all of a case is sealed, provides, in relevant part,

> > [a] party seeking to have a document ... or entire case sealed shall submit an application, under seal, setting forth the reason(s) why the document, party or entire case should be sealed, together with a proposed order for the assigned judge's approval.

> > N.D.N.Y.L.R. 83.13.

Although not mentioned in proposed intervenor Zielinski's submission on the pending motion, he is familiar to this court, having recently appeared on a petition brought by a United States Probation Officer to modify the conditions of Zielinski's supervised release.[FN26],[FN27] *United States v. Zielinski,* No. 1:11–cr–0533 (N.D.N.Y. filed Nov. 14, 2011). It appears

from court records that on June 28, 2006 Zielinski pleaded guilty to federal charges of conspiracy to commit access fraud in violation of 18 U.S.C. § 1028(a)(7). *See id.* at Dkt. No. 1. Subsequently, on or about August 30, 2006, Zielinski was convicted of charges contained in a 56–count indictment in Warren County, New York, including charges of promoting a sexual performance of a child, possessing a sexual performance by a child, and attempted dissemination of indecent material to a minor. *See id.* at Dkt. No. 3. As a result of that conviction, Zielinski was classified by New York State as a Level 2 Sex Offender. After conducting a hearing on the petition, the court sentenced Zielinski to six (6) months of home confinement for his violation of the terms of his pre-existing supervised release. *See id.* at Dkt. No. 39, p. 2. The court also modified the terms and conditions of Zielinski's supervised release by 1) extending the supervised release term for a period of 24 months following his sentence on the violation, and 2) by imposing special conditions of supervised release related to his state court convictions. *See id.* at Dkt. No. 39, p. 2. Those special conditions included a requirement that Zielinski participate in a mental health program, including participation in a treatment program for sexual disorders. *See id.* at Dkt. No. 39. n. 6.

> FN26. The judicial documents and official court records associated with those proceedings, as publically available documents, are properly considered by the court and entitled to judicial notice in connection with this proceeding. *See* Federal Rules of Evidence 201 and 1005; *see also, Wilson v. Limited Brands, Inc.,* No. 08 CV 3431, 2009 WL 1069165 at \*1 n. 1 (S.D.N.Y. April 17, 2009).

> FN27. Zielinski, who was formerly a New York State prison inmate, has also previously filed at least four civil rights actions in this court relating to, among other things, the conditions of his confinement. *See Zielinski v. Fischer, et al.,* No. 9:09–CV–1444 (N.D.N.Y. filed Dec. 29, 2009); *Zielinski v. Rabsatt, et al.,* No. 9:10–CV–0246 (N.D.N.Y. filed Mar. 3, 2010); *Zielinski v. Fischer, et al.,* No. 9:10–CV–1014 (N.D.N.Y. filed Aug. 23, 2010); *Zielinski v. Defreest, et al.,*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

No. 6:11–CV01359 (N.D.N.Y. filed Nov. 16, 2011). All of these matters are now closed.

Zielinski appealed that decision, and on February 24, 2012 filed a motion to stay his sentence pending appeal; that application was denied. On March 28, 2012, just seven days before filing his current motion to intervene, Zielinski filed a second motion to stay his sentence pending appeal, arguing, among other things, that the mental health program counseling he is required to attend is imposing a religious viewpoint upon him in violation of his First Amendment rights. *See United States v. Zielinski,* No. 1:11–cr–0533, Dkt. No. 33. In his decision and order, dated May 8, 2012, denying Zielinski's second motion to stay his sentence, District Judge McAvoy noted that "[Zielinski's] constitutional challenge to the specific mental health treatment program he has been assigned might be the basis for a modification petition (and which would require a separate hearing exploring the nature of the mental health treatment program), but it does not present a 'close call' or an issue that could have been decided the other way on whether the Court had the authority to modify the terms of his supervised release requiring that he attend mental health counseling ." *Id.* at Dkt. No. 39, pp. 6–7. The record does not reveal whether the sex offender treatment program in which Zielinski is required to participate utilizes the SOTP group therapy materials at issue in this case.

**\*18** In opposing Zielinski's motion, defendants have submitted the declarations of SOTP Director Terry Maxymillian, Psy.D., and of Naomi Freeman, Ph.D., the Director of the OMH Bureau of Sex Offender Evaluation and Treatment. Dkt. Nos. 45 and 45–1. In these submissions, defendants reiterate the dual purpose of the CNYPC–SOTP, and assert that disclosure of the SOTP materials to residents of that program would undermine its critical therapeutic objectives. *See id.* More specifically, Dr. Freeman, who is responsible for oversight and management of the personnel and facilities engaged in the civil management of sex offenders as mandated by MHL Article 10, states that "[t]o maximize the potential effectiveness of [the SOTP group therapy], it is of paramount importance that precautions are taken to minimize the likelihood that the program content ... come into possession of SOTP residents in advance of their

actual participation in the programs." Freeman Decl. (Dkt. No. 45–1) ¶ 10. Dr. Freeman explains that the group therapy protocols are not intended to be self-study, and that attempts by residents to "treat themselves" by working on the materials outside of the program, before they are clinically ready to do so, would undermine efforts of staff to engage residents in clinical work that is more suited to their current abilities and treatment needs, and interfere with the therapeutic relationship and treatment process. *Id.* at ¶¶ 11, 13, 15. Dr. Freeman states further that providing access to these group therapy program materials to SOTP residents before clinically appropriate would not only weaken the therapeutic benefits, but place the public at greater risk for sexually reoffending behavior. *Id.* at ¶ 18.

According to SOTP Director Maxymillian, many SOTP residents have long histories of manipulating people and systems, and, at least initially, have very little motivation to change their views on sexually offending behaviors. Maxymillian Decl. (Dkt. No. 45) ¶ 16. Maxymillian further explains that if these materials were made available to SOTP participants it would open the door to the manipulation of the therapy groups and other participants in the groups. *Id.* at ¶¶ 13, 16. There is also a risk that the evaluative process of these individuals would have to be extended to compensate for potential false positives created by advance access to program materials, and thus prolong the time it takes for residents to successfully complete programs, or for staff to evaluate whether they have done so. *Id.* at ¶ 18. Additionally, because the possession of program materials by SOTP residents is considered contraband, disclosure would also require the CNYPC to become "hyper-vigilant" in policing its possession. *Id.* at ¶ 14. These detrimental effects would extend beyond CNYPC–SOTP to other sex offender treatment programs throughout New York State, and could very well undermine the purposes underlying MHL Article 10. *Id.* at ¶ 20.

**\*19** In the face of the evidence offered from these doctors, who are experienced OMH executives, Zielinski has offered nothing but conjecture to suggest that their concerns and the anticipated risks of disclosure are unfounded. I have considered proposed intervenor Zielinski's personal interest in the program materials at issue, and it appears that his current motion may be for the

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

purpose of obtaining discovery related to the criminal matter that he has pending in this District, a practice the court cannot condone. Indeed, it seems clear that the disclosure of the program materials at issue in this case to Zielinski, a convicted sex offender who is required to participate in sex offender treatment, would directly implicate the very concerns that justified the court's decision to allow defendants to file them under seal in the first place.

Having weighed the competing considerations, I have determined that sealing of the SOTP program materials in this case remains warranted due to the potential detrimental effect that disclosure of the materials to convicted sex offenders may have on the SOTP program goal to rehabilitate them. Balancing the public's right of access to court proceedings, I have narrowly tailored the order so as to allow the filing of only the complete set of SOTP program materials under seal, and I note that the public otherwise retains full access to this matter, including SOTP Director Maxymillian's declarations and all other submissions filed by defendants in support of their motion for summary judgment, as well as this court's report and recommendation, which explains in detail the basis for the conclusion that the record before the court does not support plaintiff's First Amendment claims.

For these reasons, I will deny the proposed intervenor's motion.

IV. *SUMMARY AND RECOMMENDATION*

Though raising potentially significant First Amendment challenges to the use of certain group therapy programs in the SOTP, having now had the opportunity to review the entirety of the program materials, it seems clear that plaintiff's claims cannot be sustained based upon the record before the court. While some of the group therapy modalities at issue at times make mention of religion or spirituality, there is nothing in those materials that either overtly or subtly coerces SOTP participants to engage in religious or spiritual practices, thus dispelling plaintiff's Establishment Clause claim. With regard to plaintiff's Free Exercise claim, the record is lacking any evidence demonstrating that anything included in the SOTP program materials substantially burdens plaintiff's sincere

religious beliefs. Moreover, defendants have shown that the references to religion and spirituality as potential tools to assist SOTP participants in developing a socially acceptable lifestyle is reasonably related to the State's compelling interest in rehabilitating sex offenders in order to reduce recidivism and protect the community from repeat offenses. Considering the undisputed evidence before the court, I have thus concluded that the defendants have now met their burden to establish the lack of material issues of fact for trial, and therefore recommend that their motion be granted.

**\*20** With respect to proposed intervenor Zielinski's motion to intervene for the purposes of unsealing the SOTP program materials, I have found that the State's interests in maintaining these records under seal in order to ensure the integrity of the program outweighs Zielinski's interest in disclosure, and have carefully crafted my sealing order to protect the public's First Amendment right to access to judicial proceedings. Accordingly, Zielinski's motion will be denied.

For all of the foregoing reasons, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment, Dkt. No. 38, be GRANTED, and that judgment be entered in favor of the defendants in this action dismissing all remaining claims in the action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby further

ORDERED that proposed intervenor's motion, Dkt. No. 43, is DENIED; and it is further

ORDERED that the clerk of the court serve a copy of this report, recommendation and order upon the parties and the proposed intervenor in accordance with this court's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3686083 (N.D.N.Y.)

(Cite as: 2012 WL 3686083 (N.D.N.Y.))

local rules.

N.D.N.Y.,2012.

McChesney v. Hogan
Not Reported in F.Supp.2d, 2012 WL 3686083
(N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3655467 (N.D.N.Y.)

(Cite as: 2012 WL 3655467 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
David McCHESNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, New York State
Office of Mental Health, et al., Defendants.
No. 9:08–CV–1186 (NAM/DEP).

Aug. 24, 2012.
David mcchesney, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Office of the Attorney
General, State of New York, Adele Taylor–Scott, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

### MEMORANDUM–DECISION AND ORDER

NORMAN A. MORDUE, District Judge.

**\*1** The above matter comes to me following a
Report–Recommendation (Dkt. No. 49) by Magistrate
Judge David E. Peebles, filed July 30, 2012,
recommending that this Court grant defendants' motion
(Dkt. No. 38) for summary judgment dismissing the sole
remaining cause of action in plaintiff's *pro se* civil rights
complaint under 42 U.S .C. § 1983. In this cause of action,
plaintiff, a convicted sex offender who has been civilly
committed to the Central New York Psychiatric Center for
participation in sex offender treatment, alleges that his
compulsory participation in the Sex Offender Treatment
Program violates his First Amendment rights, because the
program is partially based on religious tenets.

In the Report and Recommendation, Magistrate Judge
Peebles conducts a thorough and thoughtful review of the
Sex Offender Treatment Program materials in light of First
Amendment principles, and finds no constitutional
infirmity. Plaintiff interposes no objection. The Court
adopts the Report and Recommendation in full.

It is therefore

ED that the Report–Recommendation (Dkt. No. 49)
is accepted in its entirety; and it is further

ORDERED that the defendants' motion for summary
judgment (Dkt. No. 38) is granted and the complaint is
dismissed with prejudice; and it is further

ORDERED that the Clerk is directed to enter
judgment accordingly; and it is further

ORDERED the Clerk is directed to serve a copy of
this Memorandum–Decision and Order on all parties and
Magistrate Judge Peebles in accordance with the Local
Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.

McChesney v. Hogan
Not Reported in F.Supp.2d, 2012 WL 3655467
(N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1253644 (S.D.N.Y.)

(Cite as: 2010 WL 1253644 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Hary BRAMA, Petitioner,
v.
UNITED STATES of America, Respondent.
No. 08 Civ.1931(RMB).

March 16, 2010.
***DECISION & ORDER***

RICHARD M. BERMAN, District Judge.
**I. Background**
   **\*1** On or about February 8, 2008, Hary Brama
("Petitioner" or "Brama"), proceeding *pro se,* filed a
petition for a writ of habeas corpus ("Petition") pursuant
to 28 U.S.C. § 2255 seeking to vacate, set aside, or correct
his two concurrent sentences of 87 months imprisonment
entered by this Court on January 18, 2007. (*See* Mot. to
Correct Sentence Pursuant to 28 U.S.C. § 2255, dated Feb.
8, 2008 ("Pet."), at 1-2.) Brama pled guilty in response to
two indictments in allocutions on April 7, 2006 (before
Magistrate Judge Theodore H. Katz) and on April 28,
2006 (before Magistrate Judge Henry B. Pitman) to two
counts of conspiracy to distribute and possess with intent
to distribute heroin in violation of 21 U.S.C. §§ 812,
841(a)(1) and 841(b)(1). (*See* Judgment S-5 [# 141], No.
05 Cr. 109 (Jan. 8, 2007) ("S-5 Judgment"); Judgment S-6
[# 142], No. 05 Cr. 109 (Jan. 8, 2007) ("S-6 Judgment");
Superseding Indictment S-5 [# 53], No. 05 Cr. 109 (Feb.
2, 2006), Superseding Indictment S-6 [# 54], No. 05 Cr.
109 (Feb. 2, 2006).) FN1

>     FN1. Petitioner was represented by Martin
>     Geduldig for his guilty pleas on April 7, 2006
>     and April 28, 2006. (*See* Pet. at 3.) He was
>     represented by Joseph Bondy for his January 17,
>     2007 sentencing. (*See* Pet. at 7.)

   Petitioner argues, among other things, that: (1)
counsel Martin Geduldig ("Geduldig") provided
ineffective assistance when he "misinformed [P]etitioner
about the amount of sentence the [G]overnment would
seek at sentencing"; (2) counsel Joseph Bondy ("Bondy")
provided ineffective assistance at sentencing when he
failed to make "reasonable objections" to the Pre-sentence
Investigation Report, dated August 30, 2006 ("PSR"), and
when he failed to file a notice of appeal as requested by
Petitioner; and (3) Petitioner's sentence should be reduced
because he has had two heart attacks since his sentencing
and has voluntarily consented to deportation. (Pet. at 3-9.)

   On November 19, 2008, the United States of America
("Government") filed an opposition arguing, among other
things, that: (1) as to Mr. Geduldig's representation prior
to Petitioner's guilty plea, Petitioner cannot demonstrate
any prejudice because "he was fully informed of the
possibility that his sentence might equal or exceed 87
months imprisonment"; (2) Bondy ably assisted Petitioner
at sentencing because Bondy "obtained the Government's
agreement that Brama qualified for safety-valve relief and
secured a "rare downward departure" from the applicable
United States Sentencing Guidelines ("Sentencing
Guidelines") range, and because Petitioner "did not
request that [Bondy] file a notice of appeal"; and (3)
Petitioner's claim of deteriorating health and his consent to
voluntary deportation do not provide a basis for "relief
from a conviction under section 2255," or a "modification
of his sentence ... [p]ursuant to 18 U.S.C. §
3582(c)(1)(A)(i)," or "a motion brought under 28 U.S.C.
§ 2241 ... based on conditions of confinement." (Ltr. from
Jonathan B. New to Hon. Richard M. Berman, dated Nov.
23, 2008 ("Opp'n"), at 12-14, 16-17 (internal quotations
and citations omitted).)

   **For the reasons set forth below, the Petition is
denied.**

**II. Legal Standard**

   **\*2** Collateral relief under 28 U.S.C. § 2255 is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1253644 (S.D.N.Y.)

(Cite as: 2010 WL 1253644 (S.D.N.Y.))

available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice .' " *United States v. Bokun,* 73 F.3d 8, 12 (2d Cir.1995) (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)). "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady,* 456 U.S. 152, 166, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *see Bokun,* 73 F.3d at 12 ("The reasons for narrowly limiting the relief permitted under [Section] 2255-a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place-are 'well known and basic to our adversary system of justice.' ") (citations omitted).

To prevail on an ineffective assistance of counsel claim, Petitioner must show "that counsel's performance was so unreasonable ... that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment, and [ ] that counsel's ineffectiveness prejudiced the defendant such that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *United States v. Gaskin,* 364 F.3d 438, 468 (2d Cir.2004) (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (internal citation omitted). In assessing whether counsel's performance was objectively reasonable, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001) (internal quotations omitted).

Where "the motion [for collateral relief under 28 U.S.C. § 2255] and the files and records of the case conclusively show that the prisoner is entitled to no relief," the court need not grant a hearing to "determine the issues and make findings of fact and conclusions of law." 28 U.S.C. § 2255(b); *see also Puglisi v. United States,* 586 F.3d 209, 214 (2d Cir.2009).

Where, as here, a petitioner is proceeding *pro se,* the Court construes the petitioner's claims liberally, *see Marmolejo v. United States,* 196 F.3d 377, 378 (2d Cir.1999), and will "interpret them to raise the strongest arguments that they suggest," *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

**III. Analysis**

**(1) Assistance of Counsel During Plea (Geduldig)**

Petitioner argues, among other things, that Geduldig "misinformed [P]etitioner about the amount of sentence the [G]overnment would seek at sentencing." (Pet. at 2-3 (capitalization omitted).) The Government counters, among other things, that Petitioner "was fully informed of the possibility that his sentence might equal or exceed 87 months imprisonment" and "no promises were made to Brama about his expected sentence." (Opp'n at 12-13.)

**\*3** Petitioner's claim fails because he "plead[ed] guilty while being aware of the potential maximum prison term and knowing that the sentence to be imposed was within the court's discretion" and, therefore, cannot "show that he suffered prejudice as a result of [his counsel's alleged] advice." *Benigno v. United States,* 285 F.Supp.2d 286, 299 (E.D.N.Y.2003) (citing *United States v. Sweeney,* 878 F.2d 68, 70 (2d Cir., 1989)) (internal quotations omitted). Petitioner fails to establish "a reasonable probability that, but for counsel's [alleged] errors, he would not have pleaded guilty and would have insisted on going to trial." *Robles v. Fischer,* No. 05 Civ. 3232, 2008 U.S. Dist. LEXIS 20493, at *24 (S.D.N.Y. Feb. 22, 2008) (citing *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). Indeed, Petitioner concedes he "is not conte[st]ing his conviction, nor suggesting that the plea was involuntary," but arguing only that "his sentence should be lower than the court imposed 87 months." (Pet. at 3); *see United States v. Cuoto,* 311 F.3d 179, 187 (2d Cir.2002).

Petitioner's statements at his plea allocutions on April 7, 2006 and April 28, 2006 clearly indicate that he was aware that an 87 month sentence was within the Court's discretion. (*See* Tr. of Proceedings before Mag. J. Theodore H. Katz, dated Apr. 7, 2006 ("S-6 Indictment Plea Allocution"), at 2:18-3:19, 8:18-9:11; Tr. of Proceedings before Mag. J. Henry B. Pitman, dated Apr. 28, 2006 ("S-5 Indictment Plea Allocution"), at 10:2-11:17); *see also United States v. Juncal,* 245 F.3d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1253644 (S.D.N.Y.)

(Cite as: 2010 WL 1253644 (S.D.N.Y.))

