1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4   UNITED STATES OF AMERICA,

5        -versus-                           11-CR-533

6                                           (SENTENCING)

7   JEREMY ZIELINSKI,

8                        Defendant.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10              **TRANSCRIPT OF PROCEEDINGS** held in and for the

11  United States District Court, Northern District of New

12  York, at the James T. Foley United States Courthouse,

13  445 Broadway, Albany, NY  12207, on **FRIDAY, JUNE 21, 2013,**

14  before the **HON. THOMAS J. McAVOY**, Senior United States

15  District Court Judge.

16

17

18  **APPEARANCES**:

19  FOR THE GOVERNMENT:
    HON. RICHARD S. HARTUNIAN, United States Attorney - NDNY
20  BY:  ROBERT A. SHARPE, Assistant U.S. Attorney - NDNY

21  FOR THE DEFENDANT:  (Standby Counsel)
    CARTER, CONBOY LAW FIRM
22  BY:  JAMES A. RESILA, ESQ.
           -and-
23  JEREMY ZIELINSKI, Pro se

24

25  ALSO PRESENT:
    MICHAEL PATNAUDE, U.S. Probation Officer - NDNY

                    *THERESA J. CASAL, RPR, CRR*
                *UNITED STATES DISTRICT COURT - NDNY*

*USA v. Zielinski — 11-CR-533*

```
 1                    (Court commenced at 1:00 PM.)

 2              THE CLERK:  United States of America versus Jeremy

 3   Zielinski, 11-CR-533.  May I have the appearance for the

 4   Government, please.

 5              MR. SHARPE:  Robert Sharpe on behalf of the United

 6   States Government, joined by Michael Patnaude of the United

 7   States Probation Office.  Good afternoon, Judge McAvoy.

 8              THE COURT:  Good afternoon, Mr. Sharpe.  Good

 9   afternoon, Mr. Patnaude.

10              MR. PATNAUDE:  Good afternoon, your Honor.

11              THE CLERK:  On behalf of the defendant.

12              THE DEFENDANT:  Jeremy Zielinski, pro se.  Good

13   afternoon, Judge.

14              THE COURT:  Good afternoon, Mr. Zielinski.

15              MR. RESILA:  And James Resila, Carter, Conboy; I

16   am standby counsel.

17              THE COURT:  Good afternoon, Mr. Resila.  All

18   right.  We are here really for the purposes of sentencing.

19   There was a petition filed by the Probation Office with the

20   Court charging Mr. Zielinski with failing to complete and

21   comply with his mental health treatment program and

22   Mr. Zielinski denied that that was so and so a hearing was

23   ordered, that was held before Magistrate Judge Peebles, he

24   issued a Report Recommendation indicating that the condition

25   had been violated, among other things, and then objections
```

1   were filed to those findings and Magistrate Judge Peebles'

2   decision and the Court had issued an order earlier this

3   month addressing those objections.

4          So, at this point in time, the Court is ready to

5   proceed with sentencing Mr. Zielinski for that violation.

6   And we met last week and I believe Mr. Zielinski requested a

7   few days to gather some materials together so he could

8   address the issue of sentencing before the Court, which was

9   granted, so we came back for this procedure today.

10          So, I think the first order of business would be

11   to have Mr. Zielinski address the Court on what he believes

12   sentencing should be, followed by Mr. Sharpe, and I think

13   that's how we'll proceed.

14          So, Mr. Zielinski, if you'd like to address the

15   Court.

16          THE DEFENDANT:  Yes, your Honor.  I think, at this

17   point, the Sentencing Guidelines require a period of

18   incarceration.