166, 171 (2d. Cir.2001); *Favia v. United States,* No. 01 Civ. 6385, 2007 U.S. Dist. LEXIS 51639, at *21 (E.D.N.Y. July 17, 2007); *Polito v. United States,* No. 06 Civ. 4782, 2007 U.S. Dist. LEXIS 71066, at *12 (E.D.N.Y. Sept. 17, 2007) ("Great weight must be given to the statements Petitioner made during his plea."). He knew that if his plea were accepted, he faced a maximum sentence of life imprisonment and a mandatory minimum sentence often years' imprisonment. (*See* S-5 Indictment Plea Allocution at 10:2-10 ("[JUDGE PITMAN]: Do you understand that if your plea is accepted, you face a maximum sentence of life imprisonment [and] a mandatory minimum sentence of ten years' imprisonment? [PETITIONER]: Yes.").) He also knew that the two *Pimentel* letters, dated April 4, 2006 and April 27, 2006, respectively, which he had reviewed, contained a sentencing range of 108 to 135 months. (*See* Ltr. from Jonathan B. New to Martin Geduldig, dated Apr. 4, 2006 ("S6 Pimentel Ltr."), at 2 (Petitioner's "offense level of 31 and ... Criminal History Category of I yields a sentencing range of 108 to 135 months"); Ltr. from William C. Komaroff to Martin Geduldig, dated Apr. 27, 2006 ("S5 Pimentei Ltr."), at 2 (same); S-6 Indictment Plea Allocution at 8:18-21 ("[JUDGE KATZ]: Have you seen a copy of the letter [*i.e., Pimentel* letter] that Mr. New sent to your lawyer setting forth the government's view about the likely sentence that you face? [PETITIONER]: Yes."); S-5 Indictment Plea Allocution at 2:14-18 ("[JUDGE PITMAN]: My understanding is that there is no agreement with respect to this plea. Am I correct in that regard? MR. GEDULDIG: Yes, sir. It is being done pursuant to a *Pimentel* letter[.]").) Petitioner agreed that the sentence to be imposed would be determined by the Court. (*See* S-6 Indictment Plea Allocution at 8:9-11 ("[JUDGE KATZ]: Do you understand that the sentence to be imposed lies solely in Judge Berman's discretion? [PETITIONER]: Yes."); S-5 Indictment Plea Allocution at 11:11-17.) And, he twice stated that he was satisfied with Geduldig's representation. (*See* S-6 Indictment Plea Allocution at 6:3-5 ("[JUDGE KATZ]: Are you satisfied with Mr. Geduldig's services? [PETITIONER]: Yes."); S-5 Indictment Plea Allocution at 8:18-20 ("[JUDGE PITMAN]: Are you generally satisfied with Mr. Geduldig's representation of you in this case? [PETITIONER]: Yes.").)

**(2) Assistance of Counsel During Sentencing (Bondy)**

**\*4** Petitioner argues, among other things, that "[Bondy]'s performance fell below a standard level of reasonableness" during and after sentencing because, among other reasons: (i) Bondy "did not have enough time to prepare, or review [P]etitioner's plea to make reasonable objections to the PSR"; and (ii) in response to Petitioner's request that Bondy "file an appeal in this case," Bondy "concurred but dropped the ball." (Pet. at 3, 7.) The Government counters, among other things, that: (i) Bondy "submitted a lengthy and detailed memorandum to the Court [dated December 21, 2006] in advance of sentencing and effectively argued for leniency at the sentencing hearing"; and (ii) "Mr. Bondy gives a detailed, credible, and sensible account of ... his reasons for not filing a notice of appeal." (Opp'n at 13; Aff. of Joseph A. Bondy, dated July 21, 2008 ("Bondy Aff."), ¶¶ 4-5.)

Petitioner fails to establish that "[Bondy]'s representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688: *see Toro v. United States,* No. 09 Civ. 3121, 2010 U.S. Dist. LEXIS 11242, at *5-6 (S.D.N.Y. Feb. 8, 2010). To the contrary, Bondy effectively advocated on Petitioner's behalf in a comprehensive written pre-sentencing memorandum, dated December 21, 2006, and during the sentencing hearing even though he faced a Sentencing Guidelines range of 108 to 135 months. (*See* Ltr. from Joseph A. Bondy to Hon. Richard M. Berman, dated Dec. 21, 2006 ("Pre-sentence Mem."); Tr. of Proceedings, dated Jan. 17, 2007 ("Sentencing Hr'g")); *see also Burnell v. United States,* No. 09 Civ. 00375, 2009 U.S. Dist. LEXIS 102830, at *21 (N.D.N.Y. Nov. 2, 2009) ("[A]cts by counsel were reasonable for Sixth Amendment purposes" where Petitioner's attorney "filed a lengthy substantive sentencing memorandum effectively advocating on petitioner's behalf[.]"). That the Court granted Bondy's safety-valve application and sentenced Petitioner to the minimum sentence within the lower Sentencing Guidelines range (87 to 108 months) further demonstrates Bondy's effectiveness. (*See* Sentencing Hr'g at 23:18-26:4, 27:6-30:1; *Aliotta v. United States,* No. 99 Civ. 1727, 1999 WL 977219, at *4 (S.D.N.Y. Oct. 25, 1999); *Rivera v. United States,* No. 08-391, 2009 U.S. Dist. LEXIS 49845, at *15-16 (D.N.J. June 12, 2009).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1253644 (S.D.N.Y.)

(Cite as: 2010 WL 1253644 (S.D.N.Y.))

And, Petitioner's unsworn allegations that Bondy failed to file a notice of appeal do not establish ineffective assistance of counsel where, as here, the record contains an affidavit from Bondy, dated July 21, 2008, credibly describing the circumstances concerning a notice of appeal. *See Cruz v. United States,* No. 05 Civ. 6477, 2007 U.S. Dist. LEXIS 12954, at *8 (S.D.N.Y. Feb. 16, 2007); *Lebron v. United States,* No. 06 Civ. 5049, 2007 U.S. Dist. LEXIS 28953, at *14 (S.D.N.Y. Apr. 18, 2007). Bondy states that, "[i]mmediately after sentencing, I explained to Mr. Brama that I did not believe there were any non-frivolous arguments on appeal. He understood and agreed with my assessment at the time; Mr. Brama did not request that I file a notice of appeal." (Bondy Aff. ¶¶ 4-5).

**\*5** In light of Bondy's affidavit and in the absence of a sworn affidavit from Petitioner (or any other evidence demonstrating that he requested that counsel file an appeal), Petitioner has failed to establish that he "made the request he claims he made to counsel instructing him to file a notice of appeal." *Paulino v. United States,* 476 F.Supp.2d 395, 396-97 (S.D.N.Y.2007); *see McHale v. United States,* 175 F.3d 115, 119 (2d Cir.1999); *see also Chang v. United States,* 250 F.3d 79, 84-86 (2d Cir.2001) (where "counsel submitted a detailed affidavit contradicting [petitioner's ineffective assistance] claim"); *Puglisi,* 586 F.3d at 214; *Cruz,* 2007 U.S. Dist. LEXIS 12954, at *8; *Manley v. Strack,* No. 97 Civ. 2120, 1999 U.S. Dist. LEXIS 21485, at *18-20 (S.D.N.Y. Apr. 28, 1999).

### (3) Petitioner's Health and Consent to Deportation

Petitioner also argues, among other things, that "his extraordinary health condition"-*i.e.,* that he has had two heart attacks while in prison-and his voluntary consent to deportation warrant "departure [from the Sentencing Guidelines] and/or turning him over to immigration for deportation." (Pet. at 5-6.) The Government counters, among other things, that Petitioner's claims fail to demonstrate any of the criteria required "to obtain relief from a conviction under [S]ection 2255," and that to the extent Petitioner is seeking a modification of his sentence, "his claim is foreclosed under 18 U.S.C. § 3582(c)(1)

(A)(i)." (Opp'n at 16.) And, to the extent Petitioner seeks habeas corpus pursuant to Section 2241 based on conditions of confinement, "this Court does not appear to have jurisdiction." (Opp'n at 16-17.) Petitioner should file any such claim in the United States District Court for the Southern District of Georgia.

Petitioner's claims under Section 2255 fail because, among other reasons, none of Petitioner's assertions reflect "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Bokun,* 73 F.3d at 12 (quotations and citations omitted); (*see* Pet. at 5.) At sentencing, the Court fully considered Petitioner's medical issues and likely deportation and sought to provide appropriate correctional treatment, including medical care, by recommending that Petitioner receive drug treatment while incarcerated; that he be medically evaluated and receive necessary medical treatment; and that he be housed in the McRae facility located in Georgia. (*See* S-5 Judgment at 2; S-6 Judgment at 2); *Harvey v. United States,* No. 08 Civ. 7487, 2009 U.S. Dist. LEXIS 59283, at *5 (S.D.N.Y. June 30, 2009). Medical issues arising after sentencing do not afford a basis for relief from a sentence under Section 2255. *See United States v. Donahue,* No. 00-2454, 2001 U .S. Dist. LEXIS 5704, at *6 (E.D.Pa. May 1, 2001) ('This court has no jurisdiction to reduce petitioner's sentence at his request because of his subsequently diagnosed illness."); *see also* 18 U .S.C. § 3582(c).

**\*6** The court lacks jurisdiction to grant a modification of Petitioner's sentence pursuant to 18 U.S.C. § 3582(c) in the absence of a motion from the Federal Bureau of Prisons. *See United States v. Traynor,* No. 04 Cr. 0582, 2009 U.S. Dist. LEXIS 11521, at *4-5 (E.D.N.Y. Feb. 12, 2009); *United States v. Ozoria,* No. 01 Cr. 0140, 2008 U.S. Dist. LEXIS 32966, at *3 (W.D.N.Y. Apr. 22, 2008); *see also Rivera v. United States,* No. 91 Cr. 595, 2002 U.S. Dist. LEXIS 22793, at *3-4 (S.D.N.Y. Jan. 9, 2003). And, to the extent that Petitioner takes issue with the follow-up treatment he is receiving and the effects on his health of a "lengthy incarceration," (Pet. at 5), these matters properly can be asserted only under 28 U.S.C. § 2241, "in the district where the petitioner is confined," *i.e.,* the United States District Court for the Southern District

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1253644 (S.D.N.Y.)

(Cite as: 2010 WL 1253644 (S.D.N.Y.))

of Georgia. *White v. Craig,* 218 F.App'x 10, 11-12 (2d Cir.2007); *see also Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 494-95, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973).

**IV. Certificate of Appealability**

The Court declines to grant a certificate of appealability as Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Lucidore v. N.Y. State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.2000). Any appeal from this order would not be taken in good faith. *See* 28 U.S.C. § 1915(a)(3).

**V. Conclusion**

For the reasons stated herein, the Petition [# 1] is denied. The Clerk of the Court is respectfully requested to close this case.

S.D.N.Y.,2010.

Brama v. U.S.
Not Reported in F.Supp.2d, 2010 WL 1253644 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1911038 (N.D.N.Y.)

(Cite as: 2009 WL 1911038 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
UNITED STATES of America, Respondent,
v.
Quante WRIGHT a.k.a. "Little Hova", Petitioner.
Nos. 5:06–CR–315 (NAM), 5:08–CV–1271.

June 30, 2009.
West KeySummary**Sentencing and Punishment 350H**
⟳    **870**

350H Sentencing and Punishment

350HIV Sentencing Guidelines
350HIV(F) Departures
350HIV(F)3 Downward Departures
350Hk870 k. Other Particular Grounds.
Most Cited Cases
A defendant who pleaded guilty to conspiracy under
the Racketeer Influenced and Corrupt Organizations Act
(RICO) was not entitled to a downward departure to
reflect credit for time served on a discharged term of
imprisonment on a after violating probation in connection
with his conviction for resisting arrest. The Sentencing
Guidelines permit a departure in cases in which all of
the prior offense is relevant conduct to the instant offense
and has resulted in an increase in the offense level for the
instant offense. The prior conviction for resisting arrest,
which stemmed from overt act of possession of cocaine
base, was included in the defendant's criminal history, and
not as part of the instant offense. 18 U.S.C.A. § 1962(d);
§ 5G1.3(b), 18 U.S.C.A.; U.S.S.G. § 5K2.23, p.s., 18
U.S.C.A.

Quante Wright, Inez, KY, pro se.

Andrew T. Baxter, United States Attorney, Northern
District of New York, John M. Katko, Assistant United
States Attorney, of Counsel, Syracuse, NY.

**MEMORANDUM DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.
**I. INTRODUCTION**
**\*1** Petitioner Quante Wright moves to vacate, set
aside, or correct his conviction pursuant to 28 U.S.C. §
2255. The government opposes Wright's motion.
**II. BACKGROUND**

On April 20, 2007, Wright pled guilty to a conspiracy
to engage in a pattern of racketeering activity as part of his
membership in the Brighton Brigade gang, in violation of
the Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. § 1962(d). On January 31, 2008, the
Court sentenced Wright to a term of imprisonment of 105
months, followed by 5 years of supervised release.

On April 29, 2008, Wright filed a motion seeking an
order appointing counsel and arguing: (1) that when
imposing sentence, the Court failed to consider that all the
overt acts to which Wright pled guilty were committed
between the ages of 14 and 18; and (2) that even though
his offense level was enhanced based on his overt acts, the
Court failed to award him credit for prior terms of
imprisonment he served in connection with those acts.

Because Wright claimed legal error in his sentencing
proceeding, the Court advised him that it intended to
convert his motion papers to a petition pursuant to § 2255,
warned Wright of the potential adverse consequences of
such conversion, and offered him the opportunity to
withdraw his submission. Additionally, the Court informed
Wright that if he desired the Court to consider the motion
under § 2255, he could amend and/or supplement his
motion.

Wright amended and supplemented his original
motion papers to include an argument that the Court
lacked subject matter jurisdiction in this case because the
government failed to file a certification required by the
Federal Juvenile Delinquency Act ("JDA"), 18 U.S.C. §
5301 *et seq.* The government filed a response in
opposition to Wright's motion. Wright filed a reply to the
government's opposition papers.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1911038 (N.D.N.Y.)

(Cite as: 2009 WL 1911038 (N.D.N.Y.))

## III. DISCUSSION

Section 2255 allows a convicted person held in federal custody to petition the sentencing court to vacate, set aside or correct a sentence. *Morales v. United States, 2008 WL 4761705, at \*3 (S.D.N.Y.2008).* A § 2255 petitioner may collaterally attack his sentence on very limited grounds. Indeed, a district court may only vacate or modify a sentence if the court "was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." *United States v. Addonizio,* 442 U.S. 178, 183, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). To be otherwise subject to collateral attack, the sentence must suffer from an error of law that is either constitutional in magnitude or so fundamental as to result in a miscarriage of justice. *See id.; Parsons v. United States,* 919 F.Supp. 86, 88–89 (N.D.N.Y.1996).

### A. Age

Wright argues in his motion papers that when imposing sentence, the Court failed to consider that he was between the ages of 14 and 18 when he committed the overt acts alleged in the indictment. As the Court explained when imposing sentence, "I took into consideration his age when things started with him and the amount of [criminal history] points that did develop at the younger age, didn't go away, I have thought of that in the sentence that I have imposed too." Dkt. No. 237, p. 6. Thus, Wright's argument is without merit.

### B. Federal Juvenile Delinquency Act

**\*2** In this case, Wright contends that because he was under the age of 18 during "part of the conspiracy" the JDA required the government to file a certification. Wright further asserts that the government's failure to do so deprived the Court of subject matter jurisdiction. The Second Circuit has explained:

The need certification provision directs that a juvenile alleged to have committed an act of juvenile delinquency may not be prosecuted in a federal district court unless the Attorney General certifies to the court that: (1) state courts either do not have or refuse to assume jurisdiction over the juvenile; (2) the state does not have "available programs and services adequate for the needs of juveniles;" or (3) the offense charged is a

violent felony, or is one of several enumerated narcotics- and firearm-related offenses, and there is a substantial federal interest in the case or the offense to warrant the exercise of federal jurisdiction. 18 U.S.C. § 5032. Certification is a prerequisite to the exercise of federal jurisdiction over juveniles.

*United States v. Wong,* 40 F.3d 1347, 1363 (2d Cir.1994) (footnote omitted). However, the Second Circuit has held that "federal courts have jurisdiction over conspiracies begun while a defendant was a minor but completed after his eighteenth birthday." *Wong,* 40 F.3d at 1365. In Wong, the Second Circuit explained that because the RICO conspiracy was a continuing crime, the defendant's "post-eighteen conduct" of conspiracy to murder was sufficient "to furnish the district court with jurisdiction over the substantive RICO and RICO conspiracy charges". *Wong,* 40 F.3d at 1366.

In this case, Wright turned 18 on November 25, 2002. In his plea agreement, and at the plea hearing, Wright admitted to a number of overt acts, including overt acts 45 (crack possession), 47 (crack possession), and 51 (participation in an armed robbery), all of which he committed at the age of 18. Thus, Wright "ratif[ied] his pre-eighteen participation by continued participation after attaining majority." *Wong,* 40 F.3d at 1366. Accordingly, no certification pursuant to the JDA was required and the Court had subject matter jurisdiction over this action.

### C. Credit for Discharged Terms of Imprisonment

Wright argues that "he was enhanced levels and categories for his overt acts. The court did not credit him any of his jail time credit served for the overt acts prior to this case." According to the PSR, Wright has served terms of imprisonment in connection with overt acts 33 and 45, to which he admitted as part of his plea agreement, specifically: a 5 month sentence in state court after violating probation in connection with his conviction for criminal possession of a weapon, which is described in overt act 33; and a 9 month sentence after violating probation in connection with his conviction for resisting arrest, which is described in overt act 45.[FN1] Wright completed both terms of imprisonment prior to sentencing in this case on January 31, 2008. Wright asserts the Court should have awarded credit for the time served in

Not Reported in F.Supp.2d, 2009 WL 1911038 (N.D.N.Y.)

(Cite as: 2009 WL 1911038 (N.D.N.Y.))

connection with these convictions because they were used in calculating his sentence.[FN2]

>    FN1. There appears to be an error in the PSR which refers to the facts underlying overt act 45 as overt act 54 in ¶¶ 42 and 82.

>    FN2. At the sentencing hearing, the Court found Wright's total offense level was 30, and his criminal history category was VI. Wright's offense level was calculated based on: (1) a drug quantity of at least 50 grams but less than 150 grams of cocaine base (crack), (§ 2D1.1(c)(5)), and the possession of a dangerous weapon in connection with drug trafficking activities (§ 2D1.1(b)(1)); and (2) robbery during which a firearm was discharged (overt act 51) (§§ 2B3.1 and 2B3.1(b)(2)(A)). When grouped pursuant to U.S.S.G. § 3D1.4, these offenses yielded an offense level of 33. The Court reduced the offense level by 3 levels based on Wright's acceptance of responsibility and timely notification of his intention to plead guilty (§§ 3E1.1(a) and 3E1.1(b)), resulting in a total offense level of 30.

**\*3** Regarding credit for discharged terms of imprisonment, § 5K2.23 of the United States Sentencing Guidelines provides in relevant part:

>    A downward departure may be appropriate if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of § 5G1.3 (Imposition of a Sentence on a Defendant Subject to Undischarged Term of Imprisonment) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense.

U.S.S.G. § 5K2.23. Section 5G1.3(b) applies "in cases in which all of the prior offense (i) is relevant conduct to the instant offense ...; and (ii) has resulted in an increase in the ... offense level for the instant offense." U.S.S.G. § 5G1.3, appl. n. 2.

In this case, Wright's conviction for resisting arrest, which stemmed from overt act 45, possession of cocaine

base (crack), was included in his criminal history, and not as part of the instant offense. Section 2E1.1, Application Note 4 regarding offense levels in RICO cases specifically provides that:

>    [w]here such previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense, treat as a prior sentence under § 4A1.2(a)(1) and not as part of the instant offense. This treatment is designed to produce a result consistent with the distinction between the instant offense and criminal history found throughout the guidelines.