19          THE COURT:  Require?

20          THE DEFENDANT:  A period of incarceration.  I

21   think the Guidelines, given the history of the case and my

22   conduct, I think it's actually required that you give me

23   incarceration.  But I know the Government was going to argue

24   for a significant period of incarceration.  I don't know

25   what they're going to argue for yet, but I think an extended

*USA v. Zielinski - 11-CR-533*

1   period of incarceration would be unwarranted and unnecessary

2   in light of what motivated my conduct at FMHA and subsequent

3   to my understanding of what was going on, which was brought

4   about by the Court's rulings in this matter.  And I also

5   think it would defeat the overall goals of supervised

6   release and unnecessarily give up on the goals that the

7   Court had imposed as special conditions in the first place.

8   Actually, right at the time when -- as a result of what the

9   Court just did for the last nine days, that those goals

10  become available.  The conduct I engaged at at FMHA was

11  motivated by a genuine belief that it was morally right,

12  morally required and that it was the only thing I had

13  available to me.  I believed sincerely that my only options,

14  since I didn't believe what they were saying, was to remain

15  silent, to play along and just lie.  And I believe that that

16  conduct, since that was the basis for my speaking out, I

17  believe that what I was doing was lawful.  I believe that

18  not only was it lawful, but that it was constitutionally

19  protected even, given the limited set of rights I have

20  available to me while on supervised release.

21          The Court ultimately ruled that my conduct was not

22  protected, but it did find that it had no doubt of the

23  sincerity of the beliefs which underlied that conduct.  It

24  characterized my conduct as based on a misguided belief that

25  I could refuse to participate in any aspect of the program I

*USA v. Zielinski — 11-CR-533*

1   didn't agree with.  It wasn't malicious, it wasn't

2   ill-willed.  And any conduct with that motivation doesn't

3   require or warrant the type of penalty that would be imposed

4   for conduct to be motivated by malice or rebellion.  All it

5   requires is additional education on what the law requires

6   and protects or doesn't protect, and that's all that's

7   necessary to prevent that kind of conduct going forward.

8        And the Court's ruling has provided that quite

9   clearly, regardless of whatever my actual disagreement is, I

10  don't have the right to speak out in that way if it's

11  disruptive because of the effects it has on other people and

12  the Government's operations.  And I can abide by that going

13  forward.  I didn't have the benefit of that ruling when the

14  Court first imposed special condition five.

15       The other reason that I don't think a long period

16  of incarceration would be appropriate is that quite to my

17  surprise, I realized in the last few days that I actually

18  was wrong about my entire premises of my position in the

19  first place that I don't believe them.  I sincerely believed

20  that I was right.  I really truly 100 percent believed I was

21  morally right and protected by law.  So when the Court not

22  only ruled against me, but then threw me in jail, my initial

23  reaction was just complete shock.  I was astonished at how

24  wrong I turned out to be.  But after that wore off, I wanted

25  to know where did I go wrong, what error did I make, what

1   was the flaw in my logic that led me to reach conclusions

2   that were so astoundingly wrong.

3            As I carefully looked at it, I realized I didn't

4   actually choose the beliefs I had, I didn't will myself to

5   believe they were wrong, I didn't will myself to believe

6   that FMHA was incorrect.  I just found myself believing

7   that.  And I can't will myself to believe anything about

8   human nature anymore than I could will myself to believe

9   that the law rules the universe, for example.  It's just not

10  the way it works.  And the unavoidable result that I came to

11  from that is that since my conduct is motivated, at least in

12  part, by whatever beliefs I have and I don't necessarily

13  have complete control over what I believe, that there are

14  influences in my conduct that I genuinely don't have any

15  control over.  And that's one of the claims that FMHA made

16  that I most strongly rejected throughout this entire

17  proceeding.

18           And when I started to look at why I realized that

19  the reason I didn't believe that any things they were saying

20  were true were because I was looking at them from the wrong

21  perspective.  All I looked at was their conclusions, I gave

22  a cursory look at their reasoning, chain of logic and

23  reasoning that they arrived at and I looked at my own

24  experience.  Their conclusions genuinely didn't make any

25  sense to me and seemed false because I was looking at them

*USA v. Zielinski - 11-CR-533*

1   using the wrong chain of reasoning.  They contradicted my

2   own conclusions.  But looking at them from my own

3   perspective, they didn't make sense.