This conviction, therefore, did not increase Wright's offense level and he was not entitled to credit for any time served in connection with that offense.

At sentencing, Wright received a 2–level increase pursuant to U.S .S.G. § 2D1.1(b)(1) for possessing a dangerous weapon in connection with drug trafficking activities. Although Wright served a 5 month term of imprisonment after violating probation in connection with his conviction for criminal possession of a weapon (overt act 33), "a defendant cannot enjoy the benefits of section 5G1.3(b) unless the district court *in fact* incorporated his prior offense as relevant conduct in the instant prosecution." *United States v. Williams,* 260 F.3d 160, 167 (2d Cir.2001).

In this case, the Court did not incorporate overt act 33, Wright's prior weapons offense, as relevant conduct for purposes of increasing his offense level under § 2D 1.1(b)(1). Indeed, as grounds for the imposition of the 2 level increase pursuant to § 2D1 .1(b)(1), the presentence investigation report ("PSR"), on which the Court relied in imposing sentence, cited: Brighton Brigade gang members' routine possession and use of firearms in furtherance of their criminal activities, including the distribution of cocaine base (crack); and Wright's possession of firearms. The PSR also indicated that there was a basis on which the Court could find that Wright was reasonably aware of firearms that were used to further Brighton Brigade's drug trafficking activities. Further, overt act 33 was not the only act to which Wright admitted that involved the possession of a firearm. Indeed, according to overt act 21, Wright brandished a revolver. Therefore, since the Court did not

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1911038 (N.D.N.Y.)

(Cite as: 2009 WL 1911038 (N.D.N.Y.))

"in fact" incorporate Wright's prior weapons conviction, as described in overt act 33, as relevant conduct to increase his offense level pursuant to § 2D1.1(b)(1), a downward departure pursuant to § 5K2.23 in order to provide credit for the 5 month term of imprisonment he served in connection with that offense, was not warranted.

## IV. APPOINTMENT OF COUNSEL

*4 Pursuant to 18 U.S.C. § 3006A(a)(2)(B), the Court may appoint counsel for a petitioner seeking relief under § 2255 when "the interests of justice so require". In this case, Wright's claims lack merit, thus, appointment of counsel is not warranted.

## V. CERTIFICATE OF APPEALABILITY

Finally, 28 U.S.C. § 2253(c)(1) provides in relevant part that:

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(B) the final order in a proceeding under section 2255.[FN3]

FN3. Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed in such actions "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." See Fed.R.App.P. 22(b).

A certificate of appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(2). Since Wright has failed to make such a showing herein, the Court declines to issue any certificate of appealability in this matter. See Hohn v. United States, 524 U.S. 236, 239–40, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998).

## VI. CONCLUSION

WHEREFORE, after having reviewed the record relating to the underlying criminal matter, the documents submitted by the parties in conjunction with this action, the applicable law, and for the reasons discussed herein, it is hereby

ORDERED that Petitioner's Motion to Vacate is DENIED, and it is further

ORDERED that the Clerk of the Court serve a copy of this Order on the parties by electronic or regular mail.

A Certificate of Appealability shall not be issued in this case.

IT IS SO ORDERED.

N.D.N.Y.,2009.

U.S. v. Wright
Not Reported in F.Supp.2d, 2009 WL 1911038 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Frank GUIDICE, Petitioner,
v.
UNITED STATES of America, Respondent.
No. 03 CV 4983(SJ).

July 3, 2007.
Linda S. Sheffield, Esq., Atlanta, GA, for Petitioner.

Roslynn R. Mauskopf, Esq., United States Attorney,
Brooklyn, NY, by: Jo AnnM. Navickas, Esq., for
Respondent.

**MEMORANDUM & ORDER**

JOHNSON, Senior District Judge.
*1 Before the Court is a motion by Frank Guidice
("Petitioner"): (1) to vacate, set aside, or correct his
sentence, pursuant to 28 U.S.C. § 2255; (2) for production
of certain grand jury testimony; (3) for production of a
sealed order related to Petitioner's trial counsel, Joseph
Corozzo, Jr., Esq. ("Corozzo"); and (4) for the
government to provide information regarding all conflict
hearings held as to Corozzo since 2000. Petitioner also
requests leave to amend his § 2255 petition to include
several ineffective assistance of counsel claims, and claims
arising from Crawford v. Washington, 541 U.S. 36 (2004)
("Crawford" ) and Blakely v. Washington, 542 U.S. 296
(2004) ("Blakely" ). For the reasons stated herein, the
Court DENIES Petitioner's § 2255 motion and all related
requests.

**BACKGROUND**[FN1]

> FN1. The parties' familiarity with the facts of this
> case is assumed.

Petitioner seeks to challenge a judgment, which
followed a trial by jury, convicting Petitioner of: (1)

armed robbery conspiracy, in violation of 18 U.S.C. §
1951 (the "Hobbs Act"); (2) attempted armed robbery,
also in violation of the Hobbs Act; and (3) a related gun
charge, in violation of 18 U.S.C. § 924(c). On January 12,
2001, this Court sentenced Petitioner to concurrent terms
of 63 months imprisonment on the conspiracy and attempt
charges, and a consecutive prison term of 60 months on
the related gun charge, totaling 123 months imprisonment,
as well as three years of supervised released and a $300
special assessment. United States v. Amato, No. 99 CR
536(10)(SJ), Docket Entry 429 (sentencing minutes)
(E.D.N.Y. January 12, 2001). Petitioner's judgment was
affirmed on direct appeal. United States v. Amato, No. 01
CR 1046, 2002 WL 360735 (2d Cir. Mar. 7, 2002); cert.
denied, Guidice v. United States, 537 U.S. 886 (Oct. 7,
2002).

On September 30, 2003, Petitioner filed a § 2255
petition with this Court raising several claims for relief,
including claims for ineffective assistance of counsel by
Corozzo and Petitioner's appellate counsel, Vivian
Shevitz, Esq. ("Shevitz"). Petitioner also seeks the
production of various materials he claims are relevant to
his challenge of his conviction and sentence. In his Reply
brief filed July 22, 2004, Petitioner requested leave to
amend his § 2255 petition to include additional ineffective
assistance of counsel claims, and claims based on
Crawford and Blakely. On April 21, 2006, this Court
issued an Order affording Corozzo and Shevitz the
opportunity to respond to Petitioner's ineffective
assistance of counsel claims. On September 12, 2006,
Corozzo submitted a declaration addressing several of
Petitioner's claims.

**STANDARD OF REVIEW**

Under § 2255, a sentencing court may "vacate, set
aside or correct" a conviction or sentence "imposed in
violation of the Constitution or laws of the United States."
28 U.S.C. § 2255. Relief is generally available only for a
constitutional error, defect of jurisdiction, or an error of
law constituting "a fundamental defect which inherently
results in a complete miscarriage of justice." Graziano v.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

*United States,* 83 F.3d 587, 590 (2d Cir.1996) (quoting *United States v. Bokun,* 73 F.3d 8, 12 (2d Cir.1995); *see also Hardy v. United States,* 878 F.2d 94, 97 (2d Cir.1989).

**\*2** "A § 2255 motion may not relitigate issues that were raised and considered on direct appeal." *United States v. Perez,* 129 F.3d 255, 260 (2d Cir.1997). The exception to this rule allows reconsideration of the claim if there has been an intervening change in the law, and the new law would have exonerated a defendant had it been in force when the conviction was affirmed on direct appeal. *See Chin v. United States,* 622 F.2d 1090, 1092 (2d Cir.1980); *see also Bruce v. United States,* No. 04 CV 3453, 2006 WL 1704473, at *5 (E.D.N.Y. June 12, 2006).

Furthermore, courts will not entertain § 2255 claims that were not raised on direct appeal, unless a petitioner can show that there was "cause" for failing to raise the claims earlier and "prejudice" resulting therefrom, or that the petitioner is innocent of the charges. *See Bousley v. United States,* 523 U.S. 614, 622-23 (1998). A petitioner may raise claims not previously raised on direct appeal " 'where the issues were not raised at all on direct appeal due to ineffective assistance of counsel.' " *Underwood v. United States,* 15 F.3d 16, 18 (2d Cir.1993) (quoting *Barton v. United States,* 791 F.2d 265, 267 (2d Cir.1986)). Moreover, a petitioner may raise for the first time on collateral review a claim for ineffective assistance of counsel that was not raised on direct appeal. *See Massaro v. United States,* 538 U.S. 500, 504 (2003) ("We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal.").

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley,* 520 U.S. 899, 904 (1997). Rule 6(a) of the Rules Governing Section 2255 Proceedings provides that a § 2255 petitioner is entitled to undertake discovery only when "the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."

*DISCUSSION*

**I. Petitioner Claims The Theory Of The Case Presented To The Grand Jury To Secure The Indictment Was Different Than The Theory Presented To The Jury To Secure Petitioner's Conviction**

Relying on *Stirone v. United States,* 361 U.S. 212 (1960), Petitioner claims that the government constructively amended the indictment in his case. Specifically, Petitioner alleges that the government's proof at trial with respect to the interstate commerce element did not comport with the indictment, suggesting that Petitioner may have been convicted of a crime other than the one for which the grand jury returned the indictment. At minimum, Petitioner contends that because the indictment did not specify whether the government's grand jury theory with respect to the interstate commerce element of the Hobbs Act charges involved robbery of the proceeds of a diamond merchant or a tool business, he is entitled to review the grand jury testimony of the case agent, Michael Breslin, as well as grand jury testimony of other unnamed agents. After reviewing these minutes, Petitioner alleges that he could then determine whether the theory presented at trial matched the theory presented to the grand jury.

**A. Procedural Hurdles**

**\*3** This claim was not preserved at trial or on direct appeal. Therefore, in order for this claim to be considered, Petitioner must demonstrate cause for failing to raise the claim earlier, and prejudice resulting therefrom.[FN2] The only explanation Petitioner offers for his failure to assert this claim previously is that Corozzo and Shevitz were both ineffective for failing to raise the claim. However, Petitioner did not plead in his § 2255 petition that his previous attorneys were ineffective for failing to raise this claim. Instead, in his Reply brief, Petitioner requested leave to amend his petition to include ineffective assistance of trial and appellate counsel claims with his *Stirone* claim, as a basis for avoiding procedural default of the claim. (Pet. Rep. at 1.) Respondent did not oppose the proposed amendment.

> **FN2.** Petitioner may also avoid the procedural bar by showing that he is actually innocent. "To establish actual innocence, petitioner must demonstrate that, 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him.' " *Bousley,* 523 U.S. at 623 (quoting *Schlup v. Delo,* 513 U.S. 298, 327-28 (1995)). " '[A]ctual innocence' means

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

factual innocence, not mere legal insufficiency." *Id.* (citing *Sawyer v. Whitley,* 505 U.S. 333, 339 (1992) ("A prototypical example of 'actual innocence' in a colloquial sense is the case where the State has convicted the wrong person of the crime."). Petitioner states in an Affidavit filed October 2, 2003: "I re-assert my plea of not guilty as to the robbery and the firearms charge, and I assert a claim of actual innocence." (Guidice Aff. ¶ 7.) However, Petitioner's claims mainly challenge the legal sufficiency of the evidence. Petitioner presents one claim arguably based on actual innocence, regarding aiding and abetting as to the § 924(c) charge. As discussed below, this claim is meritless. To the extent that Petitioner's other claims collectively amount to an actual innocence claim, they are unsubstantiated, contradicted by the overwhelming evidence against him at trial, and clearly insufficient to meet the high burden for establishing actual innocence. Thus, Petitioner may not avail himself of the narrow exception by which courts may review claims that are otherwise procedurally barred based on actual innocence. *See Dretke v. Haley,* 541 U.S. 386, 388 (2004) (citing *Murray v. Carrier,* 477 U.S. 478, 496 (1986)).

Although the Court has the authority to grant leave for a habeas petitioner to amend his petition under the standard provided by Fed.R.Civ.P. 15(a), *see Littlejohn v. Artuz,* 271 F.3d 360, 363 (2d Cir.2001), the Court may deny leave to amend where it would be futile to do so, *see Jones v. N.Y.S. Div. of Military & Naval Affairs,* 166 F.3d 45, 50 (2d Cir.1999) ("[A] district court may properly deny leave when amendment would be futile."). To determine whether leave to amend would be futile in this case, the Court must examine whether Corozzo and Shevitz were ineffective for failing to raise Petitioner's *Stirone* claim regarding the interstate commerce nexus, such that Petitioner can avoid procedurally defaulting the claim. *See Bousley,* 523 U.S. at 622-23.

**B. Whether Corozzo's and Shevitz's Failure To Raise Petitioner's *Stirone* Claim Constituted Ineffective Assistance**

In *Strickland v. Washington,* the Supreme Court established a two-part test to determine whether an attorney's performance was ineffective. First, a defendant or petitioner "must show that counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." 466 U .S. 668, 688 (1984). Second, the defendant or petitioner must show mat counsel's performance prejudiced his defense. *See id.* at 687. To show prejudice, there must be a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *See id.* at 694.

A court considering a *Strickland* claim "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," keeping in mind that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. Decisions concerning investigation and strategy, including the arguments to stress, witnesses to call, motions to make, and lines of inquiry to pursue, "fall squarely within the ambit of trial strategy and, if reasonably made, cannot support an ineffective assistance claim." *United States v. Smith,* 198 F.3d 377, 386 (2d Cir.1999) (quoting *United States v. Eisen,* 974 F.2d 246, 265 (2d Cir.1992). Finally, although the *Strickland* standard was formulated in response to a claim of ineffective assistance of trial counsel, it also applies to claims of ineffective assistance of appellate counsel. *See Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994).

**1. Constructive Amendment**

**\*4** "A constructive amendment occurs when the government's presentation of evidence and the district court's jury instructions combine to 'modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury.' " *United States v. Vebelunas,* 76 F.3d 1283, 1290 (2d Cir.1996) (quoting *United States v. Clemente,* 22 F.3d 477, 482 (2d Cir.1994)). When a constructive amendment affects an essential element of the charged offense, it is a per se violation of the grand jury provision of the Fifth Amendment and requires reversal without a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

showing of prejudice. *See United States v. Coyne,* 4 F.3d 100, 112 (2d Cir.1993).

**2. The Indictment In Petitioner's Case**

Relying on *Stirone,* Petitioner argues that other conspirators were indicted for the same underlying crime, but on a theory different than the one employed in Petitioner's case. Petitioner compares (1) the indictment in his case, *United States v. Amato,* Superseding Indictment No. 99-CR-536-(S-3)(SJ), which alleges conspiracy and attempt "to obstruct, delay[ ] and affect commerce, and the movement of articles and commodities in commerce, by robbery, in that they attempted to commit a robbery of the residents of 2309 Royce Street, Brooklyn, New York," but does not mention whether the home contained the proceeds from a diamond or tool business involving interstate commerce, with (2) another indictment bringing charges in connection with the same robbery, *United States v. Tabbita,* Superseding Information No. 95-CR-754-(S-9) (S J), which alleges conspiracy "to obstruct, delay and affect commerce, by robbery, in that they conspired to commit an armed robbery of a diamond merchant, who retained the proceeds from his sales within his residence in the Mill Basin section of Brooklyn, New York." Petitioner argues that the evidence presented at trial did not comport with the evidence presented to the grand jury, because the indictment in his case does not specify whether the defendants believed the residence at 2309 Royce Street contained the proceeds from a diamond or tool business engaged in interstate commerce, but such evidence was presented at trial.

**3. The Nexus To Interstate Commerce**

On direct review, the Second Circuit found that the government established a sufficient nexus to interstate commerce at Petitioner's trial by showing that:

[A]t least three of the coconspirators, Iacobelli, Tabbita, and LaRussa, believed the residents of the targeted home were diamond merchants and kept at least $1 million in cash, and possibly diamonds, in the home. *Tr.* at 542, 951, 1005, 1116. Although there was no direct evidence that defendants Kolar and Guidice also believed the residents to be diamond merchants, common sense would suggest, and a jury could reasonably find, that Tabbita would share the basis for his belief that there was over $1 million in cash in the home with those he was trying to recruit for the robbery.

It also seems reasonable to infer that when Iacobelli and LaRussa asked Guidice if he would be interested in taking over the robbery, after Tabbita decided he no longer wanted to participate, they would have informed Guidice of the same details they had originally provided to Tabbita (i.e., that the residents were diamond merchants and kept at least $1 million in cash in the house).

**\*5** *Amato,* 2002 WL 360735, at \*3. The Second Circuit also found that even if Petitioner did not know that his crime involved interstate commerce, this would not insulate him from being convicted under the Hobbs Act, because at least three of Petitioner's co-defendants believed the home contained the proceeds of a diamond business involving interstate commerce. *See id.* at \*4 (citing *United States v. Rosa,* 17 F.3d 1531, 1546 (2d Cir.), *cert. denied,* 513 U.S. 879 (holding that interstate commerce nexus could be "satisfied by the belief of at least one conspirator that the goods had traveled interstate" and concluding that "we need not explore the evidence of the other defendants' awareness that their crime was federal."); *United States v. Feola,* 420 U.S. 671, 692 (1975) ("[I]t is clear that one may be guilty as a conspirator for acts the precise details of which one does not know at the time of the agreement.")).

The Second Circuit further held that the government presented sufficient evidence from which a jury could find a potential effect on interstate commerce had the defendants succeeded in robbing the business proceeds from the residence. *See Amato,* 2002 WL 360735, at \*4-5. Although the government did not show at trial that the purported diamond business, which did not actually exist, had an effect on interstate commerce, it did offer evidence that two tool businesses, the proceeds of which were often stored in the home that was the target of the robbery, were both engaged in interstate commerce. *See id.; see also* Trial Transcript ("Tr.") at 402, 1140-41, 1142-47. Based on this evidence, the jury could have reasonably found a potential effect on interstate commerce had the robbery been successful.[FN3] *See Amato,* 2002 WL 360735, at \*5. This finding comports with well established law stating that "the burden of proving a nexus to interstate commerce is minimal," *United States v. Elias,* 285 F.3d 183, 188 (2d Cir.2002), and that "[t]he jurisdictional requirement of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce." *Id.* (quoting *United States v. Angelilli,* 660 F.2d 23, 35 (2d Cir.l981)).

> FN3. In any event, this Circuit does not recognize impossibility as a defense to conspiracy and attempt charges, *see United States v. Howard,* 998 F.2d 42, 51 (2d Cir.1993), and specifically has held that factual impossibility is not a jurisdictional defense to Hobbs Act conspiracy or attempt charges, *see United States v. Medina,* 74 F.3d 413, 418 (2d Cir.1996) (in affirming conviction for attempted robbery under the Hobbs Act, court observed that "[m]any pre-existing circumstances may doom a conspiracy, without rendering the conspirators any less culpable for their acts."); *Clemente,* 22 F.3d at 480-81. If facts exist which, unbeknownst to the defendants, make an actual effect on interstate commerce impossible, defendants are still liable under Section 1951 if the government proves that, had the factual circumstances been as the defendants believed, there would probably have been an effect on interstate commerce. *See Medina,* 74 F.3d at 418; *Clemente,* 22 F.3d at 480-81. The government clearly met its burden in this case.