4           But that's not the case when I look at them from a

5   different perspective, and being forced into a jail cell, I

6   was forced to analyze all that.  And I really would like

7   actually -- genuinely would like the opportunity to go back,

8   first of all, to apologize for being such a

9   self-righteously, dismissive jerk while I was there and to

10  actually find out what it is that they were talking about,

11  because at least one of the claims that they made upon

12  further analysis has proven to be true and I was proven to

13  be wrong.  And although I don't like to be wrong, I do like

14  to be proven wrong because to be proven wrong removes error.

15  And I think if I was allowed to go back, either with a

16  different group or even with the same group, and simply

17  explain what I've explained here, it -- I could comply with

18  and complete the program, I could abide by the rules and

19  policies and answer the questions posed by staff and follow

20  their instructions because I have a totally different

21  perspective than I had even a few days ago.  So I think it

22  would be premature to simply give up and throw me in jail

23  when I could at this point complete the program.

24          The other reason that I don't think a long jail

25  sentence is warranted is simply because of the extensiveness

1  of the otherwise positive accomplishments I've had over the

2  last year-and-a-half.  I held a full-time job for over a

3  year.  The only reason I lost that job was because the

4  employer lost a competitive bid to somebody else.  I have

5  visitation, weekly visitation with my son, after a long

6  court battle; I pay my child support every single week.  I

7  am a student at Hudson Valley Community College, I have one

8  semester left to graduate with an Associate degree in

9  liberal arts, to be followed by a bachelor's in sociology,

10  and eventually with a successful law degree.  I know I put

11  some of my rough outlines before the Court.  I've maintained

12  a consistently high GPA, I have been on the President's list

13  twice.  I am a delegate of the secular students'

14  association.  For 2013 and 2014, I was elected, in a

15  competitive election, to the faculty-student association.

16  Assuming I'm allowed to go back to school in the fall, I

17  will represent 11,000 students on inter-collegiate

18  athletics, grants and scholarship programs, working directly

19  with the President and Directors of the college, State

20  Legislature, educational foundation, all these things that

21  are necessary to increase access to and effectiveness of

22  education.

23          I've also been elected to be a delegate, one of

24  three students, to be representing Hudson Valley at SUNY.

25  These are educational opportunities I'll simply never get

*USA v. Zielinski - 11-CR-533*

1  again.  If I'm in jail, I'll never get these opportunities

2  again, I just won't.  No matter how long I spend there, no

3  matter what I do when I get out, having to leave these

4  positions because of incarceration would be detrimental.

5          I also, since then, since last time I came before

6  the Court, started a not-for-profit corporation, very

7  successful in combating discrimination against people with

8  criminal records.  With my action against the City of

9  Oswego, I directly saved at least a dozen jobs.  I spent a

10  lot of money on it, no personal stake in it.  I did that

11  because it was the right thing to do.  That was clearly

12  unlawful.  Since then, I have been working with the Attorney

13  General's office to evaluate and review all ongoing cases.

14  I was consulted last fall by City Council for a major city

15  on how to supplement State legislation.  I've had a number

16  of occasions where the Department of Labor has made calls to

17  me, I've got on the phone with employers or State agencies

18  and talked to them about why people were denied jobs and

19  been able to, in some cases, secure employment, in other

20  cases reverse terminations, negotiate policy changes with

21  multi-national companies, on many occasions.  I passed that

22  information on to the Probation Office.  I've offered to

23  work with the Probation Office.