**4. The Government Did Not Constructively Amend The Indictment**

Having established that there was a sufficient nexus to interstate commerce, the question remains whether the evidence presented at trial constructively amended the indictment, in violation of *Stirone.* In Petitioner's case, the indictment did not allege a specific effect on interstate commerce, but rather alleges the defendants "attempted to commit a robbery of the residents of 2309 Royce Street, Brooklyn, New York." *United States v. Amato,* Superseding Indictment No. 99-CR-536-(S-3)(SJ). At trial, however, the government proved a specific effect on interstate commerce by showing that at least three co-defendants believed the residence at 2309 Royce Street contained proceeds from a diamond business engaged in interstate commerce. The government also established that a successful robbery of that residence could have affected interstate commerce because proceeds from two tool

businesses engaged in interstate commerce were in fact maintained inside the residence. Where the possible bases for conviction are narrowed by the evidence presented at trial, rather than broadened, no *Stirone* violation occurs. *See United States v. Zingaro,* 858 F.2d 94, 99 (2d Cir.1988); *see also Pipola v. United States,* No. 97 CV 4988, 1999 WL 993718, at *6 (E.D.N.Y. October 19, 1999) (Johnson, J.) (holding that where indictment gave no description of the manner in which interstate commerce was affected, the government remained free to prove that interstate commerce was affected by evidence presented at trial); *cf. Stirone,* 361 U.S. at 217 (holding that where an indictment does allege a particular type of effect on interstate commerce, that specific effect must be proven by the government). Here, because the government narrowed, rather than broadened, the possible bases for conviction at trial by establishing the specific manner in which interstate commerce would have been affected by a successful robbery of the residence at 2309 Royce Street, it did not constructively amend the indictment.

**5. Counsel Was Not Ineffective For Failing To Raise Petitioner's Meritless *Stirone* Claim**

*6 Because the Court finds that there is no merit to Petitioner's *Stirone* claim, Corozzo and Shevitz cannot be held ineffective for failing to raise the claim. *See Sanchez v. United States,* No. 01 CR 908, 2005 WL 1005159, *3 (S.D.N.Y. Apr. 30, 2005) ("[F]ailure to assert a baseless claim does not fall below an objective standard of reasonableness nor prejudice the defendant.").

**C. Petitioner's Claim Is Procedurally Barred**

Having failed to establish cause and prejudice for failing to raise his *Stirone* claim regarding the interstate commerce nexus on direct appeal, Petitioner's claim is procedurally barred. Since Petitioner's *Stirone* claim is procedurally barred, his request for the grand jury testimony of Agent Breslin, and other unnamed agents, in connection with this claim is denied. Furthermore, the Court denies Petitioner's request for leave to amend his § 2255 petition to include an ineffective assistance of counsel claim in an attempt to avoid procedurally defaulting his Stirone claim, because amendment would be futile.[FN4]

> FN4. In his Reply, Petitioner also asserts a claim for ineffective assistance of trial counsel based on Corozzo's failure to obtain Agent Breslin's,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

and other unnamed agents', grand jury testimony following their testimony at trial. (Pet. Rep. at 12.) Petitioner argues that had Corozzo obtained this grand jury testimony, he could have used it to support Petitioner's *Stirone* claim. (*Id.*) Because the *Stirone* claim is meritless, Petitioner's ineffective assistance of counsel claim based on Corozzo's failure to obtain grand jury testimony that he could have used to support Petitioner's meritless *Stirone* claim necessarily fails.

## II. Petitioner Claims He Received Ineffective Assistance of Counsel Due To A Conflict of Interest

Petitioner alleges that Corozzo was ineffective because he suffered from a conflict of interest that adversely affected his representation. "The right to counsel under the Sixth Amendment entails 'a correlative right to representation that is free from conflicts of interest.' " *United States v. Levy,* 25 F.3d 146, 152 (2d Cir.1994) (quoting *Wood v. Georgia,* 450 U.S. 261, 271 (1981)). A defendant will have suffered ineffective assistance of counsel in violation of his Sixth Amendment rights if his attorney has a per se conflict, an actual conflict that adversely affects the attorney's performance, or a potential conflict that results in prejudice to the defendant. *See Levy,* 25 F.3d at 152; *Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993); *Armienti v. United States,* 234 F.3d 820, 823-24 (2d Cir.2000).

"Per se conflicts are limited to situations where trial counsel is not authorized to practice law ... or is implicated in the very crime for which his or her client is on trial." *Armienti,* 234 F.3d at 823. For actual conflict claims, a defendant must establish the existence of an actual conflict, and then show that the conflict adversely affected defense counsel's performance. *See Mickens v. Taylor,* 535 U.S. 162, 171 (2002); *Armienti v. United States,* 313 F.3d 807, 811 (2d Cir.2002). An actual conflict between a lawyer and his client exists "when, during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.' " *Armienti,* 234 F.3d at 824 (quoting *Winkler,* 7 F.3d 304, 307 (2d Cir.1993)). If the defendant establishes that an actual conflict exists, "he need not prove prejudice, but simply that a 'lapse of representation' resulted from the conflict."

*United States v. Malpiedi,* 62 F.3d 465, 469 (2d Cir.1995) (quoting *United States v. Iorizzo,* 786 F.2d 52, 58 (2d Cir.1986)) (citations omitted). That is, the defendant must "demonstrate that some 'plausible alternative defense strategy or tactic might have been pursued,' and that the 'alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.' " *Levy,* 25 F.3d at 157 (quoting *Winkler,* 7 F.3d at 309). Finally, where a defendant can show only potential conflict, a showing that a lapse of representation occurred is not sufficient; the defendant must show that he has been prejudiced by counsel's actions. *Winkler,* 7 F.3d at 307 (citing *Strickland,* 466 U.S. 668).

### A. Background

**\*7** Petitioner alleges that Corozzo told him after trial that he "may have a conflict of interest in his representation of [Petitioner]." (Pet's Br. 13.) Petitioner alleges that upon further questioning, Corozzo did not provide any additional information regarding this alleged conflict. On the basis of this statement from Corozzo, Petitioner requests that this Court issue an order disclosing the nature of the conflict, arguing that "while it is not submitted that Mr. Corozzo had any connection to the [crimes for which Petitioner was convicted], it is believed that the organized crime aspect of this case could present a [ *United States v. Cancilla,* 725 F.2d 867 (2d Cir.1984) ] and/or [ *United States v.. Curcio,* 680 F.2d 881 (2d Cir.1982) ] conflict." [FN5] (*Id.* at 14.)

> FN5. In *Cancilla,* the Second Circuit held that a defendant's representation by trial counsel who, unknown to him, had himself engaged in criminal activity related to conduct for which defendant was convicted, created a conflict of interest that violated the defendant's right to counsel. In *Curcio,* two brothers wished to retain the same counsel at a criminal trial where they were charged as co-defendants. After the district court removed the brothers' attorney, the Second Circuit reversed, stating that they saw "no reason why either [defendant] could not make a knowing and intelligent election to be represented by [their attorney] despite the existence of a conflict of interest." *Curcio,* 680 F.2d at 885.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

Petitioner also asks the Court to order the government to provide information to Petitioner regarding all conflict hearings held as to Corozzo since 2000, because Petitioner "personally has information that numerous individuals had *Curcio* hearings as to [Corozzo's] conflict of interest beginning in at least March or April of 2000." (Pet.'s Rep. 11.) Petitioner alleges that a *Curcio* hearing was held in connection with the trials of other criminal defendants alleged to be members of the Gambino Organized Crime Family ("OCF") who were represented by Corozzo, and therefore such a hearing should have been held in connection with Petitioner's trial. Specifically, "Petitioner, alleged to be a soldier in the Gambino Family by the government, would have been in a conflicted attorney client relationship with Corozzo, given the allegations publicized in the printed media concerning [Corozzo's] closest kin." (*Id.* at 12.)

**B. Recent Cases Examining Corozzo Conflict Of Interest Claims**

The Court is aware of two fairly recent cases for which a conflict of interest hearing was held in connection with Corozzo's representation of alleged members of the Gambino OCF. In *United States v. Yannotti,* 358 F.Supp.2d 289 (S.D.N.Y.2004), Judge Scheindlin granted the government's motion to disqualify Corozzo from representing a member of the Gambino OCF in a RICO trial. Judge Scheindlin held that the collective weight of three of the alleged conflicts in that case, (1) Corozzo's relationship with his uncle "Nicky" Corozzo, an alleged longtime Gambino OCF member, (2) Corozzo's alleged involvement in the shooting incident which would be the subject of trial testimony, and (3) Corozzo's representation of a "material witness against his current client," was "sufficiently severe that no rational defendant would knowingly or intelligently desire Corozzo's representation under these circumstances," and accordingly she disqualified Corozzo from continuing his representation. *Id.* at 297.

In *United States v. Pizzonia,* 415 F.Supp.2d 168 (E.D.N.Y.2006), however, Judge Weinstein, who discussed Judge Scheindlin's prior decision in *Yannotti,* denied the government's motion to disqualify Corozzo from representing another member of the Gambino OCF in a RICO trial. Judge Weinstein held that although

Corozzo had previously represented one government witness and the co-defendant of another cooperator, these conflicts were waivable. Specifically, with respect to one of the cooperator witnesses, the court determined that Corozzo merely performed investigative work as a personal favor, but never represented him in a legal capacity, and thus would not breach any ethical duties by cross-examining him or impeaching his credibility. *Pizzonia,* 415 F.Supp.2d at 179-80. Regarding a second cooperator, who was a co-defendant with a former client, Judge Weinstein found that Corozzo never undertook a joint defense with this witness. As to the government's claim that a conflict existed with respect to Corozzo's current and prior representation of an unindicted coconspirator, Judge Weinstein found that Corozzo's representation in that matter was "unrelated to defendant's prosecution" and that, although the defendant did "possibly reduce the number of defense strategies [available to him] by continuing to retain defense counsel," he was aware of this fact and could validly waive any conflict that existed. *Id.* at 181-2.

**\*8** In *Pizzonia,* the government also alleged that Corozzo had a role as a co-conspirator in the Gambino OCF, and proffered that it had taped conversations in which Corozzo's father told Gambino OCF members he wanted his son inducted into the OCF, and Corozzo's representation of numerous defendants alleged to be participants in organized crime demonstrated his status as a coconspirator. Judge Weinstein found this argument unavailing, holding that it did not prove Corozzo's co-conspirator status, the testimony would not be relevant to the trial, and no conflict existed. *Id.* at 182-3.

Finally, with respect to Corozzo's alleged familial loyalties to the Gambino OCF, Judge Weinstein found the conflicts waivable. *Id* . at 184-5. He distinguished *Yannotti* on the ground that in *Yannotti,* the defendant allegedly reported directly to Corozzo's uncle, whereas this was not the case in *Pizzonia.* Moreover, Judge Weinstein emphasized that Judge Scheindlin found Corozzo's conflicts unwaivable when viewed in combination with his alleged involvement in a shooting that would be the subject of trial testimony, and his prior representation of a cooperating witness who would provide material testimony against his client. In sum,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

Judge Weinstein found that the multiple conflicts alleged in *Pizzonia* did not mandate disqualification of Corozzo.

The outcomes in *Yannotti* and *Pizzonia* underscore that an alleged conflict claim must be evaluated on a case-by-case basis, after evaluating the totality of the circumstances. *See United States v. Liszewski*, No. 06 CR 130, 2006 WL 2376382, at *8 (E.D.N.Y. August 16, 2006) (reviewing the decisions in *Yannotti* and *Pizzonia* and finding that there is a "vast gray area that exists in this area of law between serious conflicts which lead to per se ineffective assistance of counsel and lesser potential conflicts which may, at some point, compromise the integrity of the trial process.").

## C. Petitioner Is Not Entitled To Relief Based On His Conflict Of Interest Claim

Turning to this case, the Court concludes that Petitioner is not entitled to relief based on Corozzo's alleged conflict of interest, nor is he entitled to the additional documents he requests in support of his claim. Petitioner offers no factual support for his claim that a conflict of interest existed concerning his representation, other than a single alleged statement made by Corozzo several years after Petitioner had already been sentenced. Furthermore, unlike either *Yannotti* or *Pizzonia,* Petitioner concedes that Corozzo had no involvement whatsoever in the crimes for which he was convicted. (Pet's Br. 14.) Petitioner also fails to allege that Corozzo was otherwise materially connected to any persons-whether witnesses, codefendants, or others-involved in Petitioner's trial. Moreover, in his declaration submitted to this Court, Corozzo clarified that he had never informed Petitioner that he was operating under a conflict of interest at the time he was representing Petitioner at trial. Rather, Corozzo explains:

**\*9** 16. Subsequent to the trial, sometime in 2003, I visited Mr. Guidice in prison. At that time, I informed Mr. Guidice that I recently became aware that the government claimed that I was the subject of a Grand Jury investigation during the time that I represented Mr. Guidice.

17. While I never informed Mr. Guidice that I operated under a conflict of interest during my representation of him, I did state that the government has repeatedly

informed my other clients that as a result of being the subject of Grand Jury investigations, a waivable conflict of interest existed.

(Corozzo Decl. at ¶¶ 16-17.) Thus, contrary to Petitioner's claim, Corozzo never actually informed Petitioner that a conflict existed that may have affected his representation of Petitioner. Finally, this Court conducted an *in camera* review of the sealed order concerning the alleged conflict involving Corozzo, and the Court concludes that nothing in the Order supports Petitioner's claim.

Petitioner's claim that Corozzo provided ineffective assistance of counsel due to a conflict of interest is unavailing. Because his claim is denied, Petitioner's related requests for a Court order disclosing the nature of Corozzo's alleged conflict, and for the government to provide information regarding all conflict hearings held as to Corozzo since 2000, are also denied.

## III. Petitioner Raises Two Claims Relating To His Parole Status At The Time Of Sentencing

Petitioner complains that he was misled by his parole officer into believing that no parole violation had been filed in connection with his prior federal convictions, and that this purported misinformation prejudiced him at sentencing. Petitioner also claims that his counsel rendered ineffective assistance by failing to independently investigate his parole status and raise this issue at sentencing. Both claims are meritless.

### A. Background

In 1985, Petitioner received an aggregate 9-year prison sentence and an aggregate 5-year special parole term for federal narcotics convictions in the Eastern District of New York. On April 13, 1990, Petitioner was released on parole, and on October 13, 1994, he began serving his aggregate 5-year special parole, subject to special parole supervision until October 12, 1999. Prior to the expiration of his special parole term, however, by letter dated June 25, 1999, Petitioner's parole officer, Anthony Castellano ("Castellano"), informed the U.S. Parole Commission ("Commission") that Petitioner had been arrested and charged with robbery conspiracy and use of a firearm. Castellano requested that the Commission

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

issue a violator warrant based upon Petitioner's latest arrest, but the Commission did not issue a warrant until September 1, 1999. The warrant was also to be held in abeyance pending the outcome of the new criminal proceedings.

Following Petitioner's trial and sentencing on the new charges, by letter dated March 19, 2001, Castellano reported to the Commission that Petitioner had received a 123-month sentence for the convictions. The Commission then supplemented the warrant and requested that it be lodged as a detainer with the Bureau of Prisons. The Commission also initiated a dispositional review of the warrant, informing Petitioner of his right to submit information to the Commission for an "on the record" review of the case to determine whether the warrant should remain as a detainer.

*10 By letter dated July 26, 2001, Shevitz submitted a statement to the Commission regarding the warrant and the charges. The Commission reviewed the warrant and, on September 6, 2002, the Commission ordered that the warrant remain as a detainer, to be executed after Petitioner completes the 123-month sentence he is currently serving. At that time, Petitioner will receive a revocation hearing, as set forth in 28 C.F.R. §§ 2.49, 2.50.

**B. Petitioner Claims That Castellano Misled Petitioner Regarding His Parole Status**

Petitioner claims that Castellano misled Petitioner and his counsel by incorrectly informing them that the time for a parole violation had expired, that nothing had been filed by the Commission in connection with Petitioner's alleged parole violation, and that nothing would be filed. Petitioner alleges that Castellano did not sufficiently investigate the Commission's intentions before making this representation to him. It is well-established that a collateral attack on a final judgment in a federal criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *Bokun,* 73 F.3d at 12 (quoting *Hill v. United States,* 368 U.S. 424, 428 (1962)). Petitioner cites no case law establishing that Castellano's alleged errors give rise to a cognizable habeas claim, nor has this Court located any basis for such a claim on collateral

review. [FN6] Accordingly, this claim is denied.

> [FN6.] To the extent that Petitioner is claiming he was unlawfully misled by Castellano, at minimum Petitioner would have to demonstrate that Castellano engaged in affirmative misconduct in order to possibly raise a claim for habeas relief. *See, e.g., Azizi v. Thornburgh,* 908 F.2d 1130, 1136 (2d Cir.1990) (alien who relied upon erroneous issuance of visa, and who did not appeal deportation order, not entitled to estoppel because only negligence shown, but not affirmative misconduct). Petitioner makes no such allegations.

**C. Petitioner Claims That Corozzo Was Ineffective For Failing To Investigate And Discuss Petitioner's Parole Status At Sentencing**

Alternatively, Petitioner claims his sentencing counsel, Corozzo, was ineffective for failing to investigate the existence of a parole violation warrant. He also alleges that Corozzo provided ineffective assistance by failing to discuss Petitioner's parole status at sentencing. Specifically, Petitioner alleges that Corozzo should have made this Court aware that Petitioner might suffer additional adverse consequences following the completion of his sentence from this Court, in the form of an additional parole violator term.

In order to establish a meritorious *Strickland* claim, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness, and that counsel's performance prejudiced his defense. Here, Corozzo submitted an affidavit stating that, at Petitioner's request, he contacted Castellano to determine whether a parole violation had been filed as a result of his arrest or pending trial in this case. (Corozzo Aff. at ¶ 5.) Subsequent to the expiration of Petitioner's parole, Castellano informed Corozzo that no violation had been filed. (*Id* . at ¶ 6.) Corozzo's reliance on the information provided by Castellano did not fall below an objective standard of reasonableness. On the contrary, Corozzo's decision to ask Castellano, Petitioner's parole officer, about Petitioner's parole status was an eminently reasonable course of conduct. Therefore, Petitioner cannot satisfy the first prong of his ineffective assistance claim, and his claim fails on this ground alone.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

**\*11** Even assuming Corozzo's failure to independently investigate Petitioner's parole status after discussing the issue with Castellano fell below reasonable standards, Petitioner cannot establish that Corozzo's errors prejudiced Petitioner at sentencing. To support his claim, Petitioner almost exclusively relies on U.S.S .G. § 5G1.3 comment Note 6, which states:

If the defendant was on federal or state probation, parole, or supervised release at the time of the instant offense, and has had such probation, parole, or supervised release revoked, the sentence for the instant offense should be imposed to run consecutively to the term imposed for the violation of probation, parole, or supervised release in order to provide an incremental penalty for the violation of probation, parole, or supervised release.

Thus, where a defendant has had his probation, parole, or supervised release revoked already, under Note 6 the sentencing court "should" impose a consecutive sentence. Based on this language, Petitioner suggests that because his parole had not been revoked as of the date of his sentencing, this Court would not have been *required* to impose a consecutive sentence under Note 6. Therefore, Petitioner argues that under § 5G1.3, this Court (1) could have considered the possibility of Petitioner serving another sentence if he is found to have violated his parole at sentencing, and (2) could have imposed a concurrent sentence in light of this possibility.[FN7]

FN7. Although not relevant to the resolution of Petitioner's claim, Petitioner misstates the law regarding Note 6. Under Note 6, district courts "should" impose a sentence for the instant offense to run consecutively to any term imposed for a violation of state probation, parole, or supervised release. However, imposition of a consecutive sentence is not required, as courts "retain the discretion under Note 6 to sentence a defendant concurrently or partially concurrently." *United States v. Fermin,* 252 F.3d 102, 112 n. 19 (2d Cir.2001) (quoting *United States v. Maria,* 186 F.3d 65, 72 (2d Cir.1999)). Therefore, even if the Commission already concluded that Petitioner violated his parole at

the time of Petitioner's sentencing, the Court still may have sentenced Petitioner to a concurrent or partially concurrent sentence.