24          I was an invited speaker at Siena College in 2013

25  on eliminating cultural bias against people with criminal

*USA v. Zielinski - 11-CR-533*

 1  records.  We have the largest discrimination case pending in

 2  New York State history in the Division of Human Rights

 3  against Costco right now, another major case hasn't been

 4  filed yet, and this will open doors at thousands of

 5  locations throughout the country.  Working with a major

 6  utility to bring a program that they currently have in

 7  England, where they actually train people in prison and give

 8  them jobs the day they get out, to bring that program to the

 9  United States.  And these are very high-paying, career-level

10  jobs.  Line workers can make upwards of a hundred thousand

11  dollars a year.  These aren't McDonald side line jobs.

12          And all of these things, these are just

13  highlights; I could go on for two days about all this --

14          THE COURT:  No, you can't.

15              (Laughter.)

16          THE DEFENDANT:  -- with the permission of the

17  Court.  But these are things that directly reduce

18  recidivism.  Proved over and over and over again that

19  getting people jobs when they get out of jail is one of the

20  surest ways to reduce crime, and, for whatever reason,

21  whether it's my personal history or personal drive or

22  whatever, I am very, very good at this.  And it's something

23  that I can continue doing, something I want to continue

24  doing, and none of these things that I just talked about

25  will bear any fruit if I am ordered by this Court to rot

*USA v. Zielinski – 11–CR–533*

1    away in a jail cell.

2              So, I just -- in light of the fact that I made a

3    very terrible embarrassing mistake about my initial

4    conclusions about the program and that I'm willing to

5    correct it and go back and cooperate, I think a much more

6    appropriate sentence would be to sentence me to a short

7    period of incarceration that would allow me to go to school

8    in the fall and then make up whatever time period the Court

9    thinks is necessary, either home confinement or weekends or

10   community detention.

11             THE COURT:  Thank you, Mr. Zielinski.

12             THE DEFENDANT:  Thank you.

13             THE COURT:  Mr. Sharpe.

14             MR. SHARPE:  As always, Mr. Zielinski argues a lot

15   of things.  As the Government understands it, in part what

16   he argues and what he just argued a moment ago is his claim

17   that it's been shown, quote, over and over again that

18   getting people jobs has been shown to reduce recidivism.

19   Mr. Zielinski is a convicted sex offender, he is a

20   registered level II sexual offender.  One of the things that

21   the Government knows would, in fact, address, as best it's

22   able, the idea of recidivism is a sex offender involved in a

23   mental health treatment program, more specifically a sex

24   offender treatment program, that we do know.  Mr. Zielinski

25   ought to be on supervised release and he ought to be

1    supervised and he ought to be in a mental health program and

2    sex offender program because of his background and history.

3           That having been said, the Government states to

4    the Court, in our view, that at this present time, in view

5    of all this history that we're all familiar with, that he

6    should not be on supervised release at this time and there's

7    no point of him being in a sex offender treatment program at

8    this point in time.  That's not because of the actions of

9    anybody that has dealt with him in the course of attempting

10   to help him as he's finished his past jail sentence and now

11   has been on supervision; that's because of his choices and

12   his actions; he's responsible for that.

13          Whatever the sentence imposed against him is or

14   upon him here today, nobody is responsible for that other

15   than Mr. Zielinski.  We're familiar with Mr. Zielinski

16   throughout the history of the pendency of this matter and we

17   have no idea if the things that he's saying are true or

18   somewhat true or bald-faced lies, where we have a variety of

19   people out there in the State who have no idea who and what

20   they might be dealing with, who knows.  But whatever

21   sentence is imposed upon him today, whether he's taken away

22   from all these good works that he claims to be involved in,

23   nobody is responsible for that other than him.

24          The Government would like to address some things

25   that we know that the Court is aware of.  Whether it be in

*USA v. Zielinski - 11-CR-533*

1  terms of the sentence that he originally received on his

2  original federal conviction, or the sentences that are

3  imposed upon him in connection with the violations of

4  supervised release, we're all aware that amongst the factors

5  that the Court has considered -- can consider are the nature

6  and circumstances of the offense, the history and

7  characteristics of the defendant, the idea of deterrence and

8  the need to protect the public.  And there is a significant

9  need to protect the public here, in terms of his history.