To be clear, Petitioner does not allege any error in the calculation of his offense level or criminal history at the time of his sentencing. Moreover, Petitioner concedes that he had not been found to have violated his parole at the time of his sentencing before this Court. Further, it is far from certain that he will be sentenced by the Commission for a parole violation once he completes his current sentence.[FN8] Instead, petitioner's claim is premised solely on equitable arguments, which suggest that this Court might have issued a lighter sentence had it known that the Commission might decide to impose a future sentence on Petitioner, if the Commission later finds that Petitioner violated his parole. There is simply no basis for granting § 2255 relief based on such speculation, particularly given that Petitioner was sentenced within the correct Guidelines range. *See Bokun,* 73 F.3d at 12 (holding that § 2255 cannot be a vehicle for reducing a sentence where "there was no fundamental error of fact that would render [defendant's] sentencing proceeding so irregular and invalid that relief under § 2255 would be appropriate" (citation and internal quotation marks omitted)); *see also Elgabrowny v. United States,* No. 93 CR 181,2003 WL 22416167, at \*11 (S.D.N.Y. October 22, 2003) (errors in applying the Guidelines do not qualify for § 2255 relief) (citing *Werber v. United States,* 149 F.3d 172, 177 n. 4 (2d Cir.1998); *Piervinanzi v. United States,* 151 F.Supp.2d 266, 271 (S.D.N.Y.2001) (a sentence within the Guidelines cannot be a complete miscarriage of justice). Because Petitioner cannot establish a reasonable probability that but for counsel's deficient performance, the outcome of his sentencing would have been different, Petitioner fails to establish that he suffered prejudice from the alleged deficient conduct of counsel. Accordingly, this ineffective assistance of counsel claim fails.

FN8. The Commission's violation warrant is currently lodged only as a detainer against Petitioner. After Petitioner serves his current sentence, the warrant will be executed, and the Commission will then determine what sentence, if any, will issue. The Commission may not find Petitioner in violation, or it may decide not to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

impose any additional sentence for a violation. This Court has no role in determining the Commission's future potential sentencing of Petitioner. *See Moddy v. Daggett,* 429 U.S. 78, 87-88 (1976); *see also Heath v. U.S. Parole Comm'n,* 788 F.2d 85, 92 (2d Cir.1986) (sentencing judge does not have authority to order prisoner's violator sentence to run consecutive or concurrent to new federal sentence); accord *D'Amato v. U.S. Parole Comm'n,* 837 F.2d 72 (2d Cir.1988) (state sentence).

**IV. Petitioner Claims He is Innocent Of The 18 U.S.C. §§ 924(c), 2, Charge, And The Government's Theory At Trial Regarding Use Of A Firearm Amounted To A Constructive Amendment Of The Indictment**

*12 Petitioner claims he is innocent of charge three of the indictment, use of a firearm in violation of 18 U.S.C. §§ 924(c), 2, because he did not take the affirmative step which would violate 18 U.S.C. § 2, the aiding and abetting statute. Petitioner also claims that the government's theory as to his § 924(c) liability at trial was conspiracy, rather than aiding and abetting as alleged in the indictment, and that proceeding on a conspiracy theory amounted to a constructive amendment of the indictment under *Stirone.* Each of these claims is unavailing.

**A. Petitioner Claims He Is Innocent Of Aiding And Abetting**

Under the terms of 18 U.S.C. § 2(a), "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." To be convicted of aiding and abetting, the defendant must have taken some conscious action that furthered the commission of the underlying crime. *See United States v. Dickerson,* 508 F.2d 1216, 1218 (2d Cir.1975). The government must therefore prove the underlying crime was committed by someone other than the defendant, and that the defendant himself acted with the specific intent of advancing the commission of the underlying crime. To show specific intent, the government must prove the defendant knew of the proposed crime and had an interest in furthering it. *See United States v. Wiley,* 846 F.2d 150, 154 (2d Cir.1988). Thus, to prove the act and intent elements for aiding and

abetting the commission of a crime, the evidence must demonstrate that the defendant joined and shared in the underlying criminal endeavor and that his efforts contributed to its success. *See United States v. Zambrano,* 776 F.2d 1091, 1097 (2d Cir.1985).

Petitioner claims he did not take the affirmative step which would violate 18 U.S.C. § 2, the aiding and abetting statute. However, this claim was already was raised and denied on direct appeal, and Petitioner fails to cite, nor has this Court found, any intervening change in the law that would have exonerated Petitioner had it been in force when the conviction was affirmed on appeal. *See* 2001 WL 34284354, at *65 (Petitioner's Brief on direct appeal, arguing Petitioner not liable for firearm charge under aiding and abetting or *Medina* [FN9] theory); *Amato,* 2002 WL 360735, at *5 (considering all of Petitioner's arguments not otherwise discussed, including *Medina* charge, and affirming the judgment of the district court). Therefore, Petitioner is procedurally barred from bringing this claim.

FN9. *United States v. Medina,* 74 F.3d 413 (2d Cir.1996).

**B. Petitioner Claims There Was A Constructive Amendment Regarding The Section 924(c) Charge**

Perhaps recognizing that he would be procedurally barred from re-litigating his aiding and abetting claim, Petitioner has repackaged it as a *Stirone* claim, arguing that the government's theory as to his § 924(c) liability at trial was conspiracy, whereas the indictment alleged aiding and abetting, and that this constructive amendment of the indictment violated *Stirone.*

*13 Although this claim was not presented at trial or appeal, Petitioner again seeks to avoid the procedural bar on this claim by arguing that Corozzo and Shevitz were ineffective for failing to raise the question of whether the government constructively amended the indictment in connection with the § 924(c) charge. Furthermore, as with his *Stirone* claim regarding the interstate commerce nexus, Petitioner did not plead in his § 2255 petition that Corozzo and Shevitz were ineffective for failing to raise this *Stirone* claim regarding § 924(c) liability. Therefore, in his Reply he requested leave to amend his petition to include an ineffective assistance of counsel claim with this *Stirone* claim as to the § 924(c) charge, in order to avoid the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

procedural bar. (Pet. Rep. at 1.)

In support of his *Stirone* claim regarding § 924(c) liability, Petitioner grossly misstates the prosecution's legal theory at trial and mischaracterizes the record, ignoring the significant incriminatory evidence proving his § 924(c) liability under an aiding and abetting theory. Petitioner does concede that a firearm was used in the attempted robbery. (Pet. Br. at 22.) However, Petitioner argues that his alleged knowledge that his co-defendants intended to use guns to commit the robbery is an insufficient basis to find aider and abettor liability. While Petitioner's statement of the law is correct, his summary of the trial testimony against him is not. Contrary to his profession of ignorance, the evidence clearly showed that Petitioner not only knew his co-defendants intended to use guns in the robbery, but Petitioner also assisted in providing firearms and protection for use in a possible exchange of fire during the robbery. Specifically, trial testimony established that Petitioner supplied two bulletproof vests to Anthony Tabbita, a cooperating witness involved in the planning of the robbery, for the "score," which was commonly understood in Gambino OCF circles to mean an armed robbery. (Tr. at 550, 957, 1172, 1236-37.) Furthermore, another cooperating witness, Florian Stoica, testified that on the morning of the March attempt, Petitioner and another cohort identified only as "Nick" placed several automatic firearms into a stolen van that would serve as the drop-off and getaway vehicle for the robbery. (*Id*. at 100, 102.) In addition to the firearms, Petitioner and "Nick" picked up a "22 caliber silencer" for the robbery. (*Id*. at 102.) Petitioner and "Nick" were to either poison or shoot the dogs following the break-in, and to restrain the victims. (*Id*. at 104.) Petitioner thus had a key role in ensuring that at least one firearm equipped with a silencer would be carried and potentially used during the robbery, thus violating 18 U.S.C. §§ 924(c), 2. In short, the government established Petitioner's aider and abettor liability for use of a firearm at trial, and there was no constructive amendment of the indictment.[FN10]

> FN10. Petitioner argues that "even the district judge seemed to exhibit some confusion between the elements of aiding which were required to be proven and a § 924(c) conspiracy, which was the

actual theory of the prosecution." (Pet. Br. at 18-19.) This contention, which is based on a single question the Court directed to Petitioner's attorney during the charge conference, is completely without merit. More importantly, the Court's aider and abettor jury charge was legally sound. (Tr. at 1991-94.)

**\*14** After reviewing the trial and appellate record, the Court cannot find that Corozzo's and Shevitz's failure to raise a meritless *Stirone* claim concerning § 924(c) aider and abettor liability constituted ineffective assistance under *Strickland*. Having failed to establish cause and prejudice for failing to raise this *Stirone* claim on direct appeal, Petitioner is procedurally barred from now raising the claim. Therefore, Petitioner's request for leave to amend his petition to include an ineffective assistance of counsel claim with this *Stirone* claim in order to avoid procedural default is denied, because amendment would be futile.

**V. Petitioner's Remaining Ineffective Assistance Of Counsel Claims**

Petitioner claims Corozzo rendered ineffective assistance in connection with three other aspects of his trial representation. As stated above, under *Strickland* and its progeny, a defendant advancing an ineffective assistance claim faces a heavy burden, and there is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance. Petitioner's remaining ineffective assistance of counsel claims clearly do not meet this burden.

**A. Petitioner Claims Corozzo Failed To Advise Him That The Right To Testify Was His Decision**

Petitioner complains that counsel was ineffective for insisting that Petitioner not testify at trial, because "Petitioner would have been his own best defense witness," (Pet. Br. at 24), and "could have testified that he did not commit the robbery, that he did not buy a weapon from Tabbita, and that he did not know why Tabbita needed bullet proof vests." (Pet. Br. at 25.)

As Petitioner correctly notes, the decision whether or not to testify is a "personal right," and therefore a defendant "must be allowed to testify if he so desires, regardless of strategic considerations that his lawyer

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

concludes weigh against such a decision." *Brown v. Artuz,* 124 F.3d 73, 77 (2d Cir.1997). A defendant's claim that he was denied the right to testify is considered a "component" of his ineffective assistance of counsel claim, and is therefore reviewed under the two-part *Strickland* standard. *See id.* at 79. Accordingly, courts may presume, unless the defendant can overcome the presumption, that defense counsel was effective and did not fail to advise the defendant of his right to testify. *See Strickland,* 466 U.S. at 689.

Here, Petitioner offers nothing beyond his own self-serving affidavit in support of his claim that he was never informed of his right to testify. Petitioner's affidavit states:

I wanted to testify at my trial. I always believed I had an excellent chance of being acquitted because I am innocent of the charges. I could have testified that I did not buy a gun from Anthony Tabbita, and that I did not know why Tabbita wanted/purchased bullet-proof vests. The victim of the crime did not identify me as a participant, and the only witnesses against me had more severe criminal histories than I do.

**\*15** (Guidice Aff. at ¶ 4.) First, it is far from clear that Petitioner's affidavit, read in totality, even alleges that his trial counsel failed adequately to consult and inform him about his right to testify and the progress of his case. Indeed, Petitioner does not actually allege that Corozzo failed to advise him of his right to ultimately decide whether or not he should testify. The affidavit merely states Petitioner "wanted to testify." Petitioner also fails to present an affirmation from his trial counsel to support his claim. On the contrary, Corozzo's affidavit undermines Petitioner's claim:

8. Prior to and during his trial, I discussed with [Petitioner] the possibility of his testifying.
9. I advised [Petitioner] that I thought it could be detrimental to his defense if he testified.

(Corozzo Aff. at ¶¶ 8-9.) Thus, Corozzo clearly discussed with Petitioner the possibility of testifying. When viewed in totality, Petitioner's equivocal assertions, particularly when viewed in light of Corozzo's affidavit,

fail to overcome the presumption that counsel properly advised him of his right to testify. *See Frederick v. United States,* No. 01 CV 7826, 2005 WL 2175904, at *16 (E.D.N.Y. September 08, 2005) (Johnson, J.) (citing *DeLuca v. Lord,* 858 F.Supp. 1330, 1360 (S.D.N.Y.1994).

Even assuming *arguendo* that Corozzo failed to advise Petitioner of his right to testify, *Strickland* requires that the defendant also demonstrate prejudice. The case against Petitioner was overwhelming, and Petitioner has not indicated the manner in which his proposed testimony would have led to his acquittal, other than by suggesting that the jury would have found him more credible than the numerous witnesses who testified against him. Therefore, Petitioner cannot demonstrate that he was prejudiced by not taking the stand in his own defense. *See Rega v. United States,* 263 F.3d 18, 21-26 (2d Cir.2001) (holding that a defendant claiming that counsel prevented him from testifying in his own behalf must demonstrate a reasonable probability that his testimony would have resulted in a different trial outcome). This claim is denied.

**B. Petitioner Claims Corozzo Should Have Called Dsafer Osmonevic As A Defense Witness**

Petitioner contends that Corozzo should have called a potential witness, Dsafer Osmonevic, to testify on Petitioner's behalf, and that failure to do so could not been part of Corozzo's trial strategy. Yet Petitioner concedes that "[o]n the surface, it appears that Corozzo may have had reasons for [not calling Osmonevic as a witness], since Osmonevic declined a requested interview with counsel." (Pet. Br. at 27.) This concession alone demonstrates why Corozzo's decision to not call Osmonevic cannot amount to ineffective assistance. As Corozzo stated in his affidavit, he was aware at the time of trial that prior statements from Osmonevic contained in written reports contradicted the trial testimony of government witnesses, and that Osmonevic could have potentially provided exculpatory testimony. (Corozzo Aff. at ¶¶ 10-12.) However, he also explained that Osmonevic refused to be interviewed by Corozzo prior to testifying. (*Id.* at ¶ 14.) Corozzo then informed Petitioner that although he had the right to subpoena Osmonevic to testify at trial, he was "against calling a fact witness who refused a defense request for an interview" and made the reasonable decision not to call him. (*Id.* at ¶ 15.) This is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)

(Cite as: 2007 WL 1987746 (E.D.N.Y.))

precisely the type of trial strategy decision that cannot serve as the basis for an ineffective assistance claim. *See, e.g,* *Eze v. Senkowski,* 321 F.3d 110, 129 (2d Cir.2003); *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.1997). This claim is denied.

**C. Petitioner Claims Corozzo Conducted An Irrelevant Cross-Examination As To Organized Crime Due To A Conflict Of Interest**

**\*16** Petitioner alleges that Corozzo's cross-examination of Tabbita was ineffective because it did not benefit Petitioner, but rather benefited Corozzo's partner's representation of alleged Gambino OCF associate Joseph O'Kane. Petitioner fails to articulate how Corozzo's representation may have helped O'Kane. Petitioner also claims that Corozzo's examination of witness Ronald Rivera was ineffective, though he fails to explain how counsel's representation was even remotely deficient, let alone how it amounted to ineffective assistance of counsel under *Strickland.* Having reviewed the record, the Court finds that this claim is meritless.

**VI. Petitioner Requests Leave To Amend His Petition To Include *Blakely* And *Crawford* Claims**

Petitioner requests leave to amend his petition to include claims based on *Blakely* and *Crawford.* (Pet. Rep. at 25, 28.) However, neither of these cases is retroactive to cases on collateral review. *See* *Carmona v. United States,* 390 F.3d 200, 202-03 (2d Cir.2004) (*Blakely* not retroactive); *Wharton v. Bocktine,* 127 S.Ct. 1173, 1184 (2007) (*Crawford* not retroactive). Therefore, Petitioner's request to amend his petition to include claims based on *Blakely* and *Crawford* is denied because amendment would be futile.

**VII. Certificate Of Appealability**

The only remaining issue is the question of whether to grant a certificate of appealability ("COA"). For a COA to issue, petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A substantial showing "does not require a petitioner to demonstrate that he would prevail on the merits, but merely that 'reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.' " *Santana v. United States,* No. 04 CV 1111, 2005 WL 180932, at \*7

(S.D.N.Y. Jan. 26, 2005) (quoting *Rhagi v. Artuz,* 309 F.3d 103, 106 (2d Cir.2002)) (internal quotation marks and citation omitted). Petitioner has made no substantial showing of the denial of a constitutional right. Therefore, the Court will not issue a COA.

*CONCLUSION*

After review of the filings and relevant portions of the record, which were sufficient to dispose of this motion, the Court hereby DENIES Petitioner's § 2255 motion and related requests. The Court also DENIES the issuance of a certificate of appealability. The Clerk of the Court is directed to close the case.

SO ORDERED.

E.D.N.Y.,2007.

Guidice v. U.S.
Not Reported in F.Supp.2d, 2007 WL 1987746 (E.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835004 (S.D.N.Y.)

(Cite as: 2009 WL 1835004 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Thomas P. JACKSON, Petitioner,
v.
Janice M. KILLIAN, Warden: Federal Correctional
Institution, Otisville, New York Respondent.
No. 08 Civ. 4386(SAS).

June 23, 2009.
West KeySummary**Habeas Corpus 197** 510(1)

197 Habeas Corpus

197II Grounds for Relief; Illegality of Restraint
197II(B) Particular Defects and Authority for Detention
in General
197k503 Judgment, Sentence, or Order
197k510 Computation
197k510(1) k. In general; completion of term.
Most Cited Cases
Habeas corpus petition was denied as wholly without merit
in proceeding in which inmate claimed that the federal
sentencing court misconstrued the sentencing guidelines. The
sentencing court correctly construed the sentencing guidelines
because his state burglary crime was unrelated to his federal
bank robbery crimes. There was no indication that the
sentencing court considered the state burglary as "relevant
conduct" or that the state burglary was the basis for an increase
in his offense level. 28 U.S.C.A. §§ 2241, 2255; U.S.S.G. §
5G1.3, 18 U.S.C.A.
Thomas P. Jackson, Reg. # 59535-053, F.C.I. Otisville,
Otisville, NY, Petitioner (pro se).

Kristin L. Vassallo, Assistant United States Attorney, New
York, NY, for Respondent.

*OPINION AND ORDER*

SCHEINDLIN, J.

I. INTRODUCTION
*1 Thomas P. Jackson, presently incarcerated and
proceeding pro se, brings this petition for a writ of habeas
corpus pursuant to section 2241 of Title 28 of the United States
Code ("section 2241"). Specifically, he claims that the
sentencing court misconstrued the Sentencing Guidelines and
that the Federal Bureau of Prisons ("BOP") miscalculated his
sentence credit.FN1 For the reasons stated below, Jackson's
petition for a writ of habeas corpus is dismissed.

FN1. See Petition for Writ of Habeas Corpus, April
10, 2008 ("Petition"), at 4, 5 (Introduction ¶¶ 15, 17).
The Petition is cited by noting the page number
followed by parentheses containing the section title
and paragraph number. Exhibits to the Petition are
neither paginated nor numbered.

II. BACKGROUND

A. Offense Conduct

On September 7, 2000, Jackson committed two bank
robberies in New York City. FN2 On November 27, 2000,
Jackson committed an unrelated burglary. FN3

FN2. These crimes are codified in 18 U.S.C. §
2113(a).

FN3. See 8/14/08 Declaration of John A. Farrar,
Federal BOP Policy and Correspondence Specialist
("Farrar Decl."), ¶ 4.