10  In the Government's view, based upon what we know of him and

11  what we've been involved with, Mr. Zielinski poses a danger

12  to the community for a variety of reasons.  We know that the

13  Court is abundantly familiar with his history, but,

14  nonetheless, we'd like to go through some of that.

15          As the Court is aware, Mr. Zielinski was

16  originally charged in early 2000s, when he was a younger

17  man, at the age of 18 with a variety of offenses, which

18  included promoting the sexual performance by a child,

19  attempted dissemination of indecent material to a minor and

20  bail jumping.  The Court is familiar with the facts with all

21  those things, that it involved him at the time engaging in

22  internet chats with a person whom he believed to be a

23  13-year-old girl and involved things having to do with

24  master/slave sexual relationships as well as the

25  transmission of images of sadomasochistic child pornography.

*USA v. Zielinski - 11-CR-533*

1  As the Court is aware, those charges were not initially

2  disposed of; that while he had been arrested on those

3  things, Mr. Zielinski fled to Florida.  He was gone and

4  evaded law enforcement for a couple years, and during that

5  time, he continued to engage in criminal conduct.  The Court

6  is familiar with what ultimately led to his New Jersey

7  federal conviction, that he became involved with an internet

8  group by the name of Shadow Crew, where he was a vendor and

9  became involved in an organized criminal group promoting

10 internet fraud schemes with stealing and trafficking in

11 stolen credit cards, computer hacking and trafficking in

12 counterfeit identification documents.

13         Separate and apart from that, as the Court is

14 aware, that case also involved law enforcement obtaining a

15 search warrant that was executed at that time and while they

16 were investigating that fraud matter, on his computer at

17 that time there were additional pornographic images, child

18 pornographic images, whatnot, that were obtained from him.

19         He was sentenced in 2006 in New Jersey to

20 twenty-one months and two years' supervised release.  And

21 thereafter, he was produced back to Warren County, where he

22 answered for the original charges in conjunction with the

23 bail jumping, and the Court is aware that he received a

24 State prison sentence of two to six years at that time.  We

25 know and we've noted before at various aspects of this

*USA v. Zielinski - 11-CR-533*

1  proceeding that while he received a State indeterminate

2  sentence of two to six years that he served every day of

3  that six-year sentence, and he did that because of

4  information that's been before the Court at various times;

5  that in terms of his prior criminal background at that

6  point, related to his sex offender classification and his

7  crimes, that he was ordered to participate in prison in the

8  sex offender counseling and treatment program.  As Judge

9  Peebles noted in his Report and Recommendation to the Court,

10 Mr. Zielinski has never successfully completed any sex

11 offender treatment program.  But, again, because of his own

12 actions and conduct.

13        In regards to that program in State prison, he was

14 dismissed from that program for having disobeyed rules,

15 challenging the authority of program officials, being

16 disruptive during group meetings and he was removed from the

17 program for noncompliance.  Additionally, as the Court has

18 heard at earlier stages of this and the prior violation,

19 that while in that program, he possessed pornography on the

20 very first day of the program.  Later he was caught in

21 possession of 20 adult pornographic websites, and if the

22 Court recalls, he also acquired, in prison, a book on rape

23 and, for all those reasons, he was discharged from the

24 program.

25        We dealt with the prior violation in this case

1   approximately a year or so or more ago.  If the Court

2   recalls, he had -- what he admitted to was leaving the

3   jurisdiction of the Court without the permission of the

4   Court or the Probation Office.  There is more of a context

5   to this.  We also know that he lied to Probation ahead of

6   time, that he lied to Probation after the fact and he had

7   gone to, under whatever manipulated circumstance he was

8   attempting to achieve, to obtain his own private

9   recommendation by a doctor that, of course, he was something

10  or should have been something other than the level II sex

11  offender that he's been classified as.  Part of the

12  background and context of this case that we note all along

13  is that while that doctor in that instance had actually

14  rendered a report on Mr. Zielinski, we know, in terms of

15  what was in the report, that it was largely based on

16  self-reported information provided by the defendant that

17  wasn't honest, wasn't forthright, wasn't complete.