B. Procedural History

Jackson was arrested on the burglary charge by New York
State authorities on November 27, 2000.FN4 On January 2,
2001, while Jackson was in state custody, he was "borrowed"
by federal authorities to appear on the two bank robbery
charges through a writ of habeas corpus ad prosequendum.FN5
On February 6, 2002, Jackson was sentenced by New York
State and returned to state custody to serve a term of forty-two
months to seven-years in prison.FN6 The time between
November 27, 2000, when he was first detained, to February 5,
2002, the day before his state sentence began, was credited to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835004 (S.D.N.Y.)

(Cite as: 2009 WL 1835004 (S.D.N.Y.))

both his state and federal sentences.[FN7] Both credits amounted to 436 days. From February 6, 2002 to April 2, 2004, Jackson was solely serving his state term and received no credit toward his federal sentences. On April 2, 2004, Jackson was sentenced on the federal bank robbery charges to 140 months in custody to be followed by three years of supervised release.[FN8] The state term expired on July 21, 2005, and the United States Marshals Service assumed custody of Jackson that same day.[FN9] Pursuant to the sentencing court's order and a subsequent BOP "nunc pro tunc" designation letter dated July 13, 2006, Jackson's federal term ran concurrently with his state term-that is, the time from April 2, 2004 (when his federal sentence was imposed) to July 21, 2005 (when his state sentence concluded) was applied toward both his state and federal sentences.[FN10] He is now incarcerated at FCI Otisville.[FN11] His federal term expires on September 21, 2014, but his scheduled release date is March 22, 2013.[FN12]

FN4. *See id.* ¶ 5.

FN5. *See id.* ¶ 6.

FN6. *See id.* ¶ 7.

FN7. *See id.* ¶ 14.

FN8. *See id.* ¶ 8. Jackson was found guilty of the federal crimes on April 4, 2003, almost exactly one year before his federal sentencing. *See id.*

FN9. *See id.* ¶ 10.

FN10. *See id.* ¶ 8. *See also* 7/13/06 BOP Memorandum, Ex. H to Farrar Decl.

FN11. *See* Farrar Decl. ¶ 2.

FN12. *See id.* ¶ 15. *See also* Sentence Monitoring Computation Data, January 14, 2007, attached to Petition (without pagination or exhibit numbers).

Jackson has brought several actions in various courts. On April 20, 2004, Jackson appealed his federal conviction to the Second Circuit Court of Appeals, which decided the matter on February 28, 2005.[FN13] On remand, the Eastern District of New York entered a second amended judgment on June 8, 2005.[FN14] On September 5, 2006, Jackson filed a section 2241 petition

"challenging the accuracy of the BOP calculation." [FN15] On June 27, 2007, the Eastern District of New York dismissed Jackson's section 2241 petition for failing to exhaust administrative remedies and failing to name the proper respondent.[FN16] On March 16, 2007, Jackson filed a motion pursuant to section 2255 of Title 28 of the United States Code ("section 2255"), claiming that the sentencing court " 'lacked both in [sic] personam and subject matter jurisdiction to try or charge or to convict petitioner' because the Prison Litigation Reform Act and the Antiterrorism Effective Death Penalty Act are unconstitutional mandates." [FN17] On July 3, 2007, the Eastern District of New York dismissed Jackson's section 2255 motion as untimely. [FN18] Following is a summary of important dates:

FN13. *See United States v. Jackson,* 126 Fed. App'x 5 (2d Cir.2005) ("*Jackson I*") (affirming the sentencing court's jury instructions but remanding to conform Jackson's sentencing with a recent Supreme Court case).

FN14. *See Jackson v. Apker,* No. 07 Civ. 1324, 2007 WL 1987762, at *1 (E.D.N.Y. July 3, 2007) ("*Jackson III*") (describing the procedural history following Jackson's conviction and sentencing, including the second amended judgment). Jackson did not seek additional review of the second amended judgment. *See id.* On June 1, 2004, the sentencing court issued a first amendment-specifically, a change to the judgment's "Statement of Reasons." *See id.*

FN15. *Jackson v. United States,* No. 06 Civ. 4863, 2007 WL 1875567, at *1 (E.D.N.Y. June 27, 2007) ("*Jackson II*").

FN16. *See id.,* at *3.

FN17. *Jackson III,* 2007 WL 1987762, at *1 (citation omitted). The first section 2255 motion was filed on March 16, 2007 with a subsequent section 2255 motion filed on June 20, 2007. The court construed the June 20, 2007 motion as amending the March 16, 2007 motion. *See id.*

FN18. *See id.* at *3.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835004 (S.D.N.Y.)

(Cite as: 2009 WL 1835004 (S.D.N.Y.))

- September 7, 2000:     Federal crimes committed.

- November 27, 2000:     Arrested by New York State for unrelated crime. Held in state custody.

- January 2, 2001:     "Borrowed" by federal authorities. Moved to federal custody.

- February 6, 2002:     Sentenced by New York State. Moved to state custody to serve state sentence.

- April 2, 2004:     Sentenced by Eastern District of New York. Even though Jackson remained in state custody, his federal sentence was designated, nunc pro tunc, to run concurrently with his state sentence from this point onward.

- June 8, 2005:     Entry of amended federal judgment.

- July 21, 2005:     State sentence expired.

- September 29, 2005:     Transferred to federal prison to serve out remainder of federal sentence.[19]

- March 22, 2013:     Scheduled release from federal sentence.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835004 (S.D.N.Y.)

(Cite as: 2009 WL 1835004 (S.D.N.Y.))

-              September 21, 2014:          Expiration of federal sentence.

    FN19. *See* Petition at 10 (Statement of Facts ¶ G). Even though Jackson's state sentence expired on July 21, 2005, it took two months to transfer him to a federal correctional institution.

    **\*2** Jackson exhausted his administrative remedies and now brings a writ of habeas corpus, pursuant to section 2241, claiming that his sentence should be reduced from 140 months to 99 months.[FN20] Specifically, Jackson claims that the federal sentencing court misconstrued the Sentencing Guidelines and that the BOP miscalculated the amount of credit that should be applied toward his federal sentence.[FN21]

    FN20. *See id.* at 4-7 (Introduction ¶¶ 15-19).

    FN21. *See id.* Throughout his Petition and Reply, Jackson makes various claims as to why his sentence should be reduced. For example, Jackson claims he is entitled to credit for all of his presentence incarceration. *See* 8/26/08 Jackson's Reply ("Reply") ¶ 9. However, it is not clear whether he is referring to the period of incarceration prior to his state sentence (which was credited) or the period of incarceration prior to his federal sentence (some of which was credited). At another point, Jackson asks for credit for the time period between January 2, 2001 (when the Federal Marshals took custody of him) to September 29, 2005 (when he arrived at a federal correctional institution after his state sentence ended). *See* Petition at 12 (Issues Raised ¶ 2).

## III. LEGAL STANDARD

### A. 28 U.S.C. § 2241

    "Writs of habeas corpus may be granted by ... the district courts ... within their respective jurisdictions."[FN22] "A motion pursuant to [section] 2241 generally challenges the *execution* of a federal prisoner's sentence, including such matters as the administration of parole [and] computation of a prisoner's sentence by prison officials."[FN23]

    FN22. 28 U.S.C. § 2241(a).

    FN23. *Jiminian v. Nash,* 245 F.3d 144, 146 (2d Cir.2001) (emphasis in original).

### B. 28 U.S.C. § 2255

    "In contrast [to a section 2241 motion, section] 2255 is generally the proper vehicle for a federal prisoner's challenge to his conviction and sentence, as it encompasses claims that '... the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.' '[FN24] Despite the well-defined distinction between the two sections, claims that fall within section 2255 (*i.e.,* claims that attack the imposition of the sentence, not the execution of the sentence) can be raised under a section 2241 motion "in very limited circumstances."[FN25]

    FN24. *Id.* (quoting 28 U.S.C. § 2255(a)).

    FN25. *Poindexter v. Nash,* 333 F.3d 372, 378 (2d Cir.2003).

    These circumstances-exceptions to the rule-allow for a federal prisoner to collaterally attack a conviction under section 2241 if that prisoner can show that a section 2255 motion would be "inadequate or ineffective to test the legality of his detention."[FN26] A section 2255 motion "may be inadequate or ineffective in circumstances in which 'the petitioner cannot, for whatever reason, utilize [section] 2255, and in which the failure to allow for collateral review would raise serious constitutional questions." '[FN27] The Second Circuit has recognized only one circumstance where such a section 2255 motion is inadequate or ineffective: cases in which inmates "(1) can prove 'actual innocence on the existing record,' and (2) 'could not have effectively raised [their] claim[s] of innocence at an earlier time."[FN28] On the other hand, a section 2255 motion "is *not* considered inadequate or ineffective merely because the gate keeping provision of the statute prevents a movant from raising a claim that he or she could have raised on direct review or in an earlier section 2255 motion."[FN29]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835004 (S.D.N.Y.)

(Cite as: 2009 WL 1835004 (S.D.N.Y.))

FN26. *Jiminian,* 245 F.3d at 147 (citing 28 U.S.C. § 2255(e)).

FN27. *Id.* (quoting *Triestman v. United States,* 124 F.3d 361, 377 (2d Cir.1997)).

FN28. *Cephas v. Nash,* 328 F.3d 98, 104 (2d Cir.2003) (quoting *Triestman,* 124 F.3d at 363).

FN29. *Bellomo v. United States,* 344 F.Supp.2d 429, 434 (S.D.N.Y.2004) (emphasis added and citations omitted). "As amended by the [Antiterrorism and Effective Death Penalty Act], [section] 2255 includes a gate-keeping provision that limits the filing of second or successive [section] 2255 motions." *Jiminian,* 245 F.3d at 146.

A request for relief pursuant to a section 2255 claim is generally subject to a one year statute of limitations, starting from "the date on which the judgment of conviction becomes final ... or the date on which facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." FN30 "[A petitioner] cannot ... resort to [section] 2241 merely to save his now untimely [section] 2255] claim." FN31

FN30. 28 U.S.C. § 2255(f)(1), (4). The other scenarios that toll the statute of limitations are not relevant here.

FN31. *Medrano v. Craig,* No. 9:05 Civ. 1422, 2006 WL 219820, at *2 (N.D.N.Y. Jan.27, 2006).

C. U.S.S.G. § 5G1.3

**\*3** Section 5G1.3(b) of the United States Sentencing Guidelines ("section 5G1.3") states as follows:

If ... a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction ... and that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments), the sentence for the instant offense shall be imposed as follows: (1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court

determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and (2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment. FN32

FN32. U.S.S.G. § 5G1.3(b).

"[I]t would be inappropriate to apply [section] 5G1.3(b) ... [to a defendant's] convictions [that] arose from two completely unrelated offenses." FN33 Challenging the sentencing court's section 5G1.3 calculation is "more appropriate[ly brought as an issue] for the sentencing court pursuant to a motion under [section] 2255, rather than th[e] district court in a [section] 2241 habeas petition where petitioner is held in custody." FN34

FN33. *Rosario v. United States,* No. 02 Civ. 3360, 2004 WL 439386, at *6 (S.D.N.Y. Mar.9, 2004) ("where[ ] Rosario's convictions stem[ ] from unrelated criminal conduct, ... [section] 5G1.3(b) [is rendered] inapposite.").

FN34. *Saunders v. Unnamed Warden,* No. 07 Civ. 4293, 2008 WL 2775763, at *7 (D.N.J. July 14, 2008).

D. 18 U.S.C. § 3585(b)

"The Attorney General, through the [BOP], has responsibility for imprisoning federal offenders." FN35 "A defendant who is dissatisfied with the Attorney General's determination [of credit] must raise his challenge with the BOP, by following a complex administrative process." FN36 "The defendant may seek judicial review of the Attorney General's computation once he has exhausted all administrative remedies." FN37

FN35. *United States v. Wilson,* 503 U.S. 329, 331, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992).

FN36. *Grant v. United States,* No. 5:93 Cr. 80, 2007 WL 2225809, at *1 (M.D.Ga. Jul.31, 2007). *See also* 28 C.F.R. §§ 542.10 to 542.19 (2006) (detailing the steps for obtaining administrative review).

FN37. *United States v. Wilson,* 997 F.2d 208, 209 (6th Cir.1993).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

... 

Not Reported in F.Supp.2d, 2009 WL 1835004 (S.D.N.Y.)

(Cite as: 2009 WL 1835004 (S.D.N.Y.))

"Computing a federal sentence requires two separate determinations: first, when the sentence commences; and, second, to what extent the defendant in question may receive credit for any time already spent in custody." [FN38] With respect to the first determination, the earliest date that a sentence can commence is the date the sentence is imposed. [FN39] A federal sentence can run concurrently to a state sentence if a portion of the state sentence remains undischarged when the federal sentence is imposed. [FN40] Section 3585(b) of Title 18 of the United States Code ("section 3585") dictates the second consideration-grants of credit. Section 3585 calls for the BOP to credit any time spent in official detention prior to the sentencing date "(1) as a result of the offense for which the sentence was imposed; or (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed; *that has not been credited against another sentence.*" [FN41] "Prior custody credits shall be given for any time spent in non-federal presentence custody that begins on or after the date of the federal offense up to the date that the first sentence begins to run, federal or non-federal." [FN42] "If, for example, a state defendant is denied bail solely because of a federal detainer issued against him, the time spent in state custody awaiting trial must be credited to his federal sentence." [FN43]

FN38. *United States v. Smith,* 812 F.Supp. 368, 370 (E.D.N.Y.1993).

FN39. *See, e.g., Hickman v. United States,* No. 05 Civ. 1842, 2006 WL 20489, at *3 (S.D.N.Y. Jan. 4, 2006) (noting that the date of the Judgment and Sentencing Order marks the earliest day that the defendant's sentence could commence). *Accord* BOP Program Statement 5880.28, Sentence Computation Manual (CCCA of 1984) ("BOP Prog. Stat."), excerpts attached as Exhibit F to Farrar Decl., at 4 ("In no case can a federal sentence of imprisonment commence earlier than the date on which it is imposed."). *See also Smith,* 812 F.Supp. at 370 ("When a federal court imposes a sentence on a defendant who is already in state custody, the federal sentence may commence if and when the Attorney General or the [BOP] agrees to designate the state facility for service of the federal sentence.").

FN40. *See, e.g., Fermin v. United States,* 252 F.3d 102, 109 (2d Cir.2001) (allowing a federal sentence to run concurrently only with the undischarged portion of the defendant's pre-existing state sentence).

FN41. 18 U.S.C.A. § 3585(b) (emphasis added). *Accord United States v. Labeille-Soto,* 163 F.3d 93, 99 (2d Cir.1998) ("[A] defendant has no right to credit on his federal sentence for time that has been credited against his prior state sentence.").

FN42. BOP Prog. Stat. at 10. These time credits are also known as *Willis* time credits, from *Willis v. United States,* 438 F.2d 923 (5th Cir.1971). *Accord Rivera v. Killian,* No. 08 Civ. 405, 2008 WL 1990093, at *3 (S.D.N.Y. May 8, 2008) ("[T]ime spent by a defendant in state custody solely as the result of actions of the federal government-such as the lodging of a federal detainer that prevented the defendant from being released on bail in the state case-should be credited to his federal sentence.").

FN43. *Shaw v. Smith,* 680 F.2d 1104, 1106 (5th Cir.1982) (citation omitted).

**\*4** "[C]redit is granted by the Attorney General through the [BOP] after a defendant is sentenced, and although the defendant may, after exhausting his administrative remedies, obtain judicial review of that Bureau's determination, the credit is not [to be granted] by a district court at the time of sentencing." [FN44] A determination by the district court to grant credit to a defendant "exceed[s] the court's authority as a matter of law." [FN45]

FN44. *Labeille-Soto,* 163 F.3d at 99 (citations omitted).

FN45. *Id,* at 100.

## IV. DISCUSSION

Jackson first claims that the sentencing court erred in failing to adhere to the requirements of section 5G1.3 of the Sentencing Guidelines. Respondent counters that Jackson cannot bring a section 2241 motion to attack the imposition, not the execution, of his sentence. Jackson next claims that the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835004 (S.D.N.Y.)

(Cite as: 2009 WL 1835004 (S.D.N.Y.))

BOP miscalculated his federal sentence and asks this Court to compel the BOP to correct it. Respondent counters that the BOP correctly calculated Jackson's sentence.

A. Jackson's Section 5G1.3 Claim Fails for Several Reasons

**1. This Claim Must Be Brought Pursuant to Section 2255**

Jackson's claim that the sentencing court failed to follow the dictates of section 5G1.3 must be brought under 2255 because he is attacking the imposition, not the execution, of the sentence. However, because Jackson is proceeding pro se, his petition "is to be liberally construed in his favor" and this Court will assume that he filed this part of his claim pursuant to section 2255.[FN46]

> FN46. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995) (citing *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).

**2. Jackson's Section 2255 Petition Is Time-Barred**

Jackson's second amended judgment was entered on June 8, 2005.[FN47] The instant Petition is dated April 10, 2008. Jackson has not alleged that he discovered any new facts after he filed his first section 2255 motion. Jackson's prior section 2255 motion was dismissed as time-barred.[FN48] It follows that the instant motion is also time-barred.

> FN47. Because Jackson had ten days from June 8, 2005 to file a notice of appeal on this judgment, the amended judgment became final on or about June 22, 2005.

> FN48. *See Jackson III,* 2007 WL 1987762, at *2. Because that court had entered a second amended judgment on June 8, 2005, Jackson's "conviction became final for the purpose of filing a [section] 2255 petition on June 22, 2005, the last date upon which he was could file a notice of appeal of this Court's second amended judgment." *Id.* The court then noted that even if it had used the date the Second Circuit entered judgment on the appeal-February 28, 2005-the claim also would have been time-barred because the conviction would have been "final on May 30, 2005, 90 days after the date on which the judgment was entered." *Id.* Using these dates, this Court must dismiss Jackson's instant petition as

untimely-this petition is dated almost three years after his conviction became final.

Respondent claims that this Petition requires the approval of the Second Circuit because Jackson has filed a previous section 2255 motion. However, Jackson's prior section 2255 motion was not dismissed on the merits. In *Jiminian v. Nash,* the Second Circuit held that it was proper for the district court to send a successive section 2241 petition that contained a section 2255 claim for approval when the petitioner's previous section 2255 motion was dismissed on the merits.[FN49] *Jiminian,* however, did not address a prior section 2255 motion that was procedurally barred. In *Medrano v. Craig,* the district court did not transfer a section 2241 petition, which masked an untimely section 2255 claim, to the Second Circuit for review because the previous section 2255 motion was dismissed as time-barred.[FN50] I will follow this practice and decide the claims in the pending Petition.[FN51]

> FN49. *See Jiminian,* 245 F.3d at 148 ("[W]e also hold that when presented with a [section] 2241 petition raising previously available claims appropriately the subject of a [section] 2255 motion, district courts should construe the petition as a second or successive [section] 2255 motion and transfer it to this Court for certification, *so long as the prisoner had a prior [section] 2255 motion dismissed on the merits."* ) (emphasis added).

> FN50. Some courts have held that a procedurally-barred section 2255 claim is not a "first" section 2255 motion. *See, e.g., Douglas v. Workman,* 560 F.3d 1156, 1189 (10th Cir.2009) (refusing to count a section 2255 motion as a successive claim when the first section 2255 motion was procedurally barred).

> FN51. *See Tyson v. Jeffers,* 115 Fed. App'x 34, 37 (10th Cir.2004) (upon determining that Tyson's section 2241 claim was more properly a section 2255 claim, the Tenth Circuit affirmed the District Court's dismissal because "Tyson has now forfeited such a [section] 2255 challenge in any event, since the one-year statute of limitations on [section] 2255 petitions has run").