18          In terms of things this Court has considered at

19  various times with the history of the proceedings here,

20  there have been other reports rendered as to Mr. Zielinski.

21  As part of the earlier materials of the State, there was a

22  Caleo report that had information about his background and

23  information that he provided.  You know, when we dealt with

24  that violation a year ago, the Court imposed additional

25  conditions on him.  One of 'em was for him to be involved in

*USA v. Zielinski – 11–CR–533*

1  a mental health program and a sex offender treatment

2  program.  Another aspect that we're all aware of is, in

3  terms of all of us dealing with that prior violation, we all

4  recall that the Court admonished him at that time that part

5  of what was needed here was an attitude adjustment on his

6  part to work with the Probation Office and to have some

7  appreciation of the fact that the Court, Probation, law

8  enforcement, the Government was attempting to help him and

9  attempting to work with him so that assistance could be

10 provided to him, but also so that the public could derive a

11 benefit from that, where it would have a legitimate impact

12 on the likelihood that he would recidivate in the future and

13 that he could deal with his various issues.

14         And we know that the Court is familiar with the

15 report of Judge Peebles and was familiar with the hearing

16 that was conducted over the course of two days.  And

17 everybody's aware, right from the get-go -- the Government

18 wants to comment on this point:  We understand that

19 Mr. Zielinski wants to wrap his arms around this idea of,

20 Judge, I may have been misguided or mistaken, but I acted in

21 good faith, I -- I'm a good, faithful practitioner of

22 objectivism or I have these legitimate concerns about the

23 program.  And the Government, whether the Court agrees or

24 not, refutes that and disputes that.  We don't buy that, we

25 don't buy that for a moment.

1               Part of the background information from a variety

2    of these reports from doctors that have dealt with him is

3    we're all aware that Mr. Zielinski is a very bright person,

4    but whether he appreciates these doctors or credits these

5    reports, part of what they've cited to is his constant

6    manipulation in the use of that.  We don't believe that he's

7    ever engaged in good faith.  He rejects the idea that he

8    should be part of a mental health treatment program, that he

9    should have to be in a sex offender treatment program.

10   Mr. Zielinski apparently thinks that none of us have watched

11   the Charlie Brown specials with Lucy pulling the football

12   away from Charlie Brown as he now suggests he's seen the

13   errors of his ways and wants to now go back to a sex

14   offender treatment program.  We're all done with that, it

15   seems, from the Government's view.

16               There are a variety of issues here, but the

17   Government's thinks it could be boiled down to a basic

18   thing:  Whether you look at the history, in terms of his

19   underlying convictions or the history of the violations, the

20   Government believes that he's a dangerous person, not only

21   because of the facts attendant to his underlying

22   convictions, but by his manipulation of circumstances

23   thereafter.  And again, as we started with, we think he --

24   that under different circumstances, he should be supervised,

25   should be in a program.  But he can't be.  He's not gonna

*USA v. Zielinski - 11-CR-533*

 1   comply with any conditions or program anymore than he did

 2   with the prison program or anymore than he did with Forensic

 3   Mental Health here.  So society or the public, if you will,

 4   is losing the benefit of law enforcement being in a position

 5   to be able to keep an eye on the likes of what someone like

 6   him is up to.  And that's problematic, in the Government's

 7   view.

 8            We understand that his range is 3 to 9 months, and

 9   the statutory maximum is 24 months.  He needs to answer for

10   all this.  Like he always -- he needs to answer for this and

11   there should be -- bottom line, we believe he should do

12   every day that's available, he should receive a 24-month

13   sentence to answer to the fact that he's not gonna be

14   supervised in a program, as he ought to be, and that's

15   because of what he's done.