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835004 (S.D.N.Y.)

(Cite as: 2009 WL 1835004 (S.D.N.Y.))

3. Jackson's Section 5G1.3 Claim Is Without Merit

Even if Jackson's section 2255 claim is not time-barred, is not successive, and is properly brought before this Court, it still fails because it is wholly without merit. The sentencing court correctly construed section 5G1.3 because his state burglary crime was unrelated to his federal bank robbery crimes. There is no indication that the sentencing court considered the state burglary as "relevant conduct" or that the state burglary was the basis for an increase in his offense level. Thus, the sentencing court correctly recognized that section 5G1.3 did not apply to Jackson's federal sentence.

B. Section 3585(b) Sentence Calculation Was Correct

**\*5** Jackson's section 2241 claim is that BOP miscalculated his sentence by failing to give him all of the credit to which he was entitled. This claim is also meritless. The BOP correctly determined that Jackson should receive credit from the time he was detained-November 27, 2000-to the time his state sentence started-February 5, 2002. Those 436 days were correctly counted as *Willis* time credit on his federal sentence. The time between February 6, 2002 and April 2, 2004 was not credited because his federal sentence had not yet commenced-instead, Jackson was serving his state sentence.[FN52] Finally, the time from April 2, 2004-the day Jackson's federal sentence commenced-until July 21, 2005-the day he was released from state custody-was spent concurrently serving both the state and federal sentences.

> FN52. The respondent cites a host of cases that compel this conclusion. *See, e.g., Werber v. United States,* 149 F.3d 172 (2d Cir.1998) (holding that petitioner is not entitled to credit for time already credited toward state sentence); *United States v. Wusebio,* No. 04 Cr. 607, 2007 WL 582745, at \*3 (S.D.N.Y. Feb.21, 2007) (denying credit for time spent pursuant to a writ of habeas corpus ad prosequendum).

Jackson's federal sentence of 140 months, imposed on April 2, 2004, would have placed him in prison until December 2015. Subtracting the 436 days of credit that he correctly received, his maximum sentence is now mid-September, 2014. These are the dates that the BOP imposed. No adjustment to Jackson's sentence is warranted.

C. Certificate of Appealability

A district court may grant a certificate of appealability allowing a habeas petitioner to appeal the denial of his petition with respect to any of petitioner's claims only if petitioner makes a substantial showing of the denial of a constitutional right.[FN53] A substantial showing requires only that a petitioner demonstrate that "reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"[FN54] Because Jackson has not made such a showing, I decline to issue a certificate of appealability.

> FN53. *See* 28 U.S.C. § 2253(c)(2). *See also Miller-El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

> FN54. *Rhagi v. Artuz,* 309 F.3d 103, 106 (2d Cir.2002) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (quotation marks and citation omitted)).

V. CONCLUSION

For the foregoing reasons, Jackson's petition for a writ of habeas corpus is denied. The Clerk of the Court is directed to close this motion (Docket # 1) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Jackson v. Killian
Not Reported in F.Supp.2d, 2009 WL 1835004 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 105181 (E.D.N.Y.)

(Cite as: 1993 WL 105181 (E.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

UNITED STATES of America
v.
Woodrow FLEMING, Defendant.
No. CR–88–00473 (CPS).

Feb. 10, 1993.
MEMORANDUM AND ORDER

SIFTON, District Judge.

**\*1** Defendant, Woodrow Fleming, seeks to withdraw his admission to a violation of the terms of his supervised release. For the following reasons, defendant's motion is granted, and the Court will conduct a revocation hearing on this matter forthwith.

Defendant was arrested on July 11, 1988, on federal auto theft charges. He pleaded guilty to possession of a counterfeit state security (the "underlying federal conviction") and was sentenced in March 1989 to 18 months in prison and a three-year term of supervised release, which began after Fleming's release from prison on May 23, 1990. Fleming has collaterally attacked this conviction in two separate section 2255 motions. Both attacks have been unsuccessful.

On February 10, 1992, Fleming pleaded guilty to a charge of disorderly conduct in New York state court in violation of N.Y.Penal § 240.20 (the "underlying state conviction") and was fined $100. Fleming paid the fine and did not take any further action to challenge the state conviction.

On June 24, 1992, Fleming admitted before Judge Raymond J. Dearie of this Court that he had violated the terms of his supervised release. The violation charge was based on Fleming's guilty plea to the state disorderly conduct charge and the underlying conduct that gave rise to the state prosecution. However, Fleming admitted only that he had pleaded guilty to disorderly conduct.

DISCUSSION

Defendant bases his request for withdrawal of the guilty plea on two grounds: (1) his section 2255 claims that the underlying federal conviction is invalid and (2) the claim that disorderly conduct is a violation and not a crime under New York law. The first ground does not provide a basis for his current motion to withdraw the guilty plea because both of the section 2255 motions have been found to be meritless. However, defendant's second ground for withdrawal has merit.

In the context of charges of violation of the terms of supervised release, a defendant has certain constitutional due process rights. Black v. Romano, 471 U.S. 606, 612 (1985); Gagnon v. Scarpelli, 411 U.S. 778 (1973); Morrissey v. Brewer, 408 U.S. 471 (1972); United States v. Barth, 899 F.2d 199, 201 (2d Cir.1990), cert. denied, 111 S.Ct. 953 (1991). The centerpiece of the due process rights in this context consists of the requirement that the defendant be afforded a hearing during which he can challenge the government's charges, Scarpelli, 411 U.S. at 786, and a requirement that the court note the evidence supporting the violation charge and the reasons for the revocation. See Romano, 471 U.S. at 613–14; see also Morrissey, 408 U.S. at 483–84 (stating that there must be "an appropriate determination that the individual has in fact breached the conditions of parole").

The due process requirements identified in Scarpelli and Morrissey have been incorporated into Rule 32.1 of the Federal Rules of Criminal Procedure, which governs revocation or modification of supervised release. See Fed.R.Crim.P. 32.1, and advisory committee notes; see also United States v. Barnhart, 980 F.2d 219, 222 (3d Cir.1992). Rule 32.1 provides in part as follows:

**\*2** The revocation hearing, unless waived by the person, shall be held within a reasonable time in the district of jurisdiction. The person shall be given

(A) written notice of the alleged violation[s];

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 105181 (E.D.N.Y.)

(Cite as: 1993 WL 105181 (E.D.N.Y.))

(B) disclosure of the evidence against the person;

(C) an opportunity to appear and to present evidence in the person's own behalf;

(D) the opportunity to question adverse witnesses; and

(E) notice of the person's right to be represented by counsel.

Fed.R.Crim P. 32.1(a)(2).

Although a defendant can waive the revocation hearing under this rule, there must be an adequate factual basis for the violation charge; hence, waiver often occurs by a defendant pleading "guilty" or "true" to the averments in the violation report. *See United States v. Pryor,* 957 F.2d 478, 481 (7th Cir.1992); *United States v. Ayers,* 946 F.2d 1127 (5th Cir.1991); *United States v. Dunbar,* 807 F.Supp. 426 (E.D.Tex.1992); *cf. United States v. Rapert,* 813 F.2d 182, 184 (8th Cir.1987) (noting that Rule 11 of the Federal Rules of Criminal Procedure does not govern admissions of probation violations).

In order to revoke or modify Fleming's supervised release, this Court must be reasonably satisfied that Fleming in fact violated the terms of his supervised release. *United States v. Parker,* 952 F.2d 31, 33 (2d Cir.1991); *United States v. Lettieri,* 910 F.2d 1067, 1068 (2d Cir.1990); *United States v. Nagelberg,* 413 F.2d 708, 709 (2d Cir.1969), *cert. denied,* 396 U.S. 1010 (1970); *see Barnhart,* 980 F.2d at 222; *see also* 18 U.S.C. § 3583(e)(3). Thus, the charge defendant acknowledges as true must consist of allegations of conduct which, if true, would constitute violations of the terms of supervised release.

In this case, Fleming plead "guilty" or "true" only to the second charge of violation and only to one allegation under that charge, namely, his disorderly conduct conviction in state court.

MR. ADLER: ... I would respectfully on behalf of Woodrow Fleming, who stands beside me, enter a plea of guilty to charge number two of the specifications which have been lodged against Mr. Fleming.

Charge number two charges Mr. Fleming with the commission of a new criminal offense, disorderly conduct, and I note that that case was disposed of in Nassau County with a payment of $100 fine. It is a matter of public record.

Mr. Fleming enters a plea of guilty to that specification at this time.

Moreover, the Court based its determination that Fleming had violated his supervised release on his plea of guilty to disorderly conduct.

THE COURT: Now ... you could put the government to the proof, require them to affirmatively prove that you had in fact violated this condition of your supervised release. Quite obviously, that will be, in light of your plea of guilty in Nassau County, that would be a rather straightforward proceeding.

Tr. of Proceedings Held on June 24, 1992, at 8, 12.

**\*3** The terms of Fleming's supervised release provide that he "shall not commit another Federal, state or local crime." *See* 18 U.S.C. § 3583(d). In determining whether the defendant has committed a state crime, the Court must examine the relevant state criminal code. *See United States v. Copley,* 978 F.2d 829, 832 (4th Cir.1992); *United States v. Czajak,* 909 F.2d 20 (1st Cir.1990); *United States v. Stephenson,* 928 F.2d 728, 730 (6th Cir.1991); *United States v. Lombardozzi,* 620 F.Supp. 587, 588 (E.D.N.Y.1985), *aff'd,* 788 F.2d 6 (2d Cir.1986).

Disorderly conduct, under New York's penal code is not a crime, but a violation. NYPL §§ 240.20, 10(6). Thus, because it appears that Fleming was admitting only the truth of the averment that he had in fact been convicted of disorderly conduct, this Court is not reasonably satisfied that the defendant violated the terms of his probation. Accordingly, the defendant's motion to withdraw his plea of "true" to the second charge of violation is granted.

The Clerk is directed to mail a copy of the within to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 105181 (E.D.N.Y.)

(Cite as: 1993 WL 105181 (E.D.N.Y.))

all parties.

     SO ORDERED.

E.D.N.Y.,1993.

U.S. v. Fleming
Not Reported in F.Supp., 1993 WL 105181 (E.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 144811 (N.D.N.Y.), 91 A.F.T.R.2d 2003-575

(Cite as: 2003 WL 144811 (N.D.N.Y.))

C

United States District Court,

N.D. New York.
UNITED STATES OF AMERICA
v.
William R. TAINTOR, Jr., Defendant.
No. 7:01–CR–219(TJM).

Jan. 17, 2003.

The government filed petition alleging probation violations. The District Court, McAvoy, J., referred the matter to Gary L. Sharpe, United States Magistrate Judge, who reported and recommended that: (1) probationer violated the terms of his probation by making materially false statement on required monthly supervision report regarding cash flow and bank accounts, and violated terms of his probation by failing to pay Internal Revenue Service (IRS) penalties and interest and to sell his boat as ordered, but did not possess gun in violation of terms of his probation or make a false statement on financial statement provided to probation officer concerning the value of his home, and (2) the probation violations warranted sentence of 6 months of incarceration followed by supervised release.

Report and recommendation issued.

West Headnotes

[1] Sentencing and Punishment 350H ⚷ 1969(3)

350H Sentencing and Punishment

350HIX Probation and Related Dispositions
350HIX(G) Conditions of Probation
350Hk1964 Particular Terms and Conditions
350Hk1969 Reporting to and Cooperation with Law Enforcement
350Hk1969(3) k. Construction, Operation, and Compliance. Most Cited Cases
Probationer violated the terms of his probation by making materially false statement on required monthly supervision report regarding cash flow and bank accounts where he failed to report lump sum distribution of $27,732 that he received from Veterans Administration and deposited in his bank account.

[2] Sentencing and Punishment 350H ⚷ 1974(3)

350H Sentencing and Punishment

350HIX Probation and Related Dispositions
350HIX(G) Conditions of Probation
350Hk1964 Particular Terms and Conditions
350Hk1974 Payment of Fine
350Hk1974(3) k. Construction, Operation, and Compliance. Most Cited Cases
Probationer violated the terms of his probation by failing to pay Internal Revenue Service (IRS) penalties and interest ordered within two years of judgment on his guilty plea to tax evasion, despite having assets available to make payments, and by failing to sell his boat within six months of judgment as ordered.

[3] Sentencing and Punishment 350H ⚷ 1981(3)

350H Sentencing and Punishment

350HIX Probation and Related Dispositions
350HIX(G) Conditions of Probation
350Hk1964 Particular Terms and Conditions
350Hk1981 Matters Related to Weapons
350Hk1981(3) k. Construction, Operation, and Compliance. Most Cited Cases
Probationer did not possess gun in violation of terms of his probation for tax evasion where, although probation officer found rifle on top of probationer's boat during a home visit, probationer testified that he did not hunt and had no reason to have the rifle, probationer's son-in-law testified that he took the rifle from car of probationer's daughter's boyfriend, who had been drinking, and set it on the boat, and the boyfriend's father testified that the rifle belonged to his son.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 144811 (N.D.N.Y.), 91 A.F.T.R.2d 2003-575

(Cite as: 2003 WL 144811 (N.D.N.Y.))

**[4]** Sentencing and Punishment 350H ⚷ 1969(3)

350H Sentencing and Punishment

    350HIX Probation and Related Dispositions
      350HIX(G) Conditions of Probation
        350Hk1964 Particular Terms and Conditions
        350Hk1969 Reporting to and Cooperation with Law Enforcement
          350Hk1969(3) k. Construction, Operation, and Compliance. Most Cited Cases

    Probationer did not make a false statement on financial statement provided to probation officer concerning the value of his home, in violation of terms of his probation for tax evasion, by reporting the purchase price of his house as $135,000 rather than $232,000, where he purchased the property as a camp for $42,000, and on residential loan application, estimated value of the property without the camp at $30,000, and estimated cost of rebuilding for his residence at $190,000 to justify loan of $135,000, which he actually received, and where there was no appraisal of the house since the house was built five years before the financial statement and no offer of proof of current market value.

**[5]** Sentencing and Punishment 350H ⚷ 2038

350H Sentencing and Punishment

    350HIX Probation and Related Dispositions
      350HIX(I) Revocation
        350HIX(I)4 Disposition of Offender
        350Hk2038 k. Sentence Within Statutory or Other Limitation for Offense of Conviction. Most Cited Cases

    Probationer's making of a materially false statement on required monthly supervision report was a Grade B violation, while failing to pay Internal Revenue Service (IRS) penalties and interest ordered within two years of judgment on his guilty plea to tax evasion, despite having assets available to make payments, and failing to sell his boat within six months of judgment as ordered, was a Grade C violation, warranting sentence of 6 months of incarceration followed by supervised release, for offender in Criminal History Category I. U.S.S.G. §§ 7B1.3(a, c), 18 U.S.C.A.

Hon. Glenn T. Suddaby, United States Attorney, Northern District of New York, Binghamton, New York.

James P. McClusky, McClusky, McClusky Law Firm, Adams, New York.

Thomas P. Walsh, Assistant U.S. Attorney, of counsel.

*Report and Recommendation*

SHARPE, Magistrate J.

    **\*1** Pending is a petition alleging probation violations by William R. Taintor, Jr., referred by the Honorable Thomas J. McAvoy, District Court Judge, for a hearing and a report containing proposed findings of fact and recommendations. *See* 18 U.S.C. § 3401(i); 28 U.S.C. § 636(b)(1).

I. *Background*

    After pleading guilty to tax evasion in the Eastern District of Pennsylvania, Taintor was sentenced on September 18, 2000, by the Honorable John P. Fullam to six months home detention and five years probation. Judge Fullam imposed the standard probation conditions, and special conditions requiring that Taintor pay one-half of the penalties and interest due the Internal Revenue Service ("IRS") within two years and that he sell his boat and apply the sales proceeds to his IRS debt within six months. The conditions were later modified, adding the requirement that Taintor provide probation access to his financial information. On May 17, 2001, Taintor's probation was transferred to this district.

    On September 25, 2002, Taintor's probation officer, Franklin H. Gonzalez II, filed a petition alleging that Taintor had violated the standard probation conditions by engaging in three instances of new criminal conduct, and had violated the special condition by failing to reimburse the IRS for penalties and interest. On October 25, Taintor appeared before Judge McAvoy and requested the appointment of counsel. Judge McAvoy assigned uncompensated counsel, and adjourned further proceedings *sine die.* He then appointed James P. McClusky, Esq., and on November 25, 2002, issued the referral order.

    On December 12, the court conducted a hearing and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 144811 (N.D.N.Y.), 91 A.F.T.R.2d 2003-575

(Cite as: 2003 WL 144811 (N.D.N.Y.))

received testimonial and documentary evidence from both the government and Taintor. Gonzalez testified on behalf of the government, and Taintor, Jason Reichart and Brian Cuppernill testified on behalf of the defense. Following the hearing, the court told Taintor that it concluded that he committed perjury during his testimony regarding a Veterans Administration distribution and related financial transactions.

## II. *The Allegations*

In paragraphs 1–3 of the petition, Gonzalez asserted that on three separate occasions, Taintor violated the mandatory condition that he not commit another federal, state or local crime. *See 3563(a)(1); see also, Taintor Judg., pg.2, Gov't Ex. 1.* Those violations alleged: (1) on November 15, 2001, Taintor, as a convicted felon, possessed a rifle in violation of 18 U.S.C. § 922(g); (2) on January 7, 2002, Taintor made a false statement concerning "cash inflow" on a Written Monthly Supervision Report in violation of 18 U.S.C. § 1001; and, (3) in a financial statement dated July 30, 2002, Taintor made a false statement concerning the value of his residence in violation of 18 U.S.C. § 1001. In a fourth violation, Gonzalez alleged that Taintor had violated Special Condition # 4 by not paying one-half of the penalties and interest due and owing the IRS within two years of judgment, and by not selling his boat within six months of the date of judgment.

## III. *Findings of Fact*

**\*2** As necessary to its recommendations, the court has weighed the testimony of all witnesses, reviewed the exhibits, incorporated Taintor's presentence investigation report ("PSI") into the record, and applied a preponderance of the evidence standard. Accordingly, it turns to its findings of fact.[FN1]

> FN1. The court told the parties that it was incorporating the PSI, and afforded them an opportunity to address it.
>
> The court is aware that a preponderance standard may be a heightened requirement. *See Legal Analysis.*
>
> Although the court has segregated the findings

by violation, it has consecutively numbered the paragraphs.

### A. *Violation 1: Possession of a Rifle by a Convicted Felon*

1. The court credits the testimony of Gonzalez, and finds that during a home visit on November 15, 2001, he entered the residence through the garage, observed a Savage model 110, 270 Winchester rifle on top of a boat, confronted Taintor with his discovery, listened to Taintor's explanation, seized the weapon and turned it over to the Jefferson County Sheriff's Department. *See also, Gov't Exs. 10, 11.*

2. Gonzalez did not immediately file a violation petition, but did issue a written reprimand. *See Gov't Exs. 8, 12.*

3. Taintor fully knew and understood that possession of a weapon by a convicted felon was a federal felony, all as evidenced by his signed acknowledgment of notices on September 18 and October 10, 2000. *See Gov't Exs. 3, 6.*

4. The court credits the testimony of Jason Reichart, Taintor's son-in-law, and finds that several days prior to November 15, 2001, Reichart observed the rifle in the automobile of Kevin Cuppernill, Taintor's daughter's boyfriend, advised Cuppernill that he should not have the rifle in the car because he had been drinking, and then retrieved the rifle from the car and placed it on the boat.