16            THE COURT:  All right.  Thank you, Mr. Sharpe.

17            Mr. Zielinski, there's some good things I heard

18   from you today and accurate things I heard from the

19   Government as well.  None of us in this room have any doubt

20   that you're a very bright individual, but I think the

21   question is sometimes you use your intelligence in the wrong

22   way.

23            I do recall sitting here not too long ago and

24   looking you in the eye and saying during the course of your

25   supervised release it's not you that controls the course of

1  that, it's the Court and Probation Department, and I'd like

2  to see a change of attitude come about as a result of your

3  supervision.  And because of your history, and I'm not gonna

4  go back and talk about Warren County or your fleeing to

5  Florida, all those things, they've all been talked about,

6  the records are clear on all that stuff, what I'm gonna talk

7  about is the fact that you decided right off that you

8  weren't gonna participate in this program.  You did

9  everything you could possibly, factually and legally do to

10  block it, including an appeal of this Court's order to the

11  Second Circuit, which was appropriate that ya took the order

12  to the Circuit and asked 'em to review it.  They reviewed it

13  and said yes, Mr. Zielinski, you have to come back and go

14  into this program.  And that didn't mean just go in the door

15  and spend two months in September and October going to

16  sessions.  It meant actually listening to what they were

17  telling you, following what they were telling you.  Not that

18  you have to believe it; nobody's trying to alter your

19  thought process, that's yours, yours alone, and you're

20  certainly correct about that.  But the problem is, as the

21  Court saw it, based on your past, you were a danger at that

22  point when I ordered you to go into the program without

23  receiving some kind of help so that when ya got out, there

24  was less of a chance of recidivism.  And the Court has a

25  duty to protect the public from that type of recidivation.

*USA v. Zielinski - 11-CR-533*

1          Well, when you went to the program and you refused

2   to do the assignments and you disrupted the class by

3   continually asking questions, the other members of the class

4   were frustrated, they didn't do their part -- actually, it

5   was extremely disruptive, and you were discharged from the

6   program.  And ya know, I think the thing that really

7   questions me about how ya think -- not that you're not

8   bright, you are -- but when you set up your own video camera

9   within the confines of that program without anybody's

10  permission or knowledge and began videotaping on your own

11  what was goin' on in that chamber, which was supposed to be,

12  anyone would know, highly confidential, certainly any

13  material that was let out that could show these other

14  people, who have no involvement with you except as class

15  participants, participating, telling how they committed

16  their crimes, their sexual violations, what things they

17  might be able to do to prevent them, which is what the

18  program is all about, it's not about religion as has been

19  completely fleshed out in a hearing and the Judge's

20  decision.

21          So, here we sit.  I ordered you to the program.

22  You went into program and refused to participate.  You

23  refused to participate after the Circuit ordered ya to do

24  that.  And not only did ya not participate, but you

25  disrupted it and then you secretly taped it.  What do you

1    think that's gonna make me think about whether or not you're

2    still dangerous?  I think you are and I have to sentence you

3    accordingly, although I think Mr. Sharpe's assessment of how

4    long I have to sentence you is a little over the top to what

5    I'm inclined to give you.  So that's where we are at this

6    point.

7              MR. RESILA:  Your Honor --

8              THE COURT:  Mr. Resila, this is not a hybrid

9    matter; you're standby counsel --

10             MR. RESILA:  Right.

11             THE COURT:  -- and Mr. Zielinski was free to

12   contact you with any questions about whatever presentation

13   he would make before this Court at this sentencing and he's

14   done a fine job from what he said.  He's pointed out to me

15   he's probably got some good possibilities in the future, the

16   things he's doin' in Oswego, things he's doin' in college,

17   the things he's doin' with the Attorney General's Office.

18   Those things are all positive things.  Court's not ignoring

19   those things.  I don't think that's gonna go away 'cause he

20   wants to do those things and, as he said, he's good at it.