5. The court credits the testimony of Reichart and Taintor, and finds that both were aware of the weapons possession prohibition, and Reichart's testimony that he simply forgot about the prohibition when he put the weapon in the garage.

6. The court credits the testimony of Cuppernill's father, Brian, that he owned the rifle, gave it to Kevin before November 15 to hunt, and retrieved it from the Jefferson County Sheriffs Department some time after November 15.

7. The court is not reasonably satisfied that Taintor was untruthful when he testified that he does not hunt, had no reason to have the rifle at the house, and did not know it was there until confronted by Gonzalez.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 144811 (N.D.N.Y.), 91 A.F.T.R.2d 2003-575

(Cite as: 2003 WL 144811 (N.D.N.Y.))

**B.** *Violation 2: False Statement: Written Monthly Supervision Report (Income)*

8. The court credits the documentary evidence and testimony of Gonzalez and concludes that Taintor was subject to the standard condition of probation requiring that he "answer truthfully all inquiries by the probation officer," and was obligated to "provide the probation officer with access to any requested financial information." *See Gov't Exs. 1, 4, 5.*

9. Taintor was fully instructed by Gonzalez on all conditions of probation, and was fully aware that he was obligated to provide complete disclosure of all assets and financial resources owned or controlled by him to his probation officer for the purpose of, *inter alia,* ensuring compliance with the special condition of probation requiring his payment of interests and penalties to the IRS within two years of the date of judgment and the sale of the boat within six months of judgment. *See also, Gov't Ex. 13* (summarizing the obligation).

**\*3** 10. As a special condition of probation designed to implement the financial conditions, Taintor was required to file a written Probation 8 Form, Monthly Supervision Report. *See e.g., Gov't Ex. 14, Def. Ex. 1.*

11. The Probation 8 Form contains a signature line certifying that the information supplied is "accurate and complete," and a warning that "[a]ny false statements may result in ... 5 years imprisonment, a \$250,000 fine, or both. (18 U.S.C. § 1001)." *Gov't Ex. 14, p. 2* (alteration in the original).

12. The Probation 8 Form required that Taintor report, in writing, monthly information regarding cash flow and bank accounts.

13. On January 7, 2002, Taintor filed a Probation 8 Form for December 2001, certifying as accurate and subject to the penalties imposed by 18 U.S.C. § 1001, the following information: (a) he had a cash inflow of \$3,457 and a cash outflow of \$3,350; (b) he owned a 1994 Ford Explorer and a 1984 Jeep Cherokee; and, (c) he had a \$100 balance in a checking account at the Citizens Bank of Cape Vincent. *Gov't Ex. 14.*

14. On or about December 5, 2001, Taintor received a lump sum distribution from the Veterans Administration in the amount of \$27,732, and deposited the check in his Citizens Bank account on December 10, 2001. *See Gov't Exs. 8, 16.*

15. Beginning on December 10, 2001, and concluding on January 7, 2002 (the date he certified his December 2001 monthly report), Taintor made the following withdrawals from his Citizens Bank account: (a) on December 10, 2001, he wrote a check to cash in the amount of \$9,000 and cashed the check; (b) on December 17, 2001, he wrote a check to cash in the amount of \$8,200, and deposited the money in his mother-in-law's bank account; (c) on December 21, 2001, he wrote a check to cash in the amount of \$2,000 and cashed the check; (d) on January 7, 2002, he wrote a check in the amount of \$1,520.53, and although the bank was unable to supply a legible copy, the court concludes that Taintor applied that amount to his town and county tax bill; and, (e) on January 7, 2002, Taintor wrote a check to the Becker Cleveland Funeral Home in the amount of \$5,744. *Gov't Exs. 8, 16, 17.*

16. On January 7, 2002, Taintor failed to report the \$27,732 Veterans Administration distribution as cash inflow for December 2001, and those funds were available to pay back penalties and interest do and owing the IRS as ordered by Judge Fullam. *See Gov't Ex. 14.*

17. In March 2002, Taintor purchased a 2001 Ford F–150 Supercrew pickup valued at approximately \$20,500, and paid for it with proceeds from the December 2001 Veterans Administration distribution. *Gov't Ex. 8; Taintor Testimony.*

18. The court completely discredits the explanation offered by Taintor at the hearing, and specifically finds that he lied when he testified, in essence, as follows: he believed the amount he was required to report on the January 7, 2002, Probation 8 Form was limited to the amount he had in his bank account at the end of the month; he believed that he was only required to report "income," not "cash inflow;" and, he did not report the Veterans Administration distribution because he

Not Reported in F.Supp.2d, 2003 WL 144811 (N.D.N.Y.), 91 A.F.T.R.2d 2003-575

(Cite as: 2003 WL 144811 (N.D.N.Y.))

independently researched the issue on the Internet, and decided that the distribution was not classified as "income."

**\*4** 19. The court is reasonably satisfied that Taintor made a materially false written statement concerning cash flow on the January 7, 2002, Probation 8 Form, Monthly Supervision Report, and lied at the hearing.

C. *Violation 3: False Statement: Financial Statement (Residence)*

20. To the extent they are relevant to this allegation, the court incorporates its preceding findings of fact.

21. The court credits the testimony of Gonzalez that: in the course of his supervision duties, he was tasked with monitoring Taintor's financial condition in order to assess his ability to make payments toward his obligation to the IRS; he repeatedly requested financial information from Taintor who was slow and reluctant to produce it, or did not produce it at all; he requested that Taintor complete a financial statement which Taintor did on July 26, 2002; and, on that statement, Taintor reported that he purchased his residence in 1997 for $135,000, and reported the fair market value by entering the notation, "?". *See Gov't Exs. 9, 18.*

22. In a March 24, 1997, residential loan application, Taintor reported that he had purchased the property in 1986 for $42,000, reported the then value of the lot as $30,000, the cost of proposed improvements as $190,000, and the resulting total value as $220,000 (value of the lot plus improvements). *Ex. 19.*

23. In the petition, Gonzalez concluded that Taintor lied on the financial statement when he reported the purchase price as $135,000 because he should have reported $232,000, the original purchase price of $42,000 plus improvements of $190,000. *See Ex. 9.*

24. At the hearing, Taintor testified that: he originally purchased the property as a camp in 1986 for $42,000; in 1997, he applied for a residential loan to essentially destroy the camp, and replace it with his residence; at the time and with the advice of the residential loan officer, he estimated the value of the property without the camp as

$30,000 and the cost of the rebuilding as $190,000, the latter figure used to justify the amount he actually needed for construction which was $135,000; and, he actually received a construction loan for $135,000.

25. There has been no appraisal of the house since 1997 and the government offered no proof of current market value.

26. The residence is a six bedroom, three bathroom, two-story single family home located on a waterfront lot adjacent to the Saint Lawrence River. *PSI, ¶ 34.*

27. At the time of his original pre-sentence investigation, the listed fair market value of the residence was $170,000. *PSI, ¶ 45.*

28. At the time of his original pre-sentence investigation, there were two 50" televisions in Taintor's residence, a large workshop in the basement, a boat dock with a bass boat and two jet skis, and a 2001 Ford Pickup which was *then* registered in Taintor's name. *PSI, ¶ 46.*

29. At the time of his original pre-sentence investigation, Taintor stated that the boat, truck and jet skis belonged to his children and wife. *PSI, ¶ 48.*

**\*5** 30. The court is not reasonably satisfied that Taintor made a false statement concerning the *purchase* price of his residence on the Financial Statement.

D. *Violation 4: Special Condition: Failure to Make Payments to IRS*

31. To the extent they are relevant to this allegation, the court incorporates its preceding findings of fact.

32. From the time that Taintor's probation was transferred to this district until the time the petition was filed, Taintor either owned outright or had access to, among others, the following assets:

(a) Monthly social security checks of approximately $1,287, and veterans administration checks in an undetermined amount (*see PSI, ¶ 41* );

(b) A lump sum distribution from the Veterans

Not Reported in F.Supp.2d, 2003 WL 144811 (N.D.N.Y.), 91 A.F.T.R.2d 2003-575

(Cite as: 2003 WL 144811 (N.D.N.Y.))

Administration in the amount of $27,732;

(c) A residence of an undetermined value, but in excess of $135,000;

(d) A 2001 Ford truck valued at $20,500, registered in his wife's name, but purchased with the proceeds of the Veterans Administration distribution;

(e) A life insurance policy with a cash surrender value of at least $2,700; and,

(f) A 1991 Baha Cruiser valued by Taintor at between $10,000 and $20,000 (*see Gov't Ex. 18* ).

33. Taintor's only payments toward his court-ordered debt were $204 per month garnished from his social security benefits except that he sold the boat the week-end before the hearing, and paid $7,000 to the IRS the day before the hearing.

34. Judge Fullam's sentence required that Taintor sell the boat within six months of judgment, and Taintor failed to comply.

35. Gonzalez made repeated attempts to gather financial information from Taintor which Taintor refused to supply, including information that would permit Gonzalez to ascertain the cash surrender value of his life insurance policy which Taintor valued, at the hearing, at $2,700.

36. The court is reasonably satisfied that Taintor had assets available to make additional payments toward his court-ordered debt, refused to cooperate with Gonzalez in satisfying that obligation, and failed to sell his boat within six months, all in violation of Special Condition # 4.

E. *Miscellaneous Findings*

37. The Guideline calculation for Taintor's underlying conviction reflected an offense level of 10, criminal history category I, and an imprisonment range of 6 to 12 months. *See Judg., Gov't Ex. 1.*

38. Taintor received a 2 level downward adjustment for acceptance of responsibility, predicated in part, on his

agreement that he would pay all interest and penalties due the IRS during his probationary period. *PSI, ¶¶ 3–4, 17.*

39. Taintor's tax evasion conviction resulted from criminal conduct that included his hiding corporate income by converting client checks to cash, and then diverting cash for his personal use without reporting it on his tax returns. *PSI, ¶ 9.*

40. Taintor's conduct in converting the Veterans Administration distribution to cash, utilizing the cash for his personal benefit, and hiding the distribution and conversion on a report designed to monitor his financial ability to repay the court-ordered debt is precisely the same conduct for which he was originally convicted.

IV. *Legal Principles and Analysis*

A. *Revocation Standard*

**\*6** Rule 32.1 of the Federal Rules of Criminal Procedure governs probation revocation proceedings, and a defendant is entitled to written notice of the violations and a hearing. Disposition of the case is governed by 18 U.S.C. §§ 3563, 3565, *Fed. R. Cr. P. 32.1(b)(2)(A), (d)*. If the court finds that the defendant violated his probation, the court must consider the applicable sentencing factors recited in 18 U.S.C. § 3553(a), and either "(1) continue him on probation, with or without extending the term or modifying or enlarging the conditions; or (2) revoke the sentence of probation and resentence the defendant under subchapter A [18 U.S.C. §§ 3551 *et. seq.*]." *18 U.S.C. § 3565(a)*(1–2) (alteration added).

At the hearing, the government carries the burden of persuasion while the ultimate decision is whether the court is reasonably satisfied that the probationer has violated the terms of probation. *United States v. Lettieri,* 910 F.2d 1067, 1068 (2d Cir.1990); *United States v. Nagelberg,* 413 F.2d 708, 709–10 (2d Cir.1969); *see also, United States v. D'Amato,* 429 F.2d 1284 (3d Cir.1970); *United States v. Francischine,* 512 F.2d 827 (5th Cir.1975); *United States v. Torrez–Flores,* 624 F.2d 776 (7th Cir.1980); *Schneider v. Housewright,* 668 F.2d 366 (8th Cir.1981); *United States v. Guadarrama,* 742 F.2d 487 (9th Cir.1984); *United States v. Rice,* 671 F.2d 455 (11th

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 144811 (N.D.N.Y.), 91 A.F.T.R.2d 2003-575

(Cite as: 2003 WL 144811 (N.D.N.Y.))

Cir.1982). Clearly, the standard is far less than the traditional criminal burden of proof beyond a reasonable doubt, *Nagelberg* at 709, and the Eighth Circuit has suggested that the standard has more than been met by a "preponderance of evidence to convince a rational trier of fact that" the defendant violated the terms of probation. *Schneider* at 368. Given this court's comfort level with traditional definitions, it has applied a preponderance standard.

B. *The Violations as Criminal Offenses*

In analyzing the evidence as sufficient to support the allegations of new criminal conduct, the court has applied the basic legal definitions associated with a felon in possession and false statements. Thus, a convicted felon must have *knowingly* possessed the firearm; that is, purposely and voluntarily, and not by accident or mistake. *United States v. Moore,* 208 F.3d 411 (2d Cir.2000); *see also, 2 L. Sand, et. al., Modern Federal Jury Instructions, Instrs. 35–47, 35–49.* To find a false statement, the court must be satisfied that a defendant willfully and knowingly falsified or concealed a material fact in a matter within the jurisdiction of the United States government. *2 L. Sand at 36–3.*

In its findings of fact, the court was not satisfied that it could reasonably conclude that Taintor knowingly possessed the rifle. On the other hand, it was unequivocally satisfied that Taintor made a false material statement regarding his December 2001 income, but was not reasonably satisfied that he made a false statement concerning the value of his residence.

C. *Sentencing Guidelines and Sentencing Factors*

**\*7** In the violation worksheet accompanying the petition, probation categorizes the felon in possession charge as a Grade A violation, the false statement charges as Grade B, and the special condition violation as Grade C. *See Violation Worksheet.* Accordingly, probation cites U.S.S.G. § 7B1.3(a) and 4(a) for the propositions that the imprisonment range for a Grade A violation is 12–18 months, and the court *shall* revoke supervision and has no sentencing options. On the other hand, Grade B and C violations have an imprisonment range of 4–10 months and 3–9 months, respectively, and do have various sentencing

options. *See* U.S.S.G. §§ 7B1.3(a)(1–2), 1.3(c)(1) and 1.4. The court is not sure it universally concurs with probation's citation to authority, but does generally agree with its observations, with the possible exception of gun possession as a Grade A violation.[FN2]

> [FN2.] The court recognizes that it has found that Taintor did not commit the felon in possession violation, but also recognizes that the district court is free to reject the finding and recommendation. Accordingly, the court offers its views concerning the penalties associated with all violations.

The Sentencing Guidelines applicable to probation violations are "policy statements," not "guidelines," and the court may reject a strict application. *See* 28 U.S.C. § 994(a)(3); *U.S.S.G. § 7A.1, 3(a).* In general, if the court finds a violation, the court may continue probation, with or without extending the term or modifying the conditions, or revoke probation and impose any other sentence that could have been imposed initially. *U.S.S.G. § 7A.2(a);* 18 U.S.C. § 3565(a). However, if the violation consists of illegally possessing a firearm, the court must *statutorily* revoke probation and include a term of imprisonment. 18 U.S.C. § 3565(b)(2). When assessing an appropriate penalty under the Guidelines, the Sentencing Commission recommends that the court principally punish the violation of the court's trust extended by the probationary term in the first instance, while taking into limited account the seriousness of the underlying violation and the violator's criminal history. *U.S.S.G. § 7A.3(b).*

Violations are classified from Grades A–C at U.S.S.G. § 7B1.1. Grade A violations include federal felonies that are crimes of violence or involve possession of a firearm "of a type described in 26 U.S.C. § 5845(a)." *Id. at 7B1.1(a)(1).* § 5845(a) applies to firearms such as sawed-off shotguns and other weapons subject to concealment, and would not include the rifle at issue here. Thus, the Guideline Commentary suggests that if Taintor illegally possessed the rifle, his possession is a Grade B violation. *See 7B1.1, Comm., n. 5.* Accordingly, the court disagrees with probation's position in this regard.

At risk of an accusation that the court is climbing ivory towers, but for the sake of completeness since the

Not Reported in F.Supp.2d, 2003 WL 144811 (N.D.N.Y.), 91 A.F.T.R.2d 2003-575

(Cite as: 2003 WL 144811 (N.D.N.Y.))

report is drafted for the perusal of others, the analysis requires one more step. Aside from gun possession, the conduct is a Grade A violation if it is a crime of violence. In this Circuit, gun possession is a crime of violence, at least for purposes of the bail statute. *See United States v. Dillard,* 214 F.3d 88 (2d Cir.2001); *United States v. Carswell,* 144 F.Supp.2d 123 (N.D.N.Y.2001). Thus, if the District Court disagrees with this court's conclusion concerning Taintor's possession of a weapon, it is free to conclude that the violation is a Grade B gun possession or a Grade A crime of violence.

**\*8** Regardless of the District Court's findings, it is not bound by the mandatory imprisonment required by 18 U.S.C. § 3565(b)(2). Therefore, it has the discretion to implement, or not, the policy recommendations recited at U.S.S.G. § 7B1.3. Those recommendations suggest that the court should ('shall') revoke probation in the case of a Grade A or B violation, and may do so in the case of a Grade C violation. The sentencing guideline ranges are accurately reported by probation in the worksheet as are the sentencing alternatives.

Lastly, when considering an appropriate sentence, the court should consider the statutory sentencing factors set forth in 18 U.S .C. § 3553(a). *See 18 U.S.C. § 3565(a).* As appropriate to the court's recommendations, those factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; and, the need for the sentence to promote respect for the law and to provide just punishment, and to afford deterrence to criminal conduct. *18 U.S.C. § 3553(a)(1), (a)(2)(A)(B).*

V. *Conclusions and Recommendations*

[1][2][3][4] For the reasons stated, the court is reasonably satisfied that Taintor violated the terms of his probation by engaging in new criminal conduct (false statement) as alleged in Violation # 2, and by failing to pay the penalties and interest ordered within two years of judgment and by failing to sell his boat within six months of judgment as alleged in Violation # 4. The court is not reasonably satisfied that Taintor violated the terms of his probation by engaging in new criminal conduct (gun possession and false statement) as alleged in Violation # 's 1, 3.

[5] The court recommends that the District Court find that Violation # 2 is a Grade B violation and Violation # 4 is a Grade C violation, and that the Guideline range for a Grade B violation offender, Criminal History Category I, is 4–10 months.

Based upon these findings, the court recommends that the District Court revoke Taintor's probation, and sentence him to six (6) months incarceration followed by an appropriate period of supervised release or an extension of his probationary term, as appropriate, with conditions that require his adherence to the original sentence of Judge Fullam regarding the payment of penalties and interest to the Internal Revenue Service.

The court's recommendation regarding incarceration is predicated upon an evaluation of the defendant's history and characteristics as recited in the original presentence investigation report, the need to punish his behavior in violating the court's trust reposed by a term of probation in the first instance, the need to promote respect for the proposition that convicted defendants must obey court orders regarding their behavior, and to deter others who would behave similarly. In this court's opinion, Taintor's conduct is especially egregious because it is the same behavior that resulted in his conviction in the first instance, he committed perjury during the hearing in an effort to justify what he absolutely knew to be illegal behavior, and because he has continually resisted probation in its efforts to supervise his compliance with the court's probationary orders. In essence, Taintor continues to put his self-interest and greed ahead of his obligation to comply with the law.

**\*9** It is hereby

ORDERED that the Clerk serve copies of this Report and Recommendation upon the parties by regular mail.

*NOTICE*

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THE RECOMMENDATIONS WITHIN TEN DAYS MAY

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 144811 (N.D.N.Y.), 91 A.F.T.R.2d 2003-575

(Cite as: 2003 WL 144811 (N.D.N.Y.))

PRECLUDE APPELLATE REVIEW. *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993);* *Small v. Secretary of Health and Human Services,* F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

U.S. v. Taintor
Not Reported in F.Supp.2d, 2003 WL 144811 (N.D.N.Y.), 91 A.F.T.R.2d 2003-575
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.