21   And that's probably true.  But what did ya want?

22             MR. RESILA:  I just -- Mr. Zielinski's mother is

23   here, if your Honor would like to hear her.

24             THE COURT:  Well, I'd certainly like to hear her,

25   but I don't ever make a practice in sentencing procedures of

1    hearing from anybody unless they're a victim of a crime.

2    And if I did do that -- and Ms. Zielinski, no offense to

3    you, it's not personal at all -- you know, every sentencing

4    I would have would turn into a five-day procedure, people

5    would want to come in and tell me, you know, back in 1999 he

6    helped me take out my garbage, mow my lawn, you know, all

7    the kinds of stuff I get in letters, which I read every bit

8    of and spend a tremendous amount of time reading what other

9    people think about the defendant, and, of course, parents

10   and siblings and relatives and people that work with the

11   defendant, who know another side to him, always like to

12   convey that to the Court.  And that's very important to the

13   Court in the sentencing process.  But I don't allow verbal

14   presentations and I haven't for 27 years, I'm not gonna

15   change now, too old to change, but I think the way I do it

16   is probably okay with most people.

17           So, let me proceed back to my sentencing today.

18   The Probation Officer has found and the Court agrees that

19   the violation constitutes a grade C violation, your criminal

20   history category is a I.  In accordance with the policy

21   statements set forth in Chapters 7B1.1 and 4 of the U.S.

22   Sentencing Guidelines, your imprisonment range suggested by

23   those Guidelines and policy statements is three to nine

24   months.  Of course, what is in those policy statements and

25   guidelines is subject to what the Court feels would be an

*USA v. Zielinski - 11-CR-533*

1 appropriate sentence and is not binding upon the Court.  And

2 like the regular Guidelines, which have been found by the

3 U.S. Supreme Court to be no longer mandatory, but to be

4 something the Court has to consider in the sentencing

5 process, the Court also has to give sentencing

6 considerations to the policy statements in the Guidelines

7 with respect to supervised release violations sentencing.

8          So, upon your plea of guilty to the violation of

9 supervised release petition and pursuant to the Sentencing

10 Reform Act, it's the judgment of this Court that you are

11 hereby committed to the custody of the Bureau of Prisons to

12 be imprisoned for a term of 14 months.  The sentence imposed

13 represents an imprisonment sentence above the advisory

14 guideline as the defendant has demonstrated an unwillingness

15 to comply with this Court's sex offender treatment

16 condition.  The Court will not impose a term of supervised

17 release following this sentence.

18          After considering your present financial

19 condition, the Court will not impose any fine.

20          You're remanded to the custody of the U.S. Marshal

21 in accordance with the terms of this sentence.

22          Both you and the Government have the right to

23 appeal this sentence under certain limited circumstances,

24 but the Court would advise you that you should consult with

25 counsel or do your open research, whichever you're inclined

1   to do, and ya have to file any notice of appeal you want to

2   take within 14 days of the date of this sentence.

3           So, the Court is going to stand adjourned at this

4   time and that's the end of this proceeding.

5                   (This matter adjourned at 1:35 PM.)

6                       –  –  –  –  –

```
 1

 2

 3                C E R T I F I C A T I O N

 4

 5

 6           I, THERESA J. CASAL, RPR, CRR, CSR, Official Court

 7    Reporter in and for the United States District Court,

 8    Northern District of New York, do hereby certify that I

 9    attended at the time and place set forth in the heading

10    hereof; that I did make a stenographic record of the

11    proceedings held in this matter and caused the same to be

12    transcribed; that the foregoing is a true and correct

13    transcript of the same and whole thereof.

14

15

16

17                          /s/ Theresa J. Casal

18                          THERESA J. CASAL, RPR, CRR, CSR

19                          USDC Court Reporter - NDNY

20

21    DATED: October 23, 2013

22

23

24

25
```

                    *THERESA J. CASAL, RPR, CRR*
                *UNITED STATES DISTRICT COURT - NDNY